UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
UNITED STATES OF AMERICA,

        -against-


GERALD MILLER,

                    Defendant.
--------------------------------------------------------X
GERALD MILLER,

                  Petitioner,

        -against-


UNITED STATES OF AMERICA,

                  Respondent.

--------------------------------------------------------X

**MEMORANDUM & ORDER**


**92 CR 91 (RJD)**



**99-CV-3346 (RJD)**

DEARIE, Chief Judge.

On June 21, 1993, Gerald Miller was convicted after a seven-week jury trial of a host of crimes in connection with his role as leader of the once infamous "Supreme Team," a powerful cocaine base trafficking organization that wielded substantial and tyrannical power over parts of Queens County for nearly a decade. Miller's specific criminal offenses include racketeering; criminally facilitating murder; engaging in a continuing criminal enterprise involving more than 1500 grams of cocaine base; conducting financial transactions with the proceeds of narcotics transactions; and distributing and possessing with intent to distribute more than 50 grams of cocaine base.

On appeal, the Second Circuit affirmed Miller's convictions in all respects except one, in a lengthy opinion reviewing the Supreme Team's structure, operations and disturbing record of

1

violence and gruesome killings.   United State v. Miller, 116 F.3d 641, 642-81 (2d Cir. 1997), cert. denied, 524 U.S. 905 (1998).[1]

Now serving six concurrent life sentences in accordance with my amended judgment of October 27, 1997, Miller seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2255.   He also moves for a reduction of sentence pursuant to 18 U.S.C. § 3582(c)(1)(B), and by separate motion, for a reduction of sentence pursuant to 18 U.S.C. § 3582(c)(2).   Also pending are Miller's related motions for discovery in connection with certain of the claims asserted in his Section 2255 petition, for leave to amend that application, for the unsealing of a portion of the district court record, and for the appointment of counsel.

With one exception, each of Miller's applications is denied in its entirety for the reasons set forth in this Memorandum.

As for Miller's unsealing request, however, confidentiality and security concerns no longer outweigh the constitutional and common law interests in public access to the materials sealed long ago.   See Nixon v. Warner Communications, 435 U.S. 589, 597 (1978) (footnote omitted). Accordingly, I grant Miller's request to unseal the proceedings of March 12, 1993, specifically: (i) "Court Exhibit 1," a tape recording of Miller threatening to commit acts of violence against his attorney, who of course feared for her life (see docket, #354), and (ii) the Memorandum and Order of Magistrate Judge Gold issued after listening to the tape and to testimony from Miller and the attorney about its contents (see docket, #353).   My order appropriately relieving counsel that day,

---

[1] In light of Rutledge v. United States, 517 U.S. 292 (1996), issued after Miller's conviction, the government conceded, and the Second Circuit held, that Miller's conviction for conspiracy to distribute narcotics in violation of 21 U.S.C. § 846 should be dismissed because it was a lesser included offense of another crime of which Miller was also convicted (conducting a criminal enterprise in violation of 21 U.S.C. § 848).   Miller, 116 F.3d at 678.   My amended judgment issued thereafter.

2

the Friday before the Monday that trial was set to start, has always been part of the public record.

I must remark upon the great irony, to say the least, in Miller's unsealing request. As the maker of the threat and a participant in the proceedings before Magistrate Judge Gold that the threat necessitated, Miller of course knows, for the most part, what information the sealed materials contain. The fact that Miller feigns otherwise, however, keynotes the orchestrated, grandstanding, and shameless nature of his section 2255 application. As detailed throughout this Memorandum, what Miller styles as alleged deprivations of his constitutional rights are, to the contrary, wholly manufactured claims, arising entirely from Miller's own ploys and misconduct (including his sham request to represent himself) and invoking as alleged "grounds" the very consequences he intended by his misconduct. Not only do his claims lack any recognizable merit, Miller should not even be heard to complain of alleged "errors" that it was his trial strategy to bring about.

## DISCUSSION

### I.

### The 2255 Motion

#### A. Timeliness

The government urges the Court to dismiss the 2255 motion as time-barred.

Under the Antiterrorism and Effective Death Penalty Act of 1996, an application for relief under Section 2255 must be filed within one year of the date on which the judgment of conviction becomes final. 28 U.S.C. § 2255(f). When a defendant is unsuccessful in his petition for Supreme Court review, his conviction becomes final upon the denial of certiorari. United States

v. Leon, 203 F. 3d 162, 163 (2d Cir. 2000). Miller's petition therefore became final on June 1, 1998. See Miller v. United States, 524 U.S. 905 (No. 97-7630, June 1, 1998) (denying petition for writ of certiorari).

On May 28, 1999, four days *before* the one-year period expired, an individual (identified in a later submission of Miller's as a member of his family) approached the intake counter in the Clerk's office with a five-page handwritten document purporting to be a section 2255 petition challenging Miller's 1993 convictions (hereinafter, the "Original Petition"). The document lists fifteen distinctly numbered "grounds," each asserting that Miller was "deni[ed]" a particular constitutional right, that his "conviction [was] obtained" through a particular "violation" of the Constitution, or that some other judicial or prosecutorial action during the case was "unconstitutional." Accompanying each of these fifteen "grounds" is a short paragraph captioned "supporting facts." For most of the "grounds," the "facts" offered in support are little more than a restatement of the ground itself: for example, "Ground Six" asserts that Miller's convictions were "obtained by a violation of the Equal Protection Clause" and the "supporting facts" accompanying Ground Six allege merely that "[m]ovant's Equal Protection Rights were violated by the use of evidence against him [in] his judicial proceeding."

This handwritten document was accepted, docketed, and assigned a new matter number (99-CV-3346), and the instant 2255 proceeding was thereby commenced.

Two weeks later, however, another set of documents purporting to be Miller's 2255 application was docketed and filed on his behalf (although not styled as such, for the sake of clarity I refer to it here as the "First Amended Petition"). The First Amended Petition includes the official Court-issued 2255 form, bears Miller's signature (although backdated two weeks to the date of the Original Petition), makes essentially the same claims as the Original Petition, and also

includes an affidavit from Miller that elaborates (although only minimally) upon some of those claims. The affidavit also explains that Miller had been aware of the approaching expiration of the limitations period when he commissioned a family member to file the Original Petition to preserve his rights, and that Miller's allegedly limited access to the prison law library—a common Miller complaint belied by his voluminous filings—accounts for the document's leanness. The affidavit further asserts that it was the intake clerk who, while accepting and docketing the Original Petition, nevertheless furnished the blank official form and flagged the need for Miller's signature, acts that Miller interpreted as authorization to refile his application.

Under the circumstances reflected on the Court's docket, and without deciding whether the assertions in Miller's affidavit are credible, I reject the government's limitations defense. Relying heavily on the specifications of Rule 2(b) of the Rules Governing Section 2255 Proceedings for the United States District Courts, the government argues that the Original Petition is too threadbare for me to recognize as a bona fide 2255 application. Rule 2(b) provides, in pertinent part, that a 2255 motion must "specify all the grounds for relief," "set forth in summary form the facts supporting each of the grounds thus specified," and of course "be signed under penalty of perjury by the petitioner." Rule 2(b)(1),(2) and (5).[2] To be sure, the Original Petition, essentially a catalogue of captions, is vastly under-pleaded, and even pro se criminal litigants such as Miller must "comply with the applicable rules of procedural and substantive law," Faretta v. California, 422 U.S. 806, 835 n. 46 (1975), but I nevertheless find the government's position to be inconsistent with the liberal construction typically afforded pro se pleadings as a matter of course. See Estelle v. Gamble, 429 U.S. 97, 106 (1976) ("a pro se complaint, 'however inartfully pleaded,'

---

[2] Rule 2(b) was amended in 2004. The changes to paragraphs (1) and (2) are not material here; the modification of the signature requirement, however, is discussed in the following note.

must be held to 'less stringent standards than formal pleadings drafted by lawyers.'")(internal

citation omitted); United States v. Morgan, 346 U.S. 502, 505 (1954) (2255 movants not to be

denied relief merely because their papers are mis-styled).   Although legitimate, the government's

concerns with the paucity of detail in the Original Petition bear upon the merits (as I shall discuss)

rather than upon questions of form for limitations purposes.   The missing signature, of course, *is*

purely a question of form and, in other circumstances, might give me pause, but given Miller's

prompt effort to cure the defect (albeit on the other side of the limitations line), I cannot accede to

the government's request, for which I have been furnished with no Second Circuit authority, that I

dismiss solely because the required signature is untimely.[3]

The government further argues that even if I accept the Original Petition as timely, I must

reject as untimely all the later-filed papers that Miller submitted in support of his 2255 motion (a

fairly unrelenting stream of letters, pleading-like documents, and memoranda of law).   The

government claims to see in these later filings new and different grounds and argues, under a

labored Federal Rule 15(c) analysis, that these later-mentioned claims do not "relate back" to the

Original Petition.   Once again, however, the government's efforts are largely misdirected.

Although Miller's many subsequent submissions are not insubstantial, I do not find in them any

claims not first mentioned in the Original Petition.

Further, despite's Miller's styling of several of his filings as requests to "amend" his

application under 2255, two of his submissions—namely, his request to be resentenced in light of

Booker and his claim that the amended crack cocaine guidelines also require resentencing—are by

---

[3] Furthermore, under the 2004 amendment to Rule 2(b)(5), an individual authorized to file
section 2255 motion papers on a family member's behalf can furnish the missing signature.   See
Rule 2(b)(5) (motion must "be signed . . . by the movant or by a person authorized to sign it for the
movant").   See also 2004 Advisory Committee Note to Rule 2(b)(5) ("envision[ing] . . .
'next-friend' standing analysis").

their terms applications under 18 U.S.C. §3582(c) and formally part of his criminal case rather

than the 2255 proceeding, and so do not trigger "relation back" concerns. (I treat all of Miller's

claims, however styled, in this single Memorandum and Order).

In any event, any purely pleading-related questions that I resolve or assume in Miller's

favor are ultimately of no consequence. As I now explain, regardless of the submission in which

it was first advanced in this Court, none of Miller's post-conviction claims has any recognizable

merit.

## B. Basic 2255 Standards

Relief "is generally available under § 2255 only for a constitutional error, a lack of

jurisdiction in the sentencing court, or an error of law or fact that constitutes a fundamental defect

which inherently results in a complete miscarriage of justice." Cuoco v. United States, 208 F.3d

27, 30 (2d Cir. 2000) (internal quotations and citations omitted). The discretion to grant relief

under section 2255 is to be exercised sparingly, for such applications "are in 'tension with

society's strong interest in the finality of criminal convictions.'" Elize v. United States, 2008 WL

4425286, *5 (E.D.N.Y. Sept. 30, 2008) (NGG) (internal citations omitted). Indeed, it is because

of this interest that "'the courts have established rules that make it more difficult for a defendant to

upset a conviction by collateral, as opposed to direct, attack.'" Id. (internal Supreme Court

citations omitted).

These rules, principally procedural, render only a limited category of claims even

cognizable on 2255. First, as the Second Circuit has recently reaffirmed, "[i]t is well established

that a § 2255 petition cannot be used to 'relitigate questions which [sic] were raised and considered

on direct appeal.'" United States v. Pitcher, 559 F.3d 120, 123 (2d Cir. 2009) (internal quotation

marks and citation omitted). Likewise, section 2255 may not be used to challenge the legality of

matters that were not first raised on direct appeal but could have been.   United States v. Frady, 456 U.S. 152, 165 (1982); Zhang v. United States, 506 F.3d 162, 166 (2d Cir. 2007); United States v. Pipitone, 67 F.3d 34, 38 (2d Cir. 1995); Elize, 2008 WL 4425286 at *5 ("[c]laims raised in a § 2255 petition that could have been raised on direct appeal [but were not] are . . . deemed procedurally defaulted and are not considered on collateral review").

"Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either cause and actual prejudice, or that he is actually innocent." Bousley v. United States, 523 U.S. 614, 622 (1998) (citing, *inter alia*, Wainwright v. Sykes, 433 U.S. 72 (1977)) (internal quotations omitted). See also Coleman v. Thompson, 501 U.S. 722, 748-50 (1991) (habeas petitioner must show both cause for the default and actual prejudice, or that failure to consider the claim would result in a miscarriage of justice); Murray v. Carrier, 477 U.S. 478, 496 (1986) ("miscarriage of justice" in the context of procedural default exists if alleged constitutional error "probably resulted in the conviction of one who is actually innocent").   Claims of ineffective assistance of counsel, however, are exempt from the procedural default rule and "may be brought in a collateral proceeding under § 2255 whether or not the petitioner could have raised the claim on direct appeal." Massaro v. United States, 538 U.S. 500, 504 (2003).

Procedural concerns aside, the Supreme Court has reaffirmed that "the writ of habeas corpus has historically been regarded as an extraordinary remedy, a bulwark against convictions that violate fundamental fairness," and that "[t]hose few who are ultimately successful [in obtaining habeas relief] are persons whom society has grievously wronged and for whom belated liberation is little enough compensation." Brecht v. Abrahamson, 507 U.S. 619, 633-34 (1993) (internal quotations and citations omitted).   Miller, as my review of his bounty of claims shows,

cannot conceivably be considered such a "grievously wronged" defendant.

## C. Miller's 2255 Petition

### 1. Summary

The Original Petition, as amplified by the later submissions, seeks to advance fifteen distinct claims for section 2255 relief. In an early post-filing letter, however, Miller acknowledged that his claims were numerous and conceded that some of them "may" turn out to be "frivolous." See Miller Ltr. 7/18/1999. The substantial briefing that ultimately ensued, however, exhaustively treats only two of the "original" 2255 claims—those labeled "Ground One" and "Ground Two"—and then branches out to address the subsequently filed requests for sentence modifications, but never revisits the other thirteen claims (Grounds Three through Fifteen) catalogued in the Original Petition. For Miller, as prolific, insistent and indefatigable a litigant as I have ever encountered, and who has gone to such lengths as re-filing in full certain of his memoranda to "correct" minor typographical errors, see, e.g., Dkt. Entries 811 and 822, the lack of attention to Grounds Three through Fifteen indicates, quite compellingly, virtual abandonment of those thirteen claims. Cf. Beatty v. United States, 293 F.3d 627, 632 (2d Cir. 2002) (unbriefed appellate issues deemed abandoned); Love v. McCray, 413 F.3d 192, 195 (2d Cir. 2005) (Beatty's "chief concern" is needless use of judicial resources assessing a claim "without knowing whether the petitioner wishes to" pursue it; concerns triggered even in pro se matters).

I have authority under Federal Rule 41(b) to dismiss each of the thirteen apparently abandoned claims. See Fed. R. Civ. P. 41(b) (authorizing dismissal "on the merits" of action "or any claim" if "the plaintiff fails to prosecute"); Rule 12, Rules Gov. Sec. 2255 Proceedings (Federal Rules of Civil Procedure applicable to 2255 proceedings). But because Miller has not

9

formally withdrawn the unbriefed claims and because they are "constitutional" (at least in name) and relate (again, at least in name) to the validity of his conviction and multiple life sentences, I will assume that they are not abandoned.   But even so, each of the thirteen claims is nevertheless barred from consideration on 2255 because each (i) was already "raised and considered on direct appeal" and may not be relitigated on a 2255 motion, Pitcher, 559 F.3d at 123, or (ii) is procedurally defaulted because it should have been raised on appeal but was not *and* Miller has neither shown the cause and prejudice that might excuse the default, nor sought to bypass the default through a claim of actual innocence.   See Bousley, 523 U.S. at 622.

In any event, as delineated below, I readily conclude that each of the thirteen unbriefed claims lacks any cognizable merit.

The two grounds that Miller has briefed at length, and which appear to be the only two he is genuinely pursuing under section 2255, are the pair of intertwined Sixth Amendment claims in which Miller argues both that he was denied the effective assistance of counsel and, conversely, that he was also denied his right to represent himself.   Defective counterfeits manufactured from Miller's own protracted pre-trial misconduct, these twin claims, unlike the unbriefed thirteen, will require some recounting of key episodes of that misconduct to expose their true meritless nature.

**2.   The Thirteen Procedurally Barred Claims: Grounds 3 through 15**

A.   "Ground Three" asserts that Miller's "conviction [was] obtained by a violation of [his] constitutional rights."   Orig. Pet. ¶ C.   The "supporting facts" that Miller offers are that "[t]he district court abused its discretion by refusing to grant . . . a one month continuance so that his counsel could fulfill prior commitments and prepare adequately for trial."   Id.; Miller Aff. 6/14/99 at ¶ 26.   This claim is barred from review because Miller did not raise it on direct appeal, and has not even proffered cause or prejudice.   Bousley, 523 U.S. at 622; Elize, 2008 WL 4425286 at *5.

To the extent the claim is a component of Miller's ineffective assistance of counsel claim, it lacks merit for the reasons discussed *infra* at section 4.

B.    "Ground Four: Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant."   Orig. Pet. ¶ D.   The "supporting facts" Miller offers are that "the U.S. Attorney . . . failed to disclose evidence useful to [Miller] that could have changed the outcome of his trial."   Id.   In a later submission Miller makes passing reference to his "Brady claims," Miller Aff. 6/14/99 at ¶ 23, but offers no other specifics.   Miller could have but did not raise this claim on direct appeal, and offers no cause for not having done so, so review here is foreclosed.   Bousley, 523 U.S. at 622.

In any event, the claim is also denied on the merits.   "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching; that evidence must have been suppressed by the [government], either willfully or inadvertently; and prejudice must have ensued."   Boyette v. Lefevre, 246 F.3d 76, 89 (2d Cir. 2001) (quoting Stickler v. Greene, 527 U.S. 263, 281-82 (1999)). Miller's skeletal, speculative assertion offered years after his trial does not specify the allegedly withheld evidence, much less tackle the difficult "favorability" and "prejudice" elements, and therefore fails to state a cognizable Brady claim.   See Polanco v. United States, 2000 WL 1072303, *10 (S.D.N.Y. Aug. 3, 2000) ("undetailed and unsubstantiated assertions . . . have been consistently held insufficient" to make out constitutional 2255 claims); DeChirico v. Walker, 558 F.Supp.2d 355, 375 (E.D.N.Y. 2008) (in 2254 context, "belated, self-serving assertions" inadequate).

C.    "Ground Five:   Conviction obtained by a violation of [Miller's] constitutional and statutory rights."   Orig. Pet. ¶ E.   As "supporting facts," Miller asserts that his "conviction was

obtained by a violation of Article IV of the United States Constitution and the Full Faith and Credit Statu[t]e due to the District Court's failure to apply the Full Faith and Credit Statu[t]e to [Miller's] State Court judgment and State judicial proceedings." Id. Miller's later submissions do not reference this claim.

Miller did not raise in the district court or on direct appeal a claim invoking either "Article IV" or the Full Faith and Credit Clause of the Constitution, and has not shown the cause and prejudice necessary to excuse that failure, so the claim is not reviewable here. Bousley, 523 U.S. at 622; Elize, 2008 WL 4425286 at *5.

Alternatively, it is likely that Miller seeks through this claim to relitigate a claim he did pursue vigorously at trial and on direct appeal, namely, that an order by the state court (in an earlier proceeding) suppressing evidence gathered through wiretaps was binding on me in this proceeding. See Miller, 116 F.3d at 662 et seq. To this extent, the claim is barred because the Second Circuit rejected it. See id. at 663 ("the state court's suppression order did not foreclose consideration of the wiretap evidence by the grand jury, and it was not binding on the district court").

D. "Ground Six: Conviction obtained by a violation of the Equal Protection Clause." Orig. Pet. ¶ F. The alleged facts are that Miller's "Equal Protection Rights were violated by the used of evidence against him [in] his federal judicial proceeding." Id. In a later submission Miller asserts that "another issue that [he] will raise . . . will be the violation of the Equal Protection of the laws," and that "this [i]ssue is truly complex and will require a lot of time to research." Miller Aff. 6/14/99 ¶ 22. Miller's later submissions do not reference this claim. Whatever its contours, this apparently evidentiary-based claim certainly should have been raised on direct appeal but was not; review here, therefore, is foreclosed. Bousley, 523 U.S. at 622; Elize, 2008

12

WL 4425286 at *5.   In any event, in the rare instances when evidentiary rulings are cognizable as

constitutional questions on habeas, they implicate Due Process but not the Equal Protection

Clause, see, e.g., Chambers v. Mississippi, 410 U.S. 284 (1973), and the strength of Miller's trial

record forecloses any evidentiary-based due process claim.   Alternatively, to the extent that

Miller's intent in invoking the Equal Protection Clause is to resurrect his race-based challenge to

the Eastern District's jury selection plan, that claim *was* raised on his appeal and rejected by the

Second Circuit, see Miller, 116 F.3d at 658-59 (Eastern District Plan does not violate Equal

Protection Clause), and so may not be relitigated here.   Pitcher, 559 F.3d at 123.

   **E.**   In "Ground Seven," Miller claims that the evidence obtained by wiretaps was

"unlawful" and "unconstitutional," and reiterates his claim that because the state court suppressed

the wiretap evidence, the wiretaps "therefore did not conform to the Federal" standards.   Orig.

Pet. ¶ G.   See also Miller Aff. 6/14/99 ¶ 21 (same).   In an expansive discussion, see Miller, 116

F.3d at 659-65, the Second Circuit "considered all of [Miller's] challenges to the wiretap evidence

and found them to be without merit." Id. at 664.   Accordingly, Miller's renewed challenges to the

wiretap evidence are barred from review here.   Pitcher, 559 F.3d at 123.

   **F.**   In "Ground Eight," Miller asserts that his conviction was "obtained in violation of [his]

right to a fair trial" in that his "848 conviction was in violation of the laws pertaining thereto."

Orig. Pet. ¶ H.   The "848 conviction" refers to Miller's conviction on Count Three of the

indictment, which charged him with engaging in a continuing criminal enterprise ("CCE") in

violation of 21 U.S.C. § 848(a).   Miller challenged his CCE conviction on two grounds on direct

appeal.   The first was that his separate convictions of both CCE and 21 U.S.C. § 846 (narcotics

conspiracy) violated the Double Jeopardy Clause because the latter was a lesser included offense

of the former; as already noted, see note 1, supra, the government conceded the point, the Circuit

13

reversed the section 846 conviction, Miller, 116 F.3d at 678, and an amended judgment issued. This portion of Miller's 2255 claim is therefore moot.

Miller also argued on appeal that his CCE conviction should be set aside because the section 846 narcotics conspiracy was an impermissible predicate. The Second Circuit held, however, that although separate 846 and 841 convictions could not stand, "[a] lesser included § 846 conspiracy may serve as a predicate offense for a §848 CCE conviction," and concluded that "the CCE conviction is affirmed." Id. Miller's challenge to his section 848 conviction as being "in violation of the laws pertaining thereto" was, therefore, "raised and considered on direct appeal," Pitcher, 559 F.3d at 123, and may not be relitigated here.

G. "Ground Nine" alleges that Miller's conviction was "obtained in violation of [his] constitutional and statutory rights," in that the United States Attorney "violated [Miller's] Equal Protection and Due Process Rights by engaging in selective and vindictive prosecution in the charging process." Orig. Pet. ¶ I. Miller later references "selective and vindictive prosecution" in the list of claims he intended to pursue, Miller Aff. 6/14/99 ¶ 23, but he offers no additional facts or law.

Assuming that Miller had more to say about this claim, his direct appeal would have been the venue within which to do so; having bypassed that opportunity, and having failed to offer either cause or prejudice to excuse that default, the claim is barred from review here. Bousley, 523 U.S. at 622.

In any event, Miller could not obtain section 2255 relief on the basis of either branch of this claim. To establish selective prosecution, Miller would have to show that he was "treated differently from other similarly situated individuals and that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of

14

constitutional rights, or malicious or bad faith intent to injure" him.   United States v. Stewart, 590

F.3d 93, 121 (2d Cir. 2009) (internal quotation marks and citations omitted).   To establish

vindictive prosecution, Miller would have to overcome the presumption of legitimacy that attaches

to the charging decision by showing either (i) that the circumstances give rise to the contrary

presumption, or (ii) that the decision to prosecute him was a "direct and unjustifiable penalty that

resulted solely from [his] exercise of a protected legal right."   Stewart, 590 F.3d at 122-23

(internal quotation marks and citations omitted).   Miller's minimalist assertion falls far short of

these standards.   Furthermore, having presided over the matter in the first instance, I am confident

that even if he were to seek to elaborate upon this claim, Miller could not succeed in impugning the

United States Attorney's decision to prosecute him for the prolonged and violent criminal

activities that he committed or that, as leader of the Supreme Team, he commissioned.

      **H**.   "Ground Ten" asserts that Miller's conviction was "obtained by a violation of the

Commerce Clause."   Orig. Pet. ¶ J.   His specific assertion is that his "conviction for criminal

facilitation should be dismissed for lack of subject matter jurisdiction as the act does not have a

substantial impact on Interstate Commerce, let alone any connection at all."   Id.   As I read the

Second Circuit's decision on Miller's appeal, however, it is clear that that Court fully considered

and rejected this claim.   The Circuit specifically held that, "where, as here, the RICO enterprise's

business is narcotics trafficking, that enterprise must be viewed as substantially affecting

commerce, even if individual predicate acts occur solely within a state," Miller, 116 F.3d at 674,

and then "conclude[d] that the criminal facilitation charge against Miller was a proper RICO

predicate."   Id. at 675.   The Circuit also found that "the evidence was more than sufficient to

support the jury's conclusion that Miller criminally facilitated the murder of Isaac Bolden and did

so in connection with the Supreme Team criminal enterprise."   Id. at 677.

15

To the extent Miller is making some other, general challenge to the Court's subject matter jurisdiction, the claim is barred because it should have been but was not raised on direct appeal, and Miller has not shown cause or prejudice for the procedural default.   Bousley, 523 U.S. at 622. This Court's jurisdiction to adjudicate Miller's criminal case is beyond question.   See discussion *infra* at "*L*" (Ground Fourteen).

**I.**   "Ground Eleven" asserts that Miller's sentence was "obtained by a violation of the Protection against cruel and unusual punishment,"   Orig. Pet. ¶ K, and that the "sentence of life in prison for criminal facilitation stands in stark contrast to the sentencing guidelines and represents a violation" of the Eighth Amendment.   Id.   In his later-filed affidavit, Miller further asserts that "the life sentence that [he] received for conduct that would only constitute a crime of criminal facilitation to murder" constitutes "cruel and unusual punishment."   Miller. Aff. 6/19/99 ¶ 24.

As I understand this claim, it appears to be the same one he made on direct appeal with respect to how the *state* offense of criminal facilitation figured into the *federal* guidelines calculation.   In such situations, then-applicable Guideline § 2X5.1 and commentary to then-applicable Guideline §2E1.1 both directed me to apply the guideline of the most "analogous" federal offense, and so I used the guideline for aiding and abetting first-degree murder.   Miller challenged this analysis on appeal.   After exploring the issue at some length, the Second Circuit concluded: "We can see no basis on which to disturb the district court's conclusion that, on the facts of this case, aiding and abetting provided the most appropriate analogy."   Miller, 116 F.3d at 678.   Miller may not relitigate the issue here.   Pitcher, 559 F.3d at 123.

Furthermore, to the extent that Miller did not invoke the Eighth Amendment's protection against cruel and unusual punishment on his direct appeal, he most certainly could have, so the claim is barred for that reason as well.   Bousley, 523 U.S. at 622; Elize, 2008 WL 4425286 at *5.

16

In any event, the Eighth Amendment aspect of Miller's claim is frivolous. The ch   allenged sentence is within the authorized statutory range[4] and therefore does not present a cognizable Eighth Amendment issue, see Dorsey v. Irvin, 56 F.3d 425, 427 (2d Cir. 1995), and even if Miller could now invoke the Eighth Amendment he would not obtain relief.   He would have to show that his non-capital sentence is "grossly disproportionate" to his crimes, Harmelin v. Michigan, 501 U.S. 957, 997 (1991), but the gravity of his crimes forecloses any such showing.

**J.**   "Ground Twelve" asserts that "the District Court erroneously calculated [Miller's] criminal history score," in that "[t]he criminal history point accorded for [Miller's] conviction in March 1980 and the 2 criminal history points accorded for [his] August 1980 conviction should be excluded from the calculation of his criminal history score."   Orig. Pet. ¶ L.   This claim is barred from review because it could have been raised on direct appeal.   Bousley, 523 U.S. at 622; Elize, 2008 WL 4425286 at *5.   More critically, the claim presents no cognizable constitutional question, and in any event, lacks any discernible merit.

**K.**   "Ground Thirteen" asserts that Miller's "conviction for racketeering acts 19 and 20, and count 12, was in violation of the law," and more specifically alleges that Miller's conviction for money laundering should be dismissed "as there was no showing of illegal proceeds to uphold its foundation whatsoever in law or fact."   Orig. Pet. ¶ M.   Liberally construing this claim as a challenge to the sufficiency of the evidence supporting Miller's money laundering activities, I find, first, that the claim should have been raised on direct appeal and is therefore barred, and second, that even if properly before me, the claim is frivolous.   There was more than enough evidence from which a rational juror could conclude that Miller purchased a BMW and an armored

---

[4] Criminal facilitation served as a predicate for the offense of engaging in racketeering activity, charged in Count One, in violation of 18 U.S.C. § 1962(c), for which the statutory maximum sentence is life.   See 18 U.S.C. § 1963.

Mercedes-Benz knowing them to be the product of narcotics earnings and with the intent of concealing the true source of those proceeds.

**L.** "Ground Fourteen" asserts that Miller's conviction was "obtained in violation of territorial jurisdiction," and reiterates that "[t]he district court and the U.S. Attorney's office w[ere] without jurisdiction to try" Miller on indictment CR-92-91(S-1). Orig. Pet. ¶ N. This claim is barred because Miller could have but did not raise it on direct appeal. Bousley, 523 U.S. at 622. In any event, this Court had subject matter jurisdiction to adjudicate Miller's criminal trial because he was charged with violating federal law. See U.S. Const. art. III, §2, cl. 1 ("The judicial Power shall extend to all Cases . . . arising under . . . the Laws of the United States. . ."); 18 U.S.C. § 3231 ("district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States"). This Court also had personal jurisdiction. See United States v. Bodmer, 342 F. Supp. 2d 176, 188 (S.D.N.Y. 2004) (internal citation omitted) (in criminal matters, "[j]urisdiction is presumed by virtue of the defendant's presence").

**M.** "Ground Fifteen" alleges that Miller's conviction was obtained in violation of his "right to a fair trial." Orig. Pet. ¶ O. As "supporting facts," Miller asserts that his conviction "was obtained by the use of testimony given by witnesses who were offered leniency in return for their testimony." Id. Miller submits no other particulars.

A challenge to the admission of a witness's testimony is the prototype of the kind of on-the-record claim that should be raised on direct appeal and, because it was not, is procedurally barred from consideration here. To the extent this claim is intended to be a challenge to the trial testimony of cooperator Julio Hernandez, it was fully considered and rejected by the Second Circuit on Miller's direct appeal, Miller, 116 F.3d at 665-67, and may not be relitigated on a 2255

motion.  Pitcher, 559 F.3d at 123.

### 3.  The Self-Representation Claim

#### A.  Procedural Bar

Miller has devoted considerable briefing to his wholly manufactured claim that he was

denied his right to represent himself.  See Faretta v. California, 422 U.S. 806 (1975).  Without

question, however, the claim is procedurally barred from consideration by this Court because it is

entirely record-based but was not raised on Miller's direct appeal.  See Bousley, 523 U.S. at 622.

Miller attempts, however, to demonstrate "cause and prejudice" for the default by attacking his

appointed attorney Joyce London, who represented him at trial and on appeal, as constitutionally

ineffective because she did not pursue a Faretta claim before the Circuit.

#### B.  Appellate Ineffectiveness Alleged as "Cause" and "Prejudice" for the Default

The standards for constitutional ineffectiveness claims are familiar, well established, and

"rigorous."  Parisi v. United States, 529 F.3d 134, 140 (2d Cir. 2008) (internal citation omitted).

To show that the performance of counsel—be it trial or appellate—deprived him of his Sixth

Amendment right, Miller bears the considerable burden of demonstrating that "counsel's

representation fell below an objective standard of reasonableness," Strickland v. Washington, 466

U.S. 668, 688 (1984), and that "there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different."  Id. at 694; see

Henry v. Poole, 409 F.3d 48, 58 (2d Cir. 2005) ("The Federal test for evaluating ineffective

assistance of counsel claims is set forth in Strickland").  In reviewing the record for

ineffectiveness, I must be "highly deferential" to counsel's performance, since "'it is all too easy

for a court, examining counsel's [performance] after it has proved unsuccessful, to conclude that a

particular act or omission . . . was unreasonable.'"  Pratt v. Greiner, 306 F.3d 1190, 1196 (2d Cir.

2002) (quoting Strickland, 466 U.S. at 689). (In reality, as the following makes clear, trial counsel deserves a medal for grace under fire in the defense of her very demanding and difficult client.)

### i. "Cause": the Reasonableness of Not Pursuing Faretta on Appeal

The critical inquiry under the performance prong is "whether counsel's assistance was reasonable considering all the circumstances." Strickland, 466 U.S. at 688. Acts or omissions of counsel are considered "objectively unreasonable only if there was no tactical justification for the course taken." Lynn v. Bliden, 443 F.3d 238, 247 (2d Cir. 2006) (internal quotations and citation omitted), cert. denied, 549 U.S. 1257 (2007). When reviewing counsel's performance, I begin with the principle that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Strickland, 466 U.S. at 690. As required, I also "indulge a strong presumption that counsel's conduct falls within the range of reasonable professional assistance," and "eliminate the distorting effects of hindsight." Id. at 689. Relief under section 2255, either on the ineffectiveness claim itself or as cause and prejudice to excuse a procedural default, is available only if *both* the performance and prejudice prongs of Strickland are satisfied. See United States v. Birkin, 366 F.3d 95, 100 (2d Cir. 2004). When *rejecting* a Strickland claim, however, the Court has "no reason . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." Strickland, 466 U.S. at 697.

In the appellate context, Strickland requires that Miller "prove that appellate counsel selected grounds for appeal unreasonably, such as by 'omitt[ing] significant and obvious issues while pursuing issues that were clearly and significantly weaker.'" Gomez v. Brown, 655 F. Supp. 2d 332, 347 (S.D.N.Y. 2009) (quoting Clark v. Stinson, 214 F.3d 315, 322 (2d Cir. 2000)). Appellate counsel, the Supreme Court has held, does not have a "constitutional duty to raise every

20

nonfrivolous issue requested by a defendant." Jones v. Barnes, 463 U.S. 745, 747 (1983).

Indeed, Jones recognizes that "[e]xperienced advocates since time beyond memory have

emphasized the importance of winnowing out weaker arguments on appeal and focusing on one

central issue if possible, or at most a few key issues." Id. at 751-52. Accordingly, the Second

Circuit "will not normally fault counsel for foregoing a potentially fruitful course of conduct if that

choice also entails a significant potential downside." Greiner v. Wells, 417 F.3d 305, 319 (2d Cir.

2005) (internal quotations and citation omitted), cert. denied, 546 U.S. 1184 (2006).

Under these standards, even assuming without deciding that Miller's putative

self-representation claim was a "nonfrivolous [appellate] issue," Jones, 463 U.S. at 747, Miller has

not shown that London's election not to raise it was deficient performance under Strickland prong

one. The question is whether London's decision not to pursue a Faretta-based claim was

"reasonable considering all the circumstances," Strickland, 466 U.S. at 688, and the answer is,

absolutely.

Miller's was a mammoth case with an equally mammoth appeal: the index to the appellate

record catalogues nearly 700 documents (the index alone is 58 pages); Miller himself was one of

nine defendants, all of whom appealed, some with claims overlapping his and others with distinct

claims; and on Miller's behalf exclusively, London submitted a principal brief exceeding 125

pages (and another 20 pages on reply)—which, after accomplishing the daunting task of

summarizing the seven-week trial and lengthy pre-trial proceedings, raised a host of important

appellate issues. Because London had no constitutional duty to raise every colorable issue, Jones,

463 U.S at 467, and because I do not second-guess her choices through "hindsight's" notoriously

"distorting" lens, Strickland, 466 U.S. at 689, I do not find London's choices to be "[un]reasonable

considering all the circumstances." Id. at 688.

London, as noted, prevailed on one of the claims she elected to pursue (*viz.*, that Miller's Double Jeopardy rights were violated), and the Circuit's lengthy, absorbing discussion of each of the other issues London raised on Miller's behalf, see Miller, 116 F.3d at 641-85, speaks for itself to the quality, complexity and substance of the totality of London's briefing choices.

Tellingly, Miller's protracted critique of London's appellate representation—raised, it bears reiterating, solely as an afterthought to seek to circumvent the procedural bar—discusses exclusively what Miller believes to be the strength of his Faretta claim, but does not argue that the appellate grounds that London *did* advance were unworthy of pursuing, nor does it question the competency with which London handled those issues before the Circuit. In short, Miller has not made the required comparative showing (i.e., that the claims London pursued were "clearly and significantly weaker" than the omitted issue, Gomez, 655 F. Supp. 2d at 347), nor has he otherwise demonstrated—as he must to establish appellate ineffectivenes—that London "selected grounds for appeal unreasonably." Id.

To be sure, the uncompromising, pro-defendant tone of much of the language in Faretta jurisprudence, including its "automatic reversal" rule,[5] might understandably mislead a convicted defendant into believing that the claim *must* be pursued on appeal as long as the record arguably contains *any* conceivable basis for it, and Miller of course believes that such a basis exists because of the number of times the topic of Miller's participation in his own defense came up before and

---

[5] As is well-established, "[a] criminal defendant is entitled to proceed *pro se* if he knowingly, voluntarily, and unequivocally waives his right to appointed counsel," and "[a]ssuming that a defendant's waiver meets this standard and the matter is raised prior to the start of trial, [t]he right of a defendant in a criminal case to act as his own lawyer is *unqualified*." Wilson v. Walker, 204 F.3d 33, 37 (2d Cir.) (internal quotations and citations omitted) (emphasis added by Second Circuit), cert. denied, 531 U.S. 892 (2000). Further, "a court's denial of the right to self-representation is not subject to harmless error analysis, and requires automatic reversal of a criminal conviction." Id. (internal citation omitted).

during trial (the contexts for which I will be discussing).   The selection of issues to brief on appeal, however, turns on a *balanced* assessment of each issue's jurisprudence, and a *balanced* view of the record, not the one-sided view that Miller advances in his papers. (As seasoned Circuit practitioners know, the selection of issues also involves subtle judgments about matters outside the four corners of a particular doctrine's case law formed with a view toward gauging how each issue will be received.)   However "potentially fruitful" Miller may believe the claim to be, Greiner, 417 F.3d at 319, London's decision would not be deficient performance because it no doubt reflects an awareness of the "significant potential downside," id., of pursuing the claim on this record and is therefore not deficient performance.   Id.   A plenary analysis of Miller's Faretta claim would have necessarily required close attention to the chronology of Miller's manipulative shuffling of the representation card and the worst of his misconduct, culminating in the serious threat he made against the trial-ready attorney who had effectively represented him for more than a year, causing her to fear for her life and seek to be relieved.   London's briefing decisions prudently kept these facts out of the appellate spotlight.

### ii.   "Cause": any Faretta-based Claim Was Meritless

A thorough review of the record makes clear that it was objectively reasonable for London to conclude that the Second Circuit would find no Faretta-based constitutional error.   On a record of pre-trial and trial proceedings that essentially speaks for itself, there is no reasonable view of Supreme Court and Second Circuit law with which a decision to allow Miller to represent himself could be reconciled.   Notwithstanding the Faretta right's noble ambitions and sui generis nature, see, e.g., Johnstone v. Kelly, 808 F.2d 214, 218 (2d Cir. 1986), cert. denied, 482 U.S. 926 (1987) (the right to represent oneself at trial "reflects values of individual integrity, autonomy, . . . self-expression [and other] interests beyond insuring that trial outcomes are fair"), the unfortunate

reality is that it is particularly susceptible to abuse by tactical defendants—and I have encountered few as tactical as Miller—who invoke the right at trial for its potential to delay the proceedings or, if even more calculating, precisely for its eventual, and possibly double-barreled, appellate value. As the Second Circuit recognizes, "a convicted defendant could have a colorable Sixth Amendment appeal regardless of how the trial judge rules: if his request is denied, he will assert the denial of his right to self-representation; if it is granted, he will assert the denial of his right to counsel." Williams v. Bartlett, 44 F.3d 95, 100 (2d Cir. 1994) (internal citation omitted). These concerns are hardly unfounded. See, e.g., Dallio v. Spitzer, 343 F.3d 553, 561 (2d Cir. 2003) (defendant's claim, rejected on habeas, was that he was denied his Sixth Amendment rights when court *allowed* him to represent himself without sufficiently warning him of the hazards of doing so); United States v. Maldonado-Rivera, 922 F.2d 934, 976 (2d Cir. 1990) (defendant's claim, rejected on appeal, was that district court violated his Sixth Amendment right to counsel by *granting* his request to proceed pro se); United States v. Jordan, 591 F. Supp. 2d 686, 710 (S.D.N.Y. 2008) (concluding that defendant's sequence of remarks and silences reflected his "wish[] to preserve an attack on his anticipated conviction without foregoing the benefit of being represented by counsel").

For these reasons, "[t]he right to self-representation attaches only if it is asserted 'clearly and unequivocally.'" Wilson v. Walker, 204 F.3d 33, 37 (2d Cir.) (quoting Faretta, 422 U.S. at 835), cert. denied, 531 U.S. 892 (2000). See also Williams, 44 F.3d at 100-101 ("The *purpose* of requiring that a criminal defendant make an 'unequivocal' request to waive counsel" is to thwart attempts to create twin Sixth Amendment appellate claims).

Key episodes from the proceedings before me plainly show that Miller's request to represent himself at trial was hardly unequivocal. They also show that, contrary to a recurring

claim in Miller's 2255 papers, in denying his request I acted neither summarily nor in haste but only after frequent and sustained interactions with Miller in my courtroom and ongoing review of his incessant flood of motions and requests.

### a.  Arraignment (January 1992) through Motion to Act as Co-Counsel (December 11, 1992)

Miller was represented at his arraignment on the original indictment by appointed counsel Susan Kellman, who continued to represent him through most of the protracted pre-trial proceedings, which included particularly protracted motion practice and a suppression hearing. Although the extremely able and experienced Kellman had been enthusiastically and effectively advancing Miller's interests, it was clear that Miller had also been quite involved in the preparation of his defense.  As a result, I exercised my discretion in Miller's favor, considerably, by allowing him to participate actively in all court proceedings, including the delivering of arguments and the filing of various written submissions.   One such submission was Miller's pro se application, filed without Kellman's knowledge shortly before trial was to begin, for permission to act as "co-counsel."   Miller was *not* seeking to forego the assistance of counsel; to the contrary, while continuing to be represented by Kellman, Miller was essentially asking that he, rather than Kellman, be allowed to conduct the examination of certain witnesses and make certain arguments to the Court.

As I commented in my order denying the application, see Order 12/17/1992 at 1, this application "c[a]me as no surprise" in light of Miller's active participation in the proceedings to date.   But the latitude that I extended to Miller during the pre-trial proceedings (which I generally conduct informally) was not intended to carry forward into the actual trial, and in any event, Miller clearly had no constitutional right to what had been, until that point, a privilege born of my good

graces and excessive patience. See, e.g., Ennis v. LeFevre, 560 F.2d 1072, 1075 (2d Cir. 1977)

("There is certainly a right to appear pro se, as well as a right to appointed counsel. Obviously,

however, those rights cannot be both exercised at the same time"); United States v. Tutino, 883

F.2d 1125, 1141 (2d Cir. 1989) ("This Court has held that a criminal defendant has no

constitutional or statutory right to represent himself as co-counsel with his own attorney"), cert.

denied, 493 U.S. 1081 (1990). My order cites Tutino, Order 12/17/92 at 1-2, whose rule the

Second Circuit just reaffirmed. United States v. Bloom, 2010 WL 571762, *3 n. 4 (Feb. 19, 2010)

(quoting Ennis and Tutino). As these cases explain, a defendant cannot act as his own co-counsel

for two fundamental reasons. First, when questioning witnesses and in other ways, a defendant

can easily use his role as co-counsel to testify without actually taking the stand; second, throughout

the proceedings a defendant permitted the role of co-counsel risks acting or speaking in ways that

conflict with or undermine his actual counsel's strategy, thereby confusing the jury and

undermining the integrity of the proceedings in ways no curative instructions could remedy. See

Tutino, 883 F.2d at 1141; Ennis, 560 F.2d at 1075; Order, 12/17/1992 at 2-3.

### b. December 1992 through March 10, 1993

During the ensuing ten weeks, the more imminent Miller's trial date, the more prolific and

outspoken Miller the litigant had become. He had committed himself to filing as many frivolous

applications as he could invent grounds for, and to grandstanding at every opportunity, for the sole

purpose of obstructing the proceedings and delaying his trial. So while I noted in my December

17, 1992 order that Miller's "participation to date ha[d] been somewhat unusual" but also

"appropriate and measured," and that his request to act as co-counsel did not appear to have been

"made in bad faith or with the intention to disrupt the proceedings in any way," Order 12/17/92 at

3, the ensuing ten weeks showed a quite different side of Miller. As I commented in an order

26

issued March 10, 1993:

> Most unfortunately, despite extraordinary considerations
> extended by this Court to the defendants in this case,
> particularly Mr. Miller, Mr. Miller's princip[al] line of
> defense has for too long been obstruction and delay.
> Whether it was yesterday's childish protest of refusing to
> dress for court, the incessant and unauthorized flood of
> largely frivolous motions and requests, or the supposed
> conflict with an attorney he so clearly relies on and consults
> with virtually every minute they are together in court, he is
> cunningly and indefatigably seeking to prevent a trial on the
> merits.

Order, 3/10/1993 at 3. The order also notes that the "[m]ost notable on the long and growing list

of Miller moves" were "his . . . efforts to seek appellate review pre-trial," and that, by denying

Miller's eve of trial request for a stay to permit the appeal, I was refusing to "be a party to

[Miller's] subversive efforts" to postpone his trial.

Notably, as the record chronicles, Miller's *apparent* desire with respect to representation

fluctuated during this period, although I have no doubt that even the fluctuation was by design.

He moved on January 5, 1992 for reconsideration of his request to act as *co*-counsel.   Shortly after

I denied that application ("for the reasons stated in the Court's order of December 17, 1992," see

Order 1/5/1993), Miller moved, on January 15, 1993, to represent himself; based on the totality of

my interaction with him, I granted the application, but only provisionally and to the extent of the

pre-trial phase of the case; I frequently advised Miller thereafter that he would have until the time

the government completed its opening argument to make the higher-stakes decision about whether

to proceed pro se *at trial*. See, e.g., Tr. 1/21/93 at 46-47; 3/10/93 at 502-503.   As the transcripts

for all proceedings during the ensuing ten weeks show, Miller appeared as "defendant, pro se,"

with Susan Kellman appearing as his "legal advisor."

As I expected, granting Miller's pre-trial application afforded Miller some sense of what

27

being his own counsel would entail, and it was not always to his liking. For example, during proceedings on March 1, 1993, an issue arose that Miller stated he was "not even familiar with;" he then asked that Ms. Kellman "speak for [him] on this particular issue." Tr. 3/1/1993 at 24. The ensuing colloquy (pp. 24-27) shows that Miller did not fully appreciate what it meant to represent himself. Standby counsel, of course, *stands by* because of the pro se defendant's obvious need for legal guidance, but standby counsel does not stand *in* whenever the pro se defendant stumbles. It was clear to me then Miller did not truly want to fly solo. Instead, he wanted the privilege of addressing the court, the government (and, suspiciously, certain witnesses) himself *as well as* the option of relying on a lawyer to speak for him when he encountered a matter he could not handle—which is exactly what he had twice sought in his pre-trial motions to be his own *co*-counsel. And that, of course, is not the right that Faretta recognizes.

### c. March 11-15, 1993

On March 11, 1993, a most disturbing matter was brought to my attention. Kellman informed me that, in a message left on her telephone answering machine, Miller had threatened to cause her serious bodily injury. Kellman also disclosed her resulting discomfort about continuing to serve as his legal advisor. It was a Thursday, and trial was scheduled to begin the following Monday—and the timing of this outrageous occurrence did not escape anyone's notice.

To avoid being unduly affected by playing the recording myself, I referred the matter to Magistrate Judge Gold, who listened to a tape of the message and also heard from both Kellman and Miller. The following day, upon receipt of Magistrate Gold's sealed report and recommendation, I formally entertained Kellman's application to be relieved as legal advisor and/or counsel to Miller.

Although the proceeding before Magistrate Gold had been sealed, both Kellman and Miller

28

spoke candidly in open court about the events triggering Kellman's application.[6]  See Tr. 3/12/93

at 2-17.   Kellman stated that she did not make her application "lightly" and that she had discussed

her application "for many, many hours" with Miller, and asked that Miller, as he then "st[ood]

before the Court as his own counsel," speak first.   Kellman specifically asked that Miller state

whether he was opposing her application, and if he was, whether he could make assurances that

"nothing that ha[d] gone on before" would interfere with her ability to act on his behalf.

Miller spoke at length, vacillating.   He stated that as a result of what had happened the day

before, he had "grown . . . to like" Kellman more than ever before, but that "she [was] a strong,

forceful woman" who "likes to have complete control of the case," whereas he wanted to have his

own "say-so in making decisions," so the two, he continued, often clashed.   Miller apologized

"for the tape" and stated that he understood that he was "here to make a decision on whether or not

[Kellman] is going to be my lawyer and I am not going to go pro se and/or whether I am going to

be what I am now, which is pro se."   Ultimately, Miller stated that he doubted whether Kellman

would believe that he did not intend to carry out the threat he had made against her, that

"everybody is thinking real stupid about the tape," and concluded, "[s]o I am saying that I know I

need a lawyer and I know that I have to have a lawyer to protect my rights, but I think that I have

gone so far now, that . . . I think I have to concur with her application."

Kellman then stated that she understood Miller to be saying that he "[was] not prepared to

have [her] act as his lawyer."   She then revealed the depth of her fears for her safety:

[6] The colloquy on March 11, 1993 essentially rendered moot the precautions I had taken
initially. My referral order had stated only that "[a]dvisory counsel for the defendant Gerald Miller
has brought information to the attention of the Court that suggests that further review by a judicial
officer is appropriate" and explained that the matter was being referred "[b]ecause relevant
information and other considerations may pose issues of attorney-client privilege and related
applications."   In any event, as noted supra at 2-3, upon Miller's application I am ordering the
materials unsealed.

It is my feeling based on the conversation that we had yesterday or two days ago at the M.C.C. that I am in much more danger than I understand that I was in even yesterday . . . I will not stand next to a defendant who can say with a straight face to this Court that a tape recorded conversation in which he says that . . . he was going to hurt me and that he was going to readjust certain parts of my physical anatomy . . . and he said he is serious about it at least four times during the course of that conversation, he is prepared to stand in front of this Court now and negotiate . .

I was put in real fear for my life . . . That is not [the] first time I felt that way about Mr. Miller. That was the first time I felt it was appropriate to bring it to the Court's attention on the record, and . . . I did it in a way that I thought . . . would insulate Mr. Miller; but . . . [t]his is about negotiations for co-counsel position.

Mr. Miller, as he says, . . . is a control freak and . . . at any moment [he] can blow his lid . . . and threaten my safety and maybe next time send some crack addict out into the street to make sure that I don't disobey him.

Miller then vacillated again, stating both, "I like the lady, especially after yesterday because she had . . . balls with the government," and "[b]ut in her heart she have got some bad feelings for me . . . [and] I don't know if she thinks she can represent me that way now."

The government also weighed in on the application, urging that Miller not be rewarded for his own misconduct. The government argued, as I had already found in my order issued the previous day, that "since this case started" Miller has had only two goals—"severance and delay"— and that Miller had "manipulated the process in every possible way." The government further argued that additional delay was especially costly in this case: one effect of the several trial adjournments that Miller had already secured is that his uncle had been released from prison and had, the government believed, begun to intimidate witnesses who had already been fearful of testifying.

I granted Ms. Kellman's application to be relieved "of the responsibility to represent the interests in whatever capacity [of] Miller at trial." Her concern for her safety was reasonable, and I shared it, particularly because this was not the first time Miller was linked to threats of violence,

later carried out, in order subvert the judicial process. See, e.g., Memorandum and Order dated Nov. 17, 1992 (granting government's motion for anonymous jury in part because of the evidence, albeit "somewhat circumstantial and speculative," that links Miller to the murder of two relatives of Trent Morris, who testified against Miller in his 1991 state trial); Miller, 116 F.3d at 666 (finding that the "soundness of the concern for the safety of [cooperator] Hernandez's family is well documented" in part because of the evidence linking Miller to the murders of Morris's relatives).

Indeed, I noted on the record that it was "not a surprise in any sense" that the matter "was triggered by a threat by Mr. Miller over a telephone [that] Miller clearly knew was being monitored," and that the "only . . . surprising" thing was that Kellman, "out of a sense no doubt of loyalty and professional dedication, would be prepared . . . under any circumstances to withdraw her application."

The proceeding concluded with Miller once again changing his tune, declaring, on the heels on my having relieved Ms. Kellman, that he "[d]on't want nobody but her to be on my case now" and that he wanted her "to be [his] lawyer." I announced that I would expeditiously locate counsel to replace Kellman as Miler's advisor and asked Kellman and her colleague Joyce London to assist new counsel, but directed that there be no contact between Miller and Kellman or London.

By the following Monday (March 15, 1993) I had appointed Daniel Murphy to serve as Miller's advisor. See Tr. 3/15/93. Murphy had appeared before me numerous times, had some familiarity with the case, and, critically, was willing to take it on. I granted a two-week adjournment and believed that "[Murphy's] co-tenancy" with other counsel of record and his consultation with Kellman would enable him, in that time, to be effective counsel to Miller. I also remarked to the parties that "[i]t's virtually certain at this point [that] Miller will defend himself in

31

the trial of this action."

### d. Miller's Letter dated March 18, 1993

Miller changed his tune yet again, four days later, in his letter to me dated March 18, 1993, which I received that same day. Chronicling the long history of my colloquies with him on the subject of representation, Miller confessed that Kellman's withdrawal caused him to see matters in a new light. He declared that he had "carefully considered" my "many warnings about the folly" of representing himself, and concluded: "I have decided to accept your advi[c]e and not proceed pro se." Miller also noted that "since the trial [had] not yet started, this decision [was] . . . within the time frame [the Court had] established." It was clear that he understood exactly what he was doing.

Miller also set forth the specific factors that most influenced his decision and showed it to be well-considered. He noted, for example, that while he had become accustomed to doing much of his own legal research at the M.C.C. library, he would have no opportunity to continue to do so once trial began because the library was only open during trial hours (8:30 a.m. to 3:30 p.m. weekdays, closed on weekends). He wrote that it therefore "would be foolish for [him] to attempt" to represent himself. Miller also wrote of "the many obstacles [he] had to face just to interview [his] uncle, as a prospective witness," and was concerned that "if this were to happen to all [his] witnesses, [he] would never be able to present a defense." Miller closed his letter by reiterating that, "for all of these reasons, I now need a lawyer to represent me in the remainder of my case." Having observed the range of demeanors Miller exhibited in my courtroom over the many preceding months, I credited this letter as considered and genuine. Indeed, it was reflective of Miller's true intention from the outset; and so, with his trial date inescapably at hand, Miller was sharp enough to know, and did in fact know, that it was at last time to bring his pageantry and all

the high jinx to a close, and at the same time secure for himself yet another postponement of the trial.

### e. Appointment of Joyce London

Miller expressed one additional concern in his March 18 letter: in his view, Daniel Murphy, who at that point was on the case only three days, could not adequately prepare himself for trial in only two weeks, and so, in asking to be represented at trial, Miller was also asking for new counsel—and, because the coda to nearly every application Miller made was a request for an adjournment—the stage was set for Miller's request for additional time, for whomever I might then appoint, to adequately prepare. On April 1, 1993, only two weeks from the date of his appointment and two weeks before the yet-again adjourned trial was set to begin, Mr. Murphy himself was before me with his own application to be relieved; given the history of proceedings to date, I viewed with great disfavor any additional shuffling of the Miller representation card. I was also reluctant to furnish Miller with fresh grounds for seeking another adjournment, and so denied Murphy's application.

Within twenty-four hours, however, Miller's interests, the Court, and the proceedings themselves were recipients of an unexpected gift: Joyce London, then Susan Kellman's law partner, agreed to serve as Miller's trial counsel, accepting my appointment on April 2, 1993 (a Friday). Although not as intimate with either Miller or the case as Kellman had been, London's association with Kellman had nonetheless afforded her considerable exposure to Miller and the case. Indeed, allowing London to substitute for Murphy as Miller's counsel presented itself as the appropriate way to resolve the difficult situation Miller's own actions had brought about: Miller had, in the end (*viz.,* in his March 18, 1993 letter), unequivocally asked to be represented; London knew more about the case than any other lawyer I might have then appointed; the trial (too long

33

adjourned) was to begin in a mere two weeks (on April 21, 1993); and, despite her professional

relationship with Kellman, London had not herself been threatened by Miller and did not fear, as

Kellman had, that representing Miller put her life or safety in jeopardy. In short, the appointment

of London less than a month after Kellman's departure was, like most just-right resolutions, hardly

something anyone could have anticipated, and yet it was also more than anyone could have wished

for. I do not say this lightly; while the caliber of London's lawyering is well documented in the

lengthy trial transcript, what London most brought to the case was not transcribable, though

observable to anyone present in the courtroom: she could handle Miller, having struck, in my

observations, just the right interpersonal note with this most challenging of defendants. To be

sure, Miller's ineffective assistance of counsel claim (discussed below) catalogues numerous

disagreements he claims to have had with London concerning matters of strategy, but Miller would

have concocted some version of that catalogue no matter who represented him. Indeed, *in spite of*

Miller, London succeeded in advancing an effective defense, having subjected the government's

case to meaningful scrutiny, having preserved the most critical of Miller's appellate issues and,

perhaps most vitally, having kept Miller sufficiently in check so that he did not become, as he well

might have, the saboteur of his own cause.

### f. April 19-27, 1993: Miller's First Requests to Represent Himself at Trial

But Miller was not done with his antics.

On April 19, 1993, London moved orally and then by letter for permission for Miller to

represent himself at trial. London's letter cites the fact that, at the time of *his* appointment, Daniel

Murphy had been granted a one-month continuance to prepare for trial, whereas *her* request for

additional time, made the Monday following her Friday appointment, was denied.[7]  The letter

also cites the large volume of 3500 material and tape recordings in the case, as well as Miller's

own letter to me dated April 5, 1993, that likewise touched upon Miller's supposed concern that

two weeks was not enough time for London to prepare.   London's letter then advises that "Mr.

Miller makes this pro se application for the same reason," explaining that two weeks "[wa]s

insufficient time" for London to prepare, and that, as a result, Miller believed that he was "better

prepared to defend himself with [London] as his legal advisor."   The letter further conveyed

Miller's "assur[ance] that he w[ould] be ready to proceed to trial on Wednesday April 21, 1993 as

scheduled."

During oral argument on the application the following day (April 20, 1993, the eve of trial),

I heard from Miller at length.   He argued as follows:

> I think I can put on my defense more adequately because I've sat with this case
> much longer . . . But trial starts tomorrow at ten o'clock, and I'm not asking for no
> more time . . . so I'm ready to represent myself and proceed forward in this case
> tomorrow at ten o'clock.   And if your Honor so chooses to allow me to exercise
> that right.   I'm much more familiar with my defense and things of that nature.
> This is a very serious situation.   It's going to happen tomorrow.   So I want to give
> it the best fight that I can.

---

[7]  I note here that London would not be London had she not requested the additional
adjournment; that is, her commitment to thoroughness would inevitably cause her to believe that
more time would help her advance her client's interests.   But the application of course had to be
denied: although Miller's 2255 papers tend to obscure the fact, Miller's trial was a multi-defendant
case and had already been delayed far more than I was comfortable with.   Too many important
interests were at stake to allow any further delay.   Notably, London's application for additional
time also conceded that "the trial scheduling in this case [had already] been fraught with
difficulties," and "assure[d] the Court that [her] availability was not a problem," and that she was
"committed to devoting long hours between now and the trial date to the preparation" for trial.
London Ltr., 4/5/1993 at 1.   Furthermore, the following day, after I denied the requested
adjournment, London wrote to remind me of her previously scheduled commitment to try a case
that coming summer in the U.S. District Court in Nevada, and of my promise, which I carried out,
to intervene on her behalf in securing an adjournment of that matter so she could devote her full
attention to the Miller case.   See London Ltr., 4/6/1993.

A focal point in Miller's briefing of his <u>Faretta</u> claim in his 2255 papers is the following transcript excerpt, which captures the close of that argument session:

Miller:   Are you going to have me wait here or go back?

Court:   We'll get back to you.   Thank you.   I'd ask counsel to

remain for a second.

*(Defendant retires from the courtroom.)*

Court:   *(addressing London)*: This will come as no surprise to you,
prepare your opening statement as I know you will.   Have
a good afternoon.

The following day (April 21, 1993), just as trial was to begin, London asked me to reconsider Miller's request to represent himself, "given how seriously [Miller] feels about his defense and handling it."   I ruled as follows:

All right.   You have, I have, and the application is denied.
Obviously, given the seriousness of the matter, I will address
it in a memorandum to be filed sometime during the trial, but
we will proceed with you acting as his counsel.

By the fourth day of trial, (Monday, April 26, 1993), London alerted me that Miller and she were having disagreements about matters of strategy, and so she formally renewed, on Miller's behalf, his request that he be allowed to act as his co-counsel.   This application, too, did not come as a complete surprise.   I saw it for what it was: first, a manifestation of the difficulties Miller was experiencing in adapting to the realities and protocols of trial, and second, given that I had already twice denied this application for "hybrid" representation, as a vehicle for the testing of London's allegiance.   London argued:

In light of the Court's ruling of Mr. Miller's application and
then renewed application to be pro se, and in respect of the

36

Court's ruling, I have a further application for Mr. Miller.

> Mr. Miller would like with the Court's permission to be able
> to assist more vigorously in his defense and in particular to
> have—to be able to cross-examine certain witnesses on his
> own behalf in the course of this trial. His feeling is that he
> knows much more about the background of these witnesses,
> more than he can possibly inform me of in the short period
> of time that we have—that I have been working with him on
> the specifics and that short period of time that we have left.
> I certainly will acknowledge the truth of that.

> The—his knowledge of the background and of the events
> that these witnesses are testifying to is certainly much
> greater than mine and much deeper than mine and much
> more than I can absorb in the next few days and weeks.
> This defense is extremely important to him and he would
> really like this opportunity to be able to participate more
> actively in certain limited aspects of the trial.

I denied this request at the close of London's presentation:

> This is in essence a renewal of an application made to me
> some many weeks ago, which I ruled on.[8]  I think I wrote an
> order at that time.  I don't know that anything has changed
> in that regard.

Finally, and likewise not surprisingly, Miller made an application the following day (April

27, 1993) to relieve London as his counsel, which I denied.

### g.  Legal Analysis

To return to the legal ramifications of this litany of applications, the question is whether

these facts establish that Miller had a meritorious Faretta-based claim that London should have

pursued on appeal.   The answer is no.

Most critically, despite his persistently self-assertive demeanor, Miller's request to act as

his own trial counsel was anything but the unequivocal kind that Faretta and its progeny require.

---

[8] See Order, 12/17/92.

37

Faretta, 422 U.S. at 835, Wilson, 204 F.3d at 37. Miller's several requests to act as *co*-counsel, made both pre-trial (December 11, 1992; renewed on January 5, 1993) and on the fourth day of trial (April 26, 1993), were of course *not* invocations of his Faretta right. Cf. Ennis, 560 F.2d at 1075 ("There is certainly a right to appear pro se, as well as a right to appointed counsel. Obviously, however, those rights cannot be both exercised at the same time"); Tutino, 883 F.2d at 1141 ("a criminal defendant has no constitutional or statutory right to represent himself as co-counsel with his own attorney"). Miller's only two Faretta-based applications were those made on January 15, 1993, which I *granted* provisionally to the extent of the pre-trial phase of the case, and on April 20-21, 1993, at the start of trial; the denial of *that* application, therefore, is the only ruling that could have been the basis of a Faretta appeal.

However zealous Miller's words that day may seem in isolation to a reader of the cold transcript, they were only words, and I did not have any difficulty concluding that they did not amount to an "unequivocal" Faretta request. What Miller really wanted—as his applications on December 17, 1992, and January 5, 1993, had already shown, and as his later applications on April 26, 1993, confirmed—was to have the best of both worlds: representation by counsel as well as the privilege of addressing the Court *some of the* time and examining *some of* the witnesses himself; this manifest, abiding interest in relying on counsel's active trial participation was, I concluded, far short of a genuine Faretta request, which must be a "purposeful choice reflecting an unequivocal intent to forego the assistance of counsel." Williams, 44 F.3d at 100 (internal quotation marks and citation omitted).

The "smoking gun," if one were needed, is Miller's letter of March 18, 1993, penned near the close of the pre-trial phase of the proceedings, effecting a full and unqualified withdrawal of his request to represent himself *at trial*. Notably, even when Miller and London wrote me, shortly

38

after London's appointment, with their concerns about scheduling and London's time to prepare (see Miller Ltr., 4/5/1993, London Ltr., 4/6/1993), neither intimated that Miller had reconsidered his decision, committed to writing only three weeks earlier, that he did *not* wish to proceed pro se. Against this chronology, Miller's request at the start of trial was not unequivocal.

To be clear, I did not deny Miller's request because it appeared to be a fall-back position made in the wake of my denial of London's request for an adjournment. Cf. Johnstone, 808 F.2d at 216 n.3 ("A request to proceed pro se is not equivocal merely because it is an alternative position, advanced as a fall-back to a primary request for different counsel."). I denied it because I did not believe Miller was sincere, notwithstanding London's loyal support of the application. I also denied the request because I could not justify viewing it in a vacuum, apart from Miller's pattern of obstructionist conduct to date. In short, I saw in the request Miller's signature impulse to manipulate. See, e.g., Wilson, 204 F.3d at 38 ("a court may deny a defendant's request to proceed pro se if it finds that the request is 'manipulative or abusive in some other way'") (internal citation omitted); Williams, 44 F.3d at 101 ("the requirement of an unambiguous and unequivocal request inhibits any deliberate plot to manipulate the court by alternatively requesting, then waiving, counsel"); Wiesner v. Abrams, 726 F. Supp. 912 (E.D.N.Y. 1989) ("court must also examine the events preceding the motion, to determine whether they are consistent with a good faith assertion of the *Faretta* right") (internal quotations and citation omitted), aff'd, 909 F.2d 1473 (2d Cir. 1990).[9]

Although Miller was careful to state that he was not asking for an adjournment and was prepared to proceed with the trial as scheduled, and although I made no explicit finding at the time

---

[9] Notably, Miller's lengthy treatment of this issue recounts *none* of the events occurring before trial.

that he was acting with dilatory or otherwise improper intent, I had good reason to regard Miller's "request" as a bargaining chip, part of an ongoing, highly calculated pattern of obstruction and manipulation. Knowing that the issue of his representation had, at long last, been settled, Miller hoped that in lieu of granting his renewed request to represent himself I might instead reconsider London's request for a continuance.

Finally, and lest the most foul underside of Miler's <u>Faretta</u> request be overlooked, it was Miller's own "misconduct" (to put it charitably) that set in motion the series of events that he then cited as his "reason" for asking to represent himself. By causing Susan Kellman to fear for her life, Miller forfeited the year-plus worth of experience with his case that Kellman had acquired and that no successor counsel could have duplicated (unless, of course, I were to have rewarded Miller with successive appointments of new counsel and successive one-year continuances each time he threatened his lawyer at the peak of her preparedness).

### iii. "Cause": Conclusion

For all the reasons just reviewed, I find that London's decision not to raise <u>Faretta</u> on Miller's appeal does not constitute deficient performance under <u>Strickland</u>. <u>See</u> <u>Forbes v. United States</u>, 574 F.3d 101, 106 (2d Cir. 2009) ("It is well established that the failure to include a meritless argument does not fall outside the wide range of professionally competent assistance to which a defendant is entitled") (internal quotations and citation omitted). Indeed, because London represented Miller at trial, was familiar with what transpired before me, and in fact made the motion for self-representation on Miller's behalf, I conclude without any hesitation that her decision not to appeal a <u>Faretta</u> claim was an informed strategic choice and not an oversight; it is therefore unassailable. <u>See</u> <u>Strickland</u>, 466 U.S. at 690-91 ("strategic choices made after thorough investigation of law and facts relevant to plausible options *are virtually*

*unchallengeable*") (emphasis added). Furthermore, even if the <u>Faretta</u> issue had some marginal value, London's decision not to pursue it was highly prudent because the issue would have necessarily placed squarely before the Circuit some of the worst features of Miller's antics, including the threat on Kellman. <u>See</u> <u>Greiner</u>, 417 F.3d at 319 (the Second Circuit "will not normally fault counsel for foregoing a potentially fruitful course of conduct if that choice also entails a significant potential downside").

Because Miller has "ma[de] an insufficient showing on one" of <u>Strickland</u>'s prongs, 466 U.S. at 697, I need not address <u>Strickland</u> prejudice. <u>Id.</u> <u>See, e.g.,</u> <u>Coke v. Supt., Greenhaven Corr. Facility</u>, 2010 WL 475274, *8 (W.D.N.Y. Feb. 5, 2010) (declining to address "prejudice" prong where habeas petitioner "failed to establish that his . . . counsel was deficient"); <u>Greiner</u>, 417 F.3d at 319 (Second Circuit "limit[s] [its] inquiry to the performance prong" after finding counsel's performance "reasonable under *Strickland*"); <u>United States v. Vegas</u>, 27 F.3d 773, 778 (2d Cir.) (court "need not reach question" of *Strickland* prejudice where defendant "failed to show that his counsel did not perform up to professional norms"), <u>cert. denied</u>, 513 U.S. 911 (1994).

Finally, because Miller is for all these reasons unable to show that appellate counsel was ineffective, I find that he has not shown "cause" sufficient to excuse the procedural default on his self-representation claim. That claim, therefore, remains barred from plenary consideration in this section 2255 proceeding. <u>Bousley</u>, 523 U.S. at 622.[10]

### iv. No "Prejudice" in Any Event

---

[10] Outside the confines of Miller's ineffective appellate counsel claim lies an additional consideration that also militates against finding "cause" for, or otherwise excusing, the procedural default: Miller participated in his appeal by filing his own pro se brief to supplement London's. <u>See</u> 1996 WL 33421544 (Dec. 16, 1996). Miller's submission, containing no fewer than seventeen distinct subheadings, does not discuss any alleged deprivation by this Court of his right to represent himself at trial.

41

In any event, because Miller's self-representation claim lacks merit for the reasons just reviewed, London's decision not to pursue it on appeal did not "prejudice" Miller, either within the meaning of <u>Strickland</u> prong two or the "prejudice" half of the <u>Bousley</u> "cause and prejudice" test for excusing procedural default.

**4.    Ineffective Assistance of Trial Counsel**

In light of the foregoing discussion, little more is required to dispose of Miller's claim that London rendered constitutionally deficient assistance at trial.[11]   Miller alternately refers to his claim as "ineffective assistance of counsel" and "conflict of interest," and a careful review of his papers shows that the latter is the gravamen of his complaint.   Distilled to its essence, Miller's claim is that he was denied his right to conflict-free representation because Kellman was relieved, he claims, due to a potential "conflict of interest" and because that same alleged "conflict," he further claims, tainted London, who shared a law practice and letterhead with Kellman.   Miller further complains that London labored under a "conflict" because she attended and participated in the sealed proceeding before Magistrate Gold on March 11, 1993, and argues that I should have either appointed independent counsel to represent him at that proceeding or followed the procedures set out in <u>United States v. Curcio</u>, 680 F.2d 881 (2d Cir. 1982) to obtain from him a waiver of his right to "conflict-free" representation.

To cite my pre-trial order of March 11, 1993 as only one example, Miller latched on to the term "conflict" quite early in the proceedings with an apparent view to the promise that it, like "self-representation" and select other issues, might offer on appeal.   Indeed, given the inescapable and quite overwhelming evidence of his prolonged criminal career, fatal to any effort to survive

---

[11]  Miller did not raise the claim on direct appeal, but under <u>Massaro</u>, 538 U.S. at 504, he may raise it in the first instance on collateral review.

harmless error analysis, it is not surprising that Miller, ever the strategist, has vigorously pressed

here claims under two of the few doctrines with little or no harmless error analysis—i.e., Faretta,

with its automatic reversal rule, and "conflict of interest" law, which creates a presumption of

prejudice.   See Strickland, 466 U.S. at 695 (in certain circumstances, prejudice may be presumed,

such as when defendant shows that counsel was "burdened by an actual conflict of interest").

     Miller, however, relies on an unduly broad interpretation of the word "conflict" to attempt

to characterize the quite effective working relationship he shared with London as one plagued by

Curcio-kind of conflict.   Differences on matters of strategy between counsel and client, however,

are simply not Curcio-triggering "conflict," which concerns divided loyalties resulting from joint

representation.

     Nevertheless, Miller constructs a lengthy argument in reliance on Wood v. Georgia, 450

U.S. 261 (1981), where the Supreme Court remanded a case because, although the record

"strongly suggest[ed] the presence of an actual conflict," the trial court had not made further

inquiry.   Miller believes that Wood stands for the proposition that, in order to secure a reversal of

his convictions, he need only show that his trial lawyer was subject to an identifiable "conflict,"

and that he need not show that that "conflict" adversely affected counsel's performance.

     But Miller mischaracterizes the facts of his own case and misapprehends the law.   First, as

the Supreme Court made clear post-Wood, "[a]s used in the remand instruction [in Wood] . . . 'an

actual conflict of interest' meant precisely a conflict *that affected counsel's performance*—as

opposed to a mere theoretical division of loyalties."   Mickens v. Taylor, 53 U.S. 162, 171 (2002)

(emphasis in original) (quoting Wood).   The Mickens Court further explained that the language in

Wood "was shorthand for the statement in [Cuyler v. Sullivan, 446 U.S. 335 (1980)] that "a

defendant who shows that a conflict of interest *actually affected the adequacy of his representation*

43

need not demonstrate prejudice in order to obtain relief." Mickens, 535 U.S. at 171 (emphasis added by Mickens Court) (quoting Sullivan, 446 U.S. at 349-50).

In short, Mickens makes clear that even if Miller demonstrates that London operated under an actual conflict of interest, he would also have to show that this conflict "actually affected the adequacy of [her] representation," Sullivan, 446 U.S. at 349, and this he cannot do. To be sure, his brief cobbles together a list of objections or applications that London did not make but that counsel for one of the co-defendants made, and a catalogue of ways in which London examined a witness or made an argument differently than he would have were he representing himself. Neither inventory, however, establishes that London delivered impaired representation: as to the former, Miller overlooks the fact that London wisely heeded one of my earliest instructions to counsel, namely, that objections and applications, unless identified otherwise, were deemed to be on behalf of all defendants; as to the latter, Miller concedes that London was operating from a "strategy" that differed from his but does not remotely show that this strategy was defective.

Further, despite Miller's creative use of the term "conflict," Mickens makes clear that the Sullivan presumption was recognized to account for the "high probability of prejudice arising from *multiple concurrent representation, and the difficulty of proving that prejudice*." Id., 535 U.S. at 175 (emphasis added). Accord Torres v. Donnelly, 554 F.3d 322, 326 (2d Cir. 2009) (noting that, "[al]though the Sullivan presumption has been 'unblinkingly' applied to 'all kinds of alleged attorney conflicts,' Sullivan's discussion . . . does not support this expansive application" and that "Sullivan has 'never been extended by the Supreme Court to conflicts other than joint representation'") (internal citations omitted).

Whatever the contours of the "conflict" that Miller seeks to ascribe to London's representation, it is most certainly not of the "multiple representation" variety, so the Sullivan

presumption is not triggered.   Absent that presumption, and having failed to make any non-frivolous allegations of deficient performance by London, Miller cannot establish that London rendered ineffective assistance at trial.   Indeed, irrespective of the threat Miller made against London's law partner, having presided over Miller's lengthy trial, I find without hesitation that Miller was quite effectively represented and readily reject his claim to the contrary.[12]

## II.

### The Section 3582 (c)(2) Motion

Miller contends that he is eligible for re-sentencing under the retroactive application of the United States Sentencing Commission's amendment to the crack cocaine sentencing guidelines. See 72 Fed.Reg. 28571-72 (2007).   Because Miller was found accountable for well in excess of 4.5 kilograms of cocaine base, however, the new Guidelines do not have the effect of lowering his applicable guideline range, and a sentence reduction is therefore not authorized under 18 U.S.C. § 3582(c)(2).   See U.S.S.G. § 1B1.10(a)(2)(B) ("A reduction in the defendant's term of imprisonment is not consistent with this policy statement and therefore is not authorized under 18 U.S.C. § 3582(c)(2) if . . . an amendment listed in subsection (c) does not have the effect of lowering the defendant's applicable guideline range.").   The motion is accordingly denied.

## III.

### The 3582(c)(1)(B) Motion[13]

I find no authority in the provision on which Miller relies, 18 U.S.C. § 3582(c)(1)(B), to

---

[12] Further belying the bona fides of Miller's conflict-based ineffectiveness claim against London is one of his more recent filings, an application, dated January 28, 2009, that I "re-appoint Susan G. Kellman and Joyce C. London as counsel under the Criminal Justice Act for the limited purpose of assisting, preparing, filing and arguing any matters related to Miller's motions under 18 U.S.C.§§ 3582(c)(1)(B) and 3582(c)(2)."

[13] Miller also styles this claim part of his motion to amend his 2255 application.

entertain his claim, based on <u>United States v. Booker</u>, 543 U.S. 220 (2005), that his Sixth Amendment rights were violated because he was sentenced on the basis of facts concerning drug amounts that were not specifically found by the jury.   In any event, the claim lacks merit. <u>Guzman v. United States</u>, 404 F.3d 139, 141 (2d Cir. ) (<u>Booker</u> not applicable to cases on collateral review), <u>cert. denied</u>, 546 U.S. 1035 (2005).

# IV.

## <u>Remaining Applications</u>

Miller's request for discovery is denied.   Although Rule 6(a) of the Rules Governing Section 2255 Proceedings gives a Court discretion to order discovery, I find no basis to exercise it here, for the bulk of Miller's requests relate to events in which he was a participant and which form the basis of his meritless conflict-of-interest claim.   Indeed, to allow discovery would only encourage Miller in his indefatigable recycling of stale, meritless claims and in his apparent quest to haunt the attorneys from whom, if he has anything to demand, it should be a pardon.   <u>See Harris v. Nelson</u>, 394 U.S. 286, 295 (1969) ("there was no intention to extend to habeas corpus, as a matter of right, the broad discovery provisions [of the Federal Rules of Civil Procedure]"); <u>Bracy v. Gramley</u>, 520 U.S. 899, 904 (1997) ("[a] habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of course").

For all the same reasons, I deny Miller's request for an evidentiary hearing, <u>Jordan</u>, 591 F. Supp. 2d at 710 (evidentiary hearing cannot be used a fishing expedition), and for the appointment of counsel.   <u>United States v. Reddick</u>, 53 F.3d 462, 464-65 (2d Cir. 1995).

## CONCLUSION

The applications for relief under 28 U.S.C. § 2255, 18 U.S.C. § 3582(c)(1)(B) and 18 U.S.C. § 3582(c)(2) are each denied entirely and on the merits. The motion to amend the 2255 petition is denied as moot. The motion to unseal docket entries 353 and 354 in the criminal matter (92-CR-91) is granted. Because I find Miller's substantive applications to be wholly without merit, I deny all other related applications now pending, including those requesting discovery, an evidentiary hearing, and the appointment of counsel.

Because Miller has not "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), a certificate of appealability will not issue.

SO ORDERED.

Dated: Brooklyn, New York
March 3D , 2010

s/ Judge Raymond J. Dearie

RAYMOND J. DEARIE
United States District Judge

47