**FILED**

**IN CLERK'S OFFICE**

**U.S. District Court E.D.N.Y.**

12/7/23

**BROOKLYN OFFICE**

FROM: 10766050
TO: Clerk of the Court
SUBJECT: MOTION: Section 404 of the First Step Act of 2018
DATE: 11/28/2023 11:03:09 AM

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
UNITED STATES OF AMERICA,

    v.                                       CRIMINAL NO. 92-91 (RJD)

GERALD MILLER,
          Defendant.
-----------------------------------------------------------X

### MOTION TO IMPOSE A REDUCED SENTENCE UNDER SECTION 404 OF THE FIRST STEP ACT OF 2018 PURSUANT TO TITLE 18 U.S.C. SECTION 3582(c)(1)(B)

GERALD MILLER, pro se, respectfully moves this Honorable Court for an order pursuant to Rule 47(a) of the Federal Rules of Criminal Procedure, granting Defendant Miller relief under the Formerly Incarcerated Reenter Society Transformed Safely Transitioning Every Person Act of 2018 (hereinafter, the "FIRST STEP Act ").

### PRELIMINARY STATEMENT

On January 23, 1992, Gerald Miller was charged and subsequently convicted in federal court for violating several federal criminal statutes that penalized crack cocaine offenses 100 times more harshly than powder cocaine offenses. This 100-to-1 ratio was widely criticized as irrational and racially biased. So in 2010, Congress passed the Fair Sentencing Act (the "2010 Act") to reduce the disparity to 18-to-1. But until now, the 2010 Act was not retroactively applicable to Miller. Section 404 of the FIRST STEP Act remedies this injustice by making the 2010 Act's reduced statutory penalties retroactive for defendants convicted for a violation of a covered offense committed before August 3, 2010. Miller is eligible for resentencing and prays that the Court impose a reduced sentence of time served under Section 404 of the FIRST STEP Act, or a reduced sentence sufficient, but not greater than necessary, to achieve the purposes of sentencing as set forth in 18 U.S.C. Section 3553(a), and in accordance with the holding in Concepcion v. United States, 597 U.S. ____, 142 S.Ct. 2389, 213 L.Ed.2d 731 (2022).

### STATEMENT OF FACTS AND PROCEDURAL HISTORY

Familiarity with the factual background is assumed, as it has been set forth in prior decisions of the Court spanning over a decade, and is not in dispute here. The background below offers a condensed overview of the relevant facts and procedural history for consideration of the instant motion.

Gerald Miller was convicted on June 21, 1993, after a seven-week jury trial in connection with his role in the "Supreme Team," a violent cocaine base trafficking organization that sold narcotics in Queens, New York. On May 12, 1995, Miller was sentenced to life imprisonment for racketeering, in violation of the Racketeer Influenced and Corrupt Organizations

("RICO") Act, 18 U.S.C. Section 1962(c) (Count One); conspiracy to distribute and possess with intent to distribute 50 grams or more of cocaine base, between August 1986 and March 1990, in violation of 21 U.S.C. Sections 846, 841(a)(1), and 841 (b)(1)(A)(iii) (Count Two); engaging in a Continuing Criminal Enterprise ("CCE") as the principal administrator, organizer and leader, between November 1987 and March 1990, involving in excess of 1500 grams of cocaine base, in violation of 21 U.S.C. Sections 848(a) and 848(b)(1)(2)(A) (Count Three); possession with intent to distribute 50 grams or more of cocaine base during the months of Dec. 1989 (Count Seven), Jan. 1990 (Count Eight), Feb. 1990 (Count Nine), and Mar. 1990 (Count Ten), in violation of 21 U.S.C. Sections 841(a)(1) and 841(b)(1)(A)(iii); and, for conducting financial transactions with proceeds from narcotics trafficking, in violation of 18 U.S.C. Section 1956(a)(1)(B)(i) (Count Twelve). ECF 193 (Superseding Indictment, Sep. 16, 1992); ECF 482 at 1-5, 8, 9-10, 14-17 (Verdict Sheet); ECF 674 (Judgment).

Miller was convicted of violating eight RICO Acts in Count One: RICO Acts 1, 5, 6, 7, and 8 (which are factually identical to the crack cocaine offenses in Counts Two, Seven, Eight, Nine and Ten, respectively); RICO Act 10 (aiding and abetting Criminal Facilitation in the Second Degree, in violation of New York Penal Law Section 115.05 and 20.00, which carries a statutory maximum penalty of 15 years imprisonment under New York Penal Law Section 70.00 (McKinney 1987)); RICO Acts 19 and 20 (conducting financial transactions with proceeds from narcotics trafficking). The Court dismissed RICO Act 19.

In light of the amendment to United States Sentencing Guidelines ("USSG") Section 2D1.1, effective November 1, 1994, the Court determined Miller subject to a Total Offense Level of 48, which was driven by the base offense level for the crack cocaine violations. See ECF 674 at 7 (Statement of Reasons). Miller was imprisoned for life on Counts One, Two, Three, Seven, Eight, Nine and Ten, to run concurrently; and, 20 years on Count Twelve to run concurrently. ECF 674 at 3.

On appeal, Miller's conviction was affirmed in all respects except one. In light of Rutledge v. United States, 517 U.S. 292 (1996), the United States Court of Appeals for the Second Circuit dismissed Count Two of the Superseding indictment. See United States v. Miller, 116 F.3d 641, 678 (2d Cir. 1997). On October 27, 1997, this Court imposed an Amended Judgment to reflect the Second Circuit's ruling. See ECF 749 at 1.

Miller's petition for writ of certiorari was denied. Miller v United States, 524 U.S. 905 (1998). Miller's motions for relief under 18 U.S.C. Section 3582(c), and post-conviction motion under 28 U.S.C. Section 2255, were simultaneously denied. See United States v. Miller, 92-CR-91 (RJD), 99-CV-3346 (RJD), 2010 U.S. Dist. LEXIS 31006, 2010 WL 1269796 (E.D.N.Y. March 30, 2010).

FROM: 10766050
TO:
SUBJECT: LEGAL STANDARD APPLICABLE
DATE: 11/28/2023 11:03:23 AM

------------------------------------------------------------------------------------------------------------------

### LEGAL STANDARD APPLICABLE TO MOTIONS
### UNDER SECTION 404 OF THE FIRST STEP ACT OF 2018

Section 404 of the FIRST STEP Act provides as follows:

> (a) DEFINITION OF COVERED OFFENSE.-In this section, the term "covered
> offense" means a violation of a Federal criminal statute, the statutory
> penalties for which were modified by section 2 or 3 of the Fair sentencing
> Act of 2010 (Public law 111-220; 124 Stat. 2372), that was committed
> before August 3, 2010.

> (b) DEFENDANTS PREVIOUSLY SENTENCED.-A court that imposed a sentence
> for a covered offense may, on motion of the defendant, the Director of the
> Bureau of Prisons, the attorney for the Government, or the court, impose a
> reduced sentence as if sections 2 and 3 of the Fair Sentencing Act of 2010
> (Public Law 111-220; 124 Stat. 2372) were in effect at the time the covered
> offense was committed.

> (c) LIMITATIONS.-No court shall entertain a motion made under this section
> to reduce a sentence if the sentence was previously imposed or previously
> reduced in accordance with the amendments made by sections 2 and 3 of
> the Fair Sentencing Act of 2010 (Public Law 111-220; 124 Stat. 2372) or if a
> previous motion made under this section to reduce the sentence was, after
> the date of enactment of this Act, denied after a complete review of the
> motion on the merits. Nothing in this section shall be construed to require a
> court to reduce any sentence pursuant to this section.

Pub. L. No. 115-391, Section 404, 132 Stat. 5194, 5222 (2018).

Section 404(a) of the FIRST STEP Act sets out who is eligible for relief; Section 404(b) describes what relief is available

for the parties who meet Section 404(a)'s criteria; Section 404(c) places two explicit limitations on available relief. In sum,

"it is the statute under which a defendant was convicted, not the defendant's actual conduct, that determines whether a

defendant was sentenced for a 'covered offense' within the meaning of Section 404(a)." United States v. Johnson, 961 F.3d

181, 187 (2d Cir. 2020).

But eligibility for relief does not create an entitlement to relief. See United States v. Rose, 379 F. Supp. 3d 223, 233

(S.D.N.Y. May 24, 2019) ("Congress clearly intended relief under [Section] 404 of the First Step Act to be discretionary, as

the Act specifically provides that '[n]othing in this section shall be construed to require a court to reduce any sentence

pursuant to this section.'" (quoting Section 404(c))). A district court is not required to modify a sentence for any reason.

Additionally, a motion under Section 404 of the FIRST STEP Act "falls within the scope of [18 U.S.C. Section] 3582(c)(1)

(B), which provides that a 'court may modify an imposed term of imprisonment to the extent otherwise expressly permitted

by statute.'" United States v. Holloway, 956 F.3d 660, 666 (2d Cir. 2020) (quoting 18 U.S.C. Section 3582(c)(1)(B)). Section

------------------------------------------------------------------------------------------------------

3582(c)(1)(B) is simply a gateway provision that refers to whichever statute "expressly permit[s]" the sentencing modification. Id. It does not impose any substantive or procedural limits on a district court's discretion; for those details, it refers to the statute authorizing the sentence modification. See United States v. Triestman, 178 F.3d 624, 629 (2d Cir. 1999) ("'[S]ubsection (c)(1)(B) simply notes the authority to modify a sentence if modification is permitted by statute'") (quoting S. Rep. No. 98-225 (1984)); see also Concepcion, 142 S.Ct. n.3 (stating that the "very purpose of [Section 404(b) of the FIRST STEP Act] is to reopen final judgments").

    In Concepcion, the Court held that a district court's sentencing discretion is restricted "only when Congress or the Constitution expressly limits the type of information a district court may consider in modifying a sentence." Id. at 2398. Importantly, the Supreme Court held that this discretion applies to both initial sentencings and sentence modification hearings. Id. at 2393 ("The discretion federal judges hold at initial sentencings also characterizes sentencing modification hearings.").

---

## ARGUMENT I

### Whether Defendant is Eligible for a Sentence Reduction Under Section 404(a) of the FIRST STEP Act of 2018

In 2010, Congress enacted the Fair Sentencing Act, which amended 21 U.S.C. Section 841(b)(1), and, as relevant to this motion, increased the threshold quantity required to trigger a 10-year mandatory minimum and a maximum sentence of life from 50 grams to 280 grams of cocaine base. Pub. L. No. 111-220, Section 2, 124 Stat. 2372, 2372 (2010). It also set the mandatory minimum sentence for distribution of between 28 and 280 grams of cocaine base at 5 years, with a maximum sentence of 40 years' imprisonment. Id. However, the Fair Sentencing Act did not apply retroactively to Miller, who was sentenced before the 2010 Act became effective. In 2018 Congress passed the FIRST STEP Act, Pub. L. No. 115-391, 132 Stat. 5194 (2018). Specifically, as relevant here, Section 404(a) of the FIRST STEP Act made the Fair Sentencing Act's statutory changes retroactive for a "covered offense" that was "committed before August 3, 2010." Id. 132 Stat. at 5222.

Everyone with a pre-August 3, 2010 crack conviction under 21 U.S.C. Section 841(b)(1)(A) or 21 U.S.C. Section 841(b)(1)(B), has a "covered offense" and is eligible for resentencing. See Johnson, 961 F.3d at 193, n.10 ("[I]t was Congress's decision to confer Section 404 eligibility broadly.... [W]e find it perfectly consistent with the purposes of the First Step Act that Congress would have extended Section 404 eligibility to all defendants sentenced under Section 841(b)(1)'s pre-Fair Sentencing Act crack cocaine penalties, while relying on judicial discretion to solve the more complex and individualized problem of which such defendants should ultimately receive sentencing relief."). Miller is eligible for a reduced sentence.

A. Count One (RICO Acts 1, 5, 6, 7, 8) and Counts Seven, Eight, Nine and Ten, are Covered Offenses Committed Before August 3, 2010, Whose Statutory Penalties Were Modified by Section 2 of the Fair Sentencing Act of 2010

On May 12, 1995, Miller received life imprisonment for distributing 50 grams or more of cocaine base in Dec. 1989 (Count Seven & RICO Act 5), Jan. 1990 (Count Eight & RICO Act 6), Feb. 1990 (Count Nine & RICO Act 7), and Mar. 1990 (Count Ten & RICO Act 8), in violation of 21 U.S.C. Sections 841(a)(1) and 841(b)(1)(A)(iii). Miller also received life in prison on Count One (RICO) for conspiracy to distribute and possess with intent to distribute 50 grams or more of cocaine base, between August 1986 and March 1990, in violation of 21 U.S.C. Sections 846, 841(a)(1), and 841(b)(1)(A)(iii) (RICO Act 1 & Count Two). "Racketeering Acts [1, 5, 6, 7, and 8] incorporate by reference the factual allegations set forth in [Counts Two, Seven, Eight, Nine, and Ten] of th[e] indictment." ECF 193 at 6-7.

Section 2(a) of the Fair Sentencing Act modified the statutory penalties associated with a violation of those provisions

by increasing Section 841(b)(1)(A)(iii)'s quantity threshold from 50 to 280 grams, and thus modified the penalties for Miller's statutory offenses. Miller was sentenced for a "covered offense" as defined by Section 404(a) of the FIRST STEP Act. Miller's statutory maximum sentence under Counts Seven, Eight, Nine and Ten, is now 40 years pursuant to the Fair Sentencing Act's reduced statutory maximum sentences made retroactively applicable by Section 404 of the FIRST STEP Act. Miller's statutory maximum sentence on Count One for RICO Acts 1, 5, 6, 7 and 8, is now 20 years.

The RICO conviction was "based on a racketeering activity for which the maximum penalty includes life imprisonment," 18 U.S.C. Section 1963(a), namely, the cocaine base offenses charged in Counts Two, Seven, Eight, Nine and Ten, see 21 U.S.C. Sections 846, 841(a)(1) and 841(b)(1)(A)(iii) (1992), respectively, making the maximum penalty for Count One at the time also life in prison. Post-Fair Sentencing Act of 2010, the cocaine base charges in Counts Two, Seven, Eight, Nine and Ten, would no longer carry a statutory maximum penalty of life imprisonment, see id., and thus if Miller were sentenced for those offenses as charged today, he would be subject to a maximum term of twenty years for Count One. See 18 U.S.C. Section 1963(a) (whoever violates any provision of 18 U.S.C. Section 1962(c) "shall ... be imprisoned not more than 20 years"). Additionally, the Guidelines for an offense under 18 U.S.C. Section 1962(c), directs to "the offense level applicable to the underlying racketeering activity." USSG Section 2E1.1(a)(2) (1992).

Other defendants convicted for RICO offenses involving cocaine base were found to be eligible for sentence reductions under Section 404(a) of the FIRST STEP Act. See, e.g., United States v. Robinson, Case No. 5:05-cr-00322-NAM, Doc. 1293 (N.D.N.Y. Oct. 15, 2020) (finding that defendant convicted of RICO is eligible for relief because his conviction was premised, at least in part, on a violation of 21 U.S.C. Section 841(b)(1)(A)(iii) involving cocaine base); United States v. Mothersill, 421 F.Supp.3d 1313, 1318 (N.D. Fla. 2019) (finding that a defendant was eligible for a sentence reduction on RICO and non-RICO counts "[b]ecause the crack offenses clearly affected [the] sentences on [the RICO counts]"); United States v. Mazzini, 487 F.Supp.3d 1170, 1180 (D.N.M. May 13, 2020) (finding that the First Step Act permits courts to impose a reduced sentence for a RICO defendant "[b]ecause the crack penalties in effect at the time of ... sentencing impacted his sentence on all counts"); see also, United States v. White, 93-cr-97 (BAH), 2022 U.S. Dist. LEXIS 152412, 2022 WL 3646614 (Aug. 24, 2022); United States v. Jones, No. 3:99-cr-264-1 (VAB), 2020 U.S. Dist. LEXIS 94041, 2020 WL 2791862 (D. Conn. May 29, 2020); United States v. Powell, 3:99-cr-264 (VAB), 2019 U.S. Dist. LEXIS 171895, 2019 WL 4889112 (D. Conn. Oct 3, 2019). Miller is eligible for relief on Counts One, Seven, Eight, Nine and Ten.

B. Miller's Cocaine Base Conviction Under 21 U.S.C. Section 848(b) is a Covered Offense Committed Before
   August 3, 2010, Whose Statutory Penalties Were Modified by Section 2 of the Fair Sentencing Act of 2010

On September 16, 1992, Count Three charged Miller with being the leader of a CCE "involving in excess of 1500 grams of cocaine base," in violation of 21 U.S.C. Section 848(b). ECF 193 at 11-12. On June 21, 1993, Miller was convicted on Count Three. ECF 482 at 10. The statute provides that anyone who is a "principal administrator, organizer, or leader" of a CCE that "involved at least 300 times the quantity of a substance described in [21 U.S.C. Section 841(b)(1)(B)]" "shall be imprisoned for life...." 21 U.S.C. Section 848(b).

The government did a Guidelines calculation for Count Three based on Miller's conviction under 21 U.S.C. Section 848(b). See Presentence Investigation Report ("PSR") at 25. At sentencing on May 12, 1995, the government stated that Miller was facing a mandatory life sentence under Section 848(b). See ECF 697, 892 at 11: 15-18 (May 12, 1995 Sentencing Transcript, certified by Court Reporter/Transcriber Terrell C. Dunphy on June 5, 1995). Miller was held accountable for distributing 1.5 kilograms (1500 grams) of cocaine base. Id. at 33: 14-21. Miller was imprisoned for life. ECF 749 at 3. Miller's conviction under 21 U.S.C. Section 848(b), subjected him to being sentenced to a minimum mandatory term of life imprisonment by statute and under the Guidelines. ECF 749 at 1, 3, 7.

Section 2(a) of the Fair Sentencing Act increased the threshold quantity in 21 U.S.C. Section 841(b)(1)(B) necessary to trigger certain mandatory minimum penalties. With the retroactive application of the Fair Sentencing Act through the FIRST STEP Act, 8400 grams (300 times 28)-rather than 1500 grams (300 times 5)-became the minimum quantity necessary to trigger a mandatory life sentence under 21 U.S.C. Section 848(b). See, e.g., United States v. Palmer, Case No. 89-cr-36-RCL-1, ECF No. 560 at 5-6, 2023 U.S. Dist. LEXIS 33556, 2023 WL 2265255 (D.D.C., February 27, 2023) (stating that because defendant's "statute of conviction [under 21 U.S.C. Section 848(b)] was modified by the Fair Sentencing Act, and his offense occurred prior to August 3, 2010, he committed a covered offense, and is thus eligible for relief under [Section] 404 of the First Step Act."); United States v. Jimenez, No. 92-cr-550-1(JSR), ECF No. 502, 2020 U.S. Dist. LEXIS 76721, 2020 WL 2087748, at *2 (S.D.N.Y. Apr. 30. 2020) (holding that a conviction under 21 U.S.C. Section 848(b) constituted a "covered offense"); United States v. Moore, No. 95-cr-509-2, ECF Doc. 1051, 2020 U.S. Dist. LEXIS 147754, 2020 WL 4748154, at *2-3 (N.D. Ill. Aug. 17, 2020) (same).

In at least three other cases, the government acknowledged that a conviction under 21 U.S.C. Section 848(b) involving crack cocaine is a covered offense under the FIRST STEP Act. See, e.g., United States v. Butler, 8:92CR14, 2021 U.S. Dist. LEXIS 20824, 2021 WL 366108, at *3 (D. Neb. Feb. 3, 2021) (the government, after receiving additional guidance from the

Department of Justice while the case was on appeal, conceded that a conviction under 21 U.S.C. Section 848(b) involving crack cocaine is a covered offense); United States v. Palmer, 35 F.4th 841, 850 (D.C. Cir. 2022) (finding-after the government conceded the defendant's eligibility-that a defendant's 848(b) conviction was a covered offense); United States v. Cotton, No. 00-cr-60029 (RGJ), 2021 U.D. Dist. LEXIS 70408, 2021 WL 1390403, at *2, n.4 (W.D. La. Apr. 12, 2021) (same).

Under the facts present here, Miller was convicted of violating a Federal criminal statute (21 U.S.C. Section 848(b)), for which the statutory penalties were modified by Section 2 or 3 of the Fair Sentencing Act; Miller's offense was committed before August 3, 2010; Miller has not previously filed a motion seeking FIRST STEP Act relief; and Miller's sentence has not been reduced pursuant to the amendments made by Section 2 or 3 of the Fair Sentencing Act. See United States v. Walker, Mem. Dec. & Order, 95-cr-101, ECF Doc. 620, at 4 (N.D.N.Y. Oct. 25, 2019) ("There is no dispute that Defendant is now eligible for re-sentencing because his violation of 21 U.S.C. [Section] 848(b) is a covered offense under the First Step Act.").

In addition, Section 2D1.1 of the USSG incorporated the 100:1 ratio that Congress had imposed for mandatory minimums into a Drug Quantity Table that "tied quantities of drugs to base offense levels." United States v. Castillo, 460 F.3d 337, 345 (2d Cir. 2006). In 1994, Application Note 10 stated that the Drug Quantity Table was based on Congress's sentencing structure for mandatory minimum penalties in 21 U.S.C. Section 841(b)(1), and linked drug quantities to statutory equivalences. See USSG Section 2D1.1(c), Application Note 10 (1994) ("The Commission has used the sentences provided in, and equivalences derived from, the statue (21 U.S.C. 841(b)(1)), as the primary basis for the guideline sentences.").

On May 12, 1995, Gerald Miller was "guided by the notion that the [mandatory] Guidelines, having the force and effect of law, are to be construed as if they were a statue[.]" United States v. Kirvan, 86 F. 3d 309, 311, (2d Cir. 1996). See Mistretta v. United States, 488 U.S. 361, 391 (1989) (holding that the mandatory Guidelines are binding on judges); see also, United States v. Maria, 186 F.3d 65, 70 (2d Cir. 1999) (applying these principles to application notes and commentary).

Because Miller's statute of conviction was modified by the Fair Sentencing Act, and his offense occurred prior to August 3, 2010, he committed a covered offense, and is thus eligible for relief under Section 404 of the FIRST STEP Act. See Order, United States v. Williams-Davis, No. 91-cr-559-1 (TFH), ECF No. 2376 (finding defendant convicted for engaging in a CCE pursuant to 21 U.S.C. Section 848(b), along with two counts of second degree murder, eligible for relief under Section 404 of the FIRST STEP Act of 2018, and reducing life sentence to 30 years).

## ARGUMENT II

### Whether and to What Extent to Grant Defendant a Sentence
### Reduction Pursuant to Section 404(b) of the FIRST STEP Act of 2018

Section 404(b) permits the Court, on a motion from the Defendant, to impose a reduced sentence "as if sections 2 and 3 of the Fair Sentencing Act of 2010 ... were in effect at the time the covered offense was committed." 132 Stat. 5222. The Defendant's request for a reduced sentence should take into consideration how he appears today, "not on the date of his offense or the date of his conviction.... Congress enacted the First Step Act of 2018 against that backdrop." Concepcion, 142 S.Ct. at 2396. The Court should begin by addressing the new statutory minimum or maximum penalties and current Guidelines, before applying the relevant sentencing factors listed in 18 U.S.C. Section 3553(a).

A. Miller's Concurrent Life Sentences on Counts One, Seven, Eight, Nine and Ten, Exceeds the Fair Sentencing Act's Reduced Statutory Maximum Sentences Made Retroactively Applicable by Section 404 of the FIRST STEP Act of 2018

The impact of the Fair Sentencing Act in this case is significant. If sentenced today under Count One - RICO Acts 1, 5, 6, 7, 8 - and Counts Seven, Eight, Nine and Ten, Miller would be subject to the sentencing ranges set forth in 21 U.S.C. Section 841(b)(1)(C) (2010). That range sets a maximum mandatory term of twenty years' imprisonment. Although Miller was initially sentenced under 21 U.S.C. Section 841(b)(1)(A)(iii) (1995), the Fair Sentencing Act increased the amount of cocaine base required to trigger this sentencing range from 50 grams to 280 grams. Fair Sentencing Act, Section 2, 124 Stat. 2372.

Because Miller's indictment specified his responsibility for an unquantified amount of cocaine base under Counts One, Seven, Eight, Nine and Ten, it alleged only sufficient facts to trigger the "fallback" penalty range of 21 U.S.C. Section 841(b)(1)(C). See Jimenez, 2020 WL 2087748 at *2 ("For purposes of calculating statutory penalties here [on a FIRST STEP Act motion], the relevant drug quantity is the one charged in the superseding indictment upon which [the defendant] was convicted ... not the amount attributed to [him] by subsequent judicial finding"); United States v. Powell, 360 F. Sup. 3d 134, 139 (N.D.N.Y. 2019) ("The drug type and quantity used to set the statutory range under the First Step Act of 2018 is the quantity charged in the indictment and found by a jury beyond a reasonable doubt.").

Additionally, intervening changes of law unequivocally recognizes that Miller's life sentences imposed on Counts One, Seven, Eight, Nine and Ten, are unconstitutional. See Apprendi v. New Jersey, 530 U.S. 466, 490 (2000) (holding that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt"). Five years later, the Supreme Court

---

decided United States v. Booker, 543 U.S. 220 (2005), which held that a mandatory application of the Sentencing Guidelines is unconstitutional. Id. at 244-46.

Miller received five concurrent terms of life imprisonment on Count One - RICO Acts 1, 5, 6, 7, 8 - and Counts Seven, Eight, Nine and Ten, pursuant to 21 U.S.C. Section 841(b)(1)(A)(iii) (1995), involving 50 grams or more of cocaine base. ECF 749 at 1, 3. But those counts of conviction did not mention in their text any specific quantity of cocaine base involved in either the RICO Acts or the substantive counts of distribution. ECF 193 at 6-7, 13-15. No elements of drug quantity were submitted to the jury and proved beyond a reasonable doubt. ECF 472 at 6075-78; ECF 482 at 9, 14-17. At sentencing on May 12, 1995, Miller's maximum sentences on Counts One, Seven, Eight, Nine and Ten, were increased from 20 years for an unquantified amount of cocaine base under 21 U.S.C. Section 841(b)(1)(C), to a range with a 10-year minimum and maximum sentence of life imprisonment under 21 U.S.C. Section 841(b)(1)(A)(iii).

The Supreme Court recently held that a district court proceeding under Section 404 of the FIRST STEP Act, may consider intervening changes of law in adjudicating a FIRST STEP Act motion. See Concepcion, 142 S.Ct. at 2396, 2404 (holding that Section 404 "allows district courts to consider intervening changes of law or fact in exercising their discretion to reduce a sentence pursuant to the First Step Act"). The Court has discretion to consider the constitutional holdings in Booker and Apprendi to impose a reduced sentence of twenty years on Counts One, Seven, Eight, Nine and Ten, to run concurrent.

FROM: 10766050
TO:
SUBJECT: ARGUMENT II B
DATE: 11/28/2023 11:04:28 AM

B. The Court has Discretion to Consider the Holdings in Alleyne
and Booker to Impose a Reduced Sentence Under Count Three

A jury convicted Miller of the Super CCE offense, a statute of conviction originally involving at least 1500 grams of crack cocaine. ECF 193 at 11-12. Plainly, that amount is smaller than the 8400 grams necessary to trigger the Super CCE threshold under 2(a) of the Fair Sentencing Act. 124 Stat. at 2372. The 1500 gram amount, however, nonetheless qualifies for the baseline CCE offense, which has no minimum drug quantity threshold. See 21 U.S.C. Section 848(a). That offense includes a twenty-year mandatory minimum. Id.

Twenty years, then, is the correct mandatory minimum for the Court to use in deciding whether to "impose a reduced sentence" for Miller's CCE offense under the FIRST STEP Act. First Step Act, Section 404(b), 132 Stat. at 5222; accord United States v. White, 984 F.3d 76, 86, 450 U.S. App. D.C. 287 (D.C. Cir. 2020) (using drug quantity in statute of conviction, rather than greater amount attributable to defendant's conspiracy, to determine mandatory minimum). Miller should receive the benefit of Alleyne. See Butler, 2021 U.S. Dist. LEXIS 20824, 2021 WL 366108, at *3 (noting the drastic changes in the government's "interpretation of the First Step Act and how it applie[d]" to defendant, including the concession that the defendant should get the benefit of post-sentencing changes in the law following Alleyne and Apprendi).

In Alleyne, the Supreme Court applied Apprendi's reasoning to include "not only facts that increase the ceiling, but also those that increase the floor[,]" referring to mandatory minimum sentences. See Alleyne v. United States, 570 U.S. 99, 108 (2013). Because "[m]andatory minimum sentences increase the penalty for a crime ... any fact that increases the mandatory minimum is an 'element' that must be summitted to the jury." Id. at 103. Miller was found guilty of disturbing an unquantified amount of cocaine base under Count Three. ECF 472 at 6095-6100. The jury was never asked to make any findings of drug quantity in its verdict. ECF 482 at 10.

When Gerald Miller was sentenced on May 12, 1995, a minimum term of life imprisonment was mandatory for him by statute and under the Guidelines. Today, sentences imposed under the mandatory Guidelines are unconstitutional, see Booker, 543 U.S. at 265 ("We do not doubt that Congress, when it wrote the [Sentencing Reform Act of 1984], intended to create a form of mandatory Guidelines system. But ... given today's constitutional holding, that is not a choice that remains open." (citation omitted)).

The advisory Guidelines now require at least 25.2 kilograms of crack cocaine to trigger the highest base offense level of 38, while a quantity of 1.5 kilograms (1500 grams) of crack cocaine triggers a base offense level of 32. The 1500 grams of crack cocaine relied upon in Miller's indictment for a CCE conviction under Count Three results in a Total Base Offense Level

of 36 (4+32). See USSG Section 2D1.5(a)(1). Since that level is lower than the higher alternative base offense level under

USSG Section 2D1.5(a)(2), the Base Offense Level is 38, with a Guidelines' sentencing range of 360 months to life.

Miller's mandatory life sentence under Count Three should be reduced considering the policy goals of Congress in

enacting the FIRST STEP Act, and the Fair sentencing Act before it, in accordance with the Court's "consider[ation of]

intervening changes of law or fact in exercising [its] discretion[.]" Concepcion, 142 S.Ct. at 2404. See, Effects of Booker,

123 Yale L.J. 2, 36-37 (2013) (referring to the sentencing frameworks notoriously harsh treatment of crack cocaine cases,

"which disproportionately involved black defendants"). Today, Miller would no longer face a minimum mandatory life

sentence by statute or the Guidelines. The advisory Guidelines' range for his Count Three conviction is recalculated below:

Base Offense Level: 2D1.5(a)(1) (4 plus the offense level from Section 2D1.1 applicable to the underlying offense)
Indictment - Count Three: 1500 grams of cocaine base (1.5 kilograms) = Level 32 (Drug quantity Table - 2D1.1)
Total Base Offense Level: 36 (4+32)

Base Offense Level: 38 (2D1.5(a)(2) - the greater applies)
Adjustment for Obstruction of Justice: 2
Adjusted Offense Level (subtotal): 40
Criminal History Category: V
Advisory Guideline Range: 360 months to life

FROM: 10766050
TO:
SUBJECT: ARGUMENT II C
DATE: 11/28/2023 11:04:46 AM

C. The FIRST STEP Act's Broad Remedial Purpose to Ensure Greater Justice for Those Subject to a Racially Disparate
   Sentencing Scheme and the Factors Under 18 U.S.C. Section 3553(a) Supports Miller's Request for a Reduced Sentence

Fundamentally, in enacting the FIRST STEP Act, Congress gave the Courts the power to impose a reduced sentence to correct a historical wrong. See, e.g., 164 Cong. Rec. S7764 (Sen. Booker) ("The problem was the change [in the disparity between powder and crack cocaine sentencing addressed in the Fair Sentencing Act] wasn't retroactively applied.... We never made this change retroactive.... Making this fix in the bill alone will mean that thousands of Americans who have more than served their time will become eligible for release...."); id. at S7774 (Sen. Feinstein) (Congress addressed [the disparity between crack and powder cocaine sentencing] in 2010, when the Fair Sentencing Act became law.... Unfortunately, this new law did not apply retroactively, and so there are still people serving sentences under the 100-1 standard. The bill before us fixes that and finally makes the Fair Sentencing Act retroactive so that people sentence under the old standard can ask to be resentenced under the new one.").

It was a broad grant because Congress knew there would be complicated cases; moreover, it wanted the courts to have discretion and flexibility to determine the appropriate remedy for defendants who were sentenced under laws that are now widely recognized as misguided, unjust, and racially motivated. Thus, in exercising discretion, Miller's post-sentencing conduct "provides the most up-to-date picture of [his] 'history and characteristics.'" Pepper v. United States, 562 U.S. 476, 492 (2011) (citing 18 U.S.C. Section 3553(a)(1)). Indeed, the Supreme Court has emphasized the important nature of post-sentencing rehabilitation, stating that "there would seem to be no better evidence than a defendant's post incarceration conduct." Id. at 491. "Post-sentencing rehabilitation may also critically inform a sentencing judge's overarching duty under [18 U.S.C. Section] 3553(a) to 'impose a sentence sufficient, but not greater than necessary' to comply with the sentencing purposes set forth in [18 U.S.C. Section] 3553(a)(2)." Id.

The instant offense in this case started in July 1984, when Miller was just 21 years old. See August 17, 1994 PSR Addendum (stating that "information obtained from the Government indicated that [Gerald Miller] began participating in the instant offense in 1984"). Recent studies on the development of the human brain conclude that human brain development may not become complete until the age of twenty-five. See U.S. Sentencing Commission, Youthful Offenders in the Federal System, at 5 (May 2017) https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170525_youthful-offenders.pdf (last visited Aug. 4, 2023) ("The inclusion of young adults in the definition of youthful offenders is informed by recent case law and neuroscience research in which there is a growing recognition that people may not gain full reasoning skills and abilities until they reach age 25 on average."); see also,

Elizabeth Williamson, Brain Immaturity Could Explain Teen Crash Rate, Wash. Post, Feb. 1, 2005 at A01 (summarizing a recent National Institutes of Health ("NIH") study that suggests "that the region of the brain that inhibits risky behavior is not fully formed until age 25").

And while Miller acknowledges that his age at the time of commission of the instant offense does not excuse or justify his criminal conduct, the Sentencing Commission's empirical research suggest that the maturation process does not end at 18 years old. Instead, for males especially, the maturation process continues well into one's late 20s; such that, at the time of Miller's instant offense conduct he was less able to exercise proper judgment and control impulses, than he is now as a mature and thoughtful adult who is a markedly different person.

The first 5 years following Miller's sentencing on May 12, 1995, was a rough adjustment for him in some of the most dangerous penitentiaries in the United States. The reality of life without parole (LWOP) left Miller feeling like he had no real chance for fulfillment outside of prison walls, no chance for reconciliation with society, and no hope. That resignation left Miller believing he would never leave prison before life's end. During that rough period of his incarceration, Miller's disciplinary history reflects he had some initial difficulty conforming his behavior to institutional rules. Between 1997 to 2000, he incurred eight disciplinary infractions. However, Miller was able to alter the course of his life by focusing on his genuine need for change.

The dramatic difference between the first five years after Miller was sentenced on May 12, 1995 - and the last 23 years of his over 31 years in federal custody is a testament to his impressive growth and rehabilitation. Miller has had only two incident reports in the last 23 years. Since October 11, 2016, Miller has not incurred a single disciplinary infraction. That he has largely followed the rules while incarcerated for the last 23 years suggests that he will do so once released, which minimizes the danger he poses to the community. See United States v. Marks, No. 03-CR-6033, 455 F. Supp. 3d 17, 2020 U.S. Dist. LEXIS 68828, 2020 WL 1908911, at *16 (W.D.N.Y. Apr. 20, 2020) ("[G]iven Mark's clean disciplinary record for many years past, and his demonstrably successful efforts at rehabilitation, I conclude that upon release, he will not pose a danger to the community.").

Gerald Miller's  commendable behavior is especially significant because his sentence of LWOP eliminated any extrinsic motivation to earn good time credits and to acquire new skills and knowledge; moreover, Miller's efforts at rehabilitation are exceptional because, when the Court denied Miller's motions under 18 U.S.C. Section 3582(c), on March 30, 2010, there were no significant prospects for release and it appeared that he would serve his life term of imprisonment without reduction, reflecting that his motivations for rehabilitation are by all indications sincere.

Miller has spent over half his life in federal prison. The risk of recidivism decreases as a person ages, and it is

increasingly unlikely that Gerald Miller will engage in misconduct as he grows older. This comports with his lowered rate of infractions while serving life imprisonment. See 18 U.S.C. 3553(a)(2)(B) and (C). As Miller argues, keeping him incarcerated for life, rather than granting him immediate release or a sentence reduction, is neither necessary to protect society from Miller, nor to deter him from committing future crimes.

Once again, the United States Sentencing Commission's empirical research establishes the point. As age increases, recidivism by every measure decreases. See United States Sentencing Comm., The Effects of Aging on Recidivism Among Federal Offenders, p. 30 (December 2017), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf [https://perma.cc/S95U-MC7F]; see also, United States v. Piggott, No. 94 Cr. 417, 2022 U.S. Dist. LEXIS 5293, 2022 WL 118632, at *3 (S.D.N.Y. Jan. 12, 2022) ("It is also well-established that recidivism decreases significantly with age.").

First, Miller asks the Court to consider his rehabilitation and programs completed, the amount of time he has already served, as well as his age to find that he's not a danger to the community. Second, the Department of Justice ("DOJ") has supportive evidence to infer that Miller is not a danger to the community. At the insistence of Congress, the DOJ through the Federal Bureau of Prisons (BOP"), implemented a uniform scientifically validated risk assessment tool under the FIRST STEP Act of 2018, pursuant to 18 U.S.C. Section 3632-33. These assessment measures do not classify Gerald Miller as a high risk for future offenses.

The DOJ's Prisoner Assessment Tool Targeting Estimated Risk and Need (PATTERN), scores Miller as a "low" risk of recidivism; the second-lowest of four options for both general and violent recidivism. This tool is designed to assess all inmates through an algorithm that calculates their risk of recidivism to determine if they present a high, medium, low, or minimum risk of reoffending.

Furthermore, Gerald Miller has a release plan that includes living with his elderly parents, taking them to medical appointments, and helping them with home upkeep if the Court grants him immediate release. Miller's father is 85 years old and his mother is 83 years old. Miller will return to the community with a large network of support consisting of family, friends, acquaintances, service providers, and businesspeople, all of whom are eager to help him smoothly transition back into the community, including through offers of employment. See United States v. Reid, 2021 U.S. Dist. LEXIS 42380, 2021 WL 837321, at *7 (E.D.N.Y. Mar. 5, 2021).

One of Miller's several offers includes employment as a consulting producer for Flow State Films. As a consulting producer, Mr. Miller would work on many facets of the business, which includes working on films and TV sets, creating presentation materials, working with other producers on the creation of film, TV, and podcast ideas; and working with the company to source and gain access to other stories that are based on authentic narratives and intellectual property. Miller

would start working remotely and then travel accordingly dependent on where various productions are located.

A lot of the work that Flow State Films does is related to stories based around the idea of criminal justice, mass incarceration, social justice, the media, and socio-economic issues facing America and the world. Miller will work from the ground up; moreover, he will be mentored on the film and television business by the owner of Flow State Films, with an eye toward a career. See letter from Donald J. Sikorski.

Mr. Miller also has a job waiting for him in the Hospitality and Restaurant business based on the certifications and skills he acquired as a participant in the Culinary Arts Program while at United States Penitentiary ("USP") Allenwood. All of the above facts support Miller's claims that he does not pose a danger to any person or the community if released. See United States v. Scott, 239 F. Supp. 3d 629, 635 (E.D.N.Y. 2017) ("[Defendant's] strong family support and good job prospects make recidivism unlikely.").

In addition, Miller's substantive commitment to rehabilitation while in prison warrants a reduction of his life sentence. He has maintained a solid record of programming by taking advantage of important psychological, educational, and vocational training programs available in the BOP. Under the programs and tutelage of staff, Miller has reaped the rewards and matured with the positive direction provided.

Currently, Gerald Miller is attending Big Sandy Community and Technical College while at USP Big Sandy. He also works in Electric I in the Facilities Department at the prison. Miller has taken an apprenticeship to acquire more knowledge about the safe performance of electrical work. Finally, Mr. Miller is a mentor in USP Big Sandy's Getting Ready for the Outside World ("GROW") Program, which is spearheaded by the U.S. Department of Justice through the Reentry Services Division of the Federal Bureau of Prisons.

GROW is a voluntary program where participants reside on a unit with other motivated inmates, allowing them to focus on personal growth and skill building. In this setting, inmates have the opportunity to address factors that would otherwise contribute to future criminal behavior and reentry problems. The GROW Program addresses criminal behavior by structuring individualized plans to address participants' needs. Instead of a punitive or negative consequence approach, GROW is based on the ability to earn positive consequences for positive behavior, while learning new skills for reentry success.

Mr. Miller not only improved himself while incarcerated, he improved the lives of others by assisting his fellow inmates in acquiring their GEDs, which is attested to in letters submitted on his behalf. Gerald Miller was also instrumental in guiding

many of the younger inmates through the CODE Program, while being a participant himself. The BOP's Challenge,

Opportunity, Discipline, and Ethics ("CODE") Program was intended "to teach inmates basic core values such as respect for

others, responsibility for personal actions, honesty in relationships with others, and tolerance towards the actions of

others." Audit Div., Office of the Inspector Gen., U.S. Department of Justice, Audit Report 04-16, The Federal Bureau of

Prisons Inmate Release Preparation and Transitional Reentry Programs," at 14 (2004).

The CODE Program was a residential therapeutic program that encompassed the belief that living in an environment

which expects and encourages positive coping behaviors, directed toward specific goals, can help facilitate change. The

CODE Program was the precursor to what is currently known as the Challenge Program: an intensive cognitive-behavioral

treatment program at high-security prisons "focuse[d] on the reduction of antisocial peer associations; promotion of

positive relationships; increased self-control and problem solving skills; and development of pro-social behaviors." Federal

Bureau Of Prisons, Directory Of National Programs 10 (2017). The Challenge Program "places a special emphasis on violence

prevention." Id.

While in the CODE Program, starting on September 26, 2005, Miller worked on his "Treatment Plan" to: identify his

criminal thinking patters that led to his incarceration, learning effective communication skills and the ability to relate to

others, and understanding the impact his crimes had on victims and their families. Miller successfully completed the CODE

Program on August 31, 2006. Then, Miller reenrolled for a second time to continue the treatment plans mentioned above.

Miller completed his second participation in the CODE Program on October 30, 2007, earning exceptional program reviews,

certificates, and awards in the process.

Gerald Miller impressed BOP officials in the CODE Program so much, he was personally recruited to become an active

participant in certain aspects of the Challenge Program when the CODE Program initially switched over. Miller successfully

completed six months in the "Focus Group" of the Challenge Program on December 17, 2009, as well as Part One and Two of

the Challenge "Aftercare" Program on May 28, and August 28, 2011, respectively. The Challenge Program's Focus Group and

Aftercare components addressed criminality via cognitive-behavioral challenges to criminal thinking errors.

Particularly noteworthy is Miller's extensive "voluntary" participation in these programs. Collectively, Miller's participation

in the CODE Program and components of the Challenge Program lasted from September 26, 2005, up until August 28, 2011.

This substantial evidence of rehabilitation should convince the court that "the history and characteristics of the defendant"

counsels against the sentence mitigated for by "the nature and circumstances of the offense." 18 U.S.C. Section 3553(a)(1).

Gerald Miller's rehabilitative efforts - undertaken without any reasonable prospect of the Court ever reducing his life

term of imprisonment - this supports a reduced sentence. Various other related sentencing factors such as "the need for the

sentence imposed ... to protect the public from further crimes of the defendant; and to provide the defendant with needed

---

educational or vocational training" similarly favor a lower sentence based on Miller's rehabilitation. 18 U.S.C. Section 3553 (a)(2)(C), (D). The nearly 34 years of Miller's incarceration is sufficient to deter future misconduct. 18 U.S.C. Section 3553 (a)(2)(B).

If released, Gerald Miller plans on being a caring son to his elderly parents, a loving father to his daughter, and a hands-on grandfather to his grandchildren. Miller's granddaughter is just two years old. She does not know that her grandfather is incarcerated. Mr. Miller would like to be the one who explains his mistakes in life to his granddaughter as she grows up. But he'd like to do so as a free man, not from a prison visiting room as he had to do with his daughter when she was just an 8-year-old little girl.

One of Mr. Miller's main goals if released is to educate younger generations about the dangers of engaging in a crime. To do this, Miller plans on starting a non-profit organization called C.A.B.S. (which is an acronym for Creating A Better Society) dedicated to driving at risk children, teenagers, and young adults away from crime, violence, gangs, and narcotics. Miller expressed his thoughts about C.A.B.S. in a letter he wrote to the Court in 2009, accompanying his post-judgment motions for relief under 18 U.S.C. Section 3582(c), which was denied in 2010. See January 1, 2009 Letter to the Court from Gerald Miller, in United States v. Gerald Miller, 1:92-cr-00091-RJD, Doc. 802-2, Filed 03/25/09, p. 1-4.

Perhaps Judge Jack B. Weinstein - one of the smartest judges who ever sat on the federal bench - said it best:

> Pragmatism and a sense of fairness suggest reconsideration of our overreliance on incarceration. Through defendants are hemmed in by circumstances, the law must believe that free will offers an escape. Otherwise, its vaunted belief in redemption and deterrence-both specific and general-is a euphemism for cruelty.

United States v. Bannister, 786 F. Supp. 2d 617, 690 (E.D.N.Y. 2011); see also, Michael Tonry, Purposes and Functions of Sentencing, 34 Crime and Justice: A Review of Research 28-29 (2006); Andrew von Hirsch, et. al., Criminal Deterrence and Sentence Severity: An Analysis of Recent Research (1999); Gary Kleck, et. al., The Missing Link in General Deterrence Theory, 43 Criminology 623 (2005).

Finally, Gerald Miller's exemplary conduct while incarcerated has garnered so many character reference letters in support of his release. In addition to their quantity, they are meaningful in both their quality and their source. Miller has received letters of support for his release from family and friends, BOP staff, and community leaders. These letters compellingly document Mr. Miller's personal growth and his efforts to improve the lives of others as previously mentioned.

Many individuals, either currently or formerly incarcerated with Miller, have described his positive impact on their lives and on the prison community. BOP officials write that Gerald Miller often steps in as a voice of reason to diffuse conflict between prisoners, as well as between prisoners and guards. They also describe Miller as a genuinely changed person, a

---

clear mentor to other prisoners, and someone with whom they can depend on as being consistent and trustworthy. The letters from BOP officials, who had direct and extended interactions with Gerald Miller, should assure the Court that he is truly rehabilitated. Miller's behavior demonstrates his commitment to leading a law-abiding and productive life post-incarceration, which will be supported by an engaged community as the numerous letters asking for his release indicate.

Mr. Miller is extremely remorseful for the far-reaching impact of his crimes and accepts full responsibility for his actions. See Letter to the Court from Gerald Miller (November 28, 2023). Requiring Miller to spend the rest of his life in prison serves no useful purpose to himself or society at this point. The record reflects that Mr. Miller has done virtually everything in his power to rehabilitate himself. The one thing that is not in his power is his release from prison and return to society. That power lies with the Court. Gerald Miller should be given the opportunity for a second chance pursuant to Section 404 of the FIRST STEP Act of 2018.

D. The Court has Discretion to Consider all Relevant Factors to Inform its Decision Whether to Impose a Reduced Sentence Under Count One Pursuant to Section 404(b) of the First Step Act

When raised by the parties, a "district court may consider all relevant factors when determining whether an eligible defendant merits relief under the First Step Act." Palmer, 35 F.4th at 851 (quoting White, 984 F.3d at 90). Some important factors to consider are: "new statutory minimum or maximum penalties; current Guidelines; post-sentencing conduct; and other relevant information about a defendant's history and conduct," to ensure that a sentence is "sufficient, but not greater than necessary, to fulfill the purposes of [18 U.S.C. Section] 3553(a)." Id. (quoting White, 984 F.3d at 90). See also Concepcion, 142 S.Ct. at 2396 (affirming that courts "may consider other intervening changes of law (such as changes to the Sentencing Guidelines) or changes of facts (such as behavior in prison) in adjudicating a First Step Act motion" and are "obligated to consider nonfrivolous arguments presented by the parties" but are "not compel[led] ... to exercise their discretion to reduce any sentence based on those arguments").

If sentenced today, Miller would no longer qualify for a life sentence under Count One. Miller's cocaine base RICO Acts no longer includes life imprisonment under the Fair Sentencing Act's reduced statutory maximum sentences made retroactively applicable by Section 404 of the FIRST STEP Act. The statutory maximum penalty for RICO Acts 1, 5, 6, 7 and 8, is 20 years imprisonment. See Arguments I A & II A (incorporated herein by reference). For the following reasons, Miller's RICO Act 10 conviction also carries a statutory maximum sentence of 20 years imprisonment.

The RICO statute provides, in relevant part, that "[w]hoever violates any provision of section 1962 of this chapter shall be ... imprisoned not more than 20 years (or for life if the violation is based on a racketeering activity for which the maximum penalty includes life imprisonment)...." 18 U.S.C. Section 1963(a). Aiding and abetting Criminal Facilitation in the Second Degree is a class C felony punishable by a penalty of imprisonment between 1-to-15 years maximum. See New York Penal Law Section 70.00 (McKinney 1987). Accordingly, the maximum penalty "shall be" 20 years imprisonment.

However, the Probation Department applied USSG Sections 2X5.1, 2X2.1, and 2A1.1, to Miller's conviction for aiding and abetting Criminal Facilitation in the Second Degree (RICO Act 10), which resulted in an offense level of life imprisonment under the mandatory Guidelines for first degree murder. This error violated Miller's right to due process, and Sixth Amendment right to trial by jury.

Significantly, USSG Section 2X2.1 (aiding and abetting) did not call for a term of life imprisonment for Criminal Facilitation in the Second Degree when Miller was sentenced. The 1994 mandatory Guidelines for aiding and abetting defined the meaning of the term "underlying offense":

Commentary

Statutory Provision: 18 U.S.C. 2.

Application Note:

1. "Underlying offense" means the offense the defendant is convicted of aiding and abetting.

USSG Section 2X2.1 - Aiding and Abetting (November 1, 1994).

The RICO Act 10 offense Miller "is convicted of aiding and abetting" is Criminal Facilitation in the Second Degree; not first degree murder. Miller was neither charged by the grand jury with committing murder under RICO Act 10, see ECF 193 at 7-8, nor convicted by the petit jury on the elements of murder for his RICO Act 10 violation. See ECF 472 at 6086-89. Miller was charged, tried, and convicted of one complete crime; but sentenced for a different offense. See ECF 697, 862: 14-18, 26-27.

In Apprendi, the Supreme Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. Thereafter, on December 28, 2000, the Department of Justice ("DOJ") issued a memorandum to all federal prosecutors instructing them as to the policy regarding the application of Apprendi to RICO prosecutions. See Memorandum from Assistant Att'y Gen. James K. Robinson, Criminal Division Apprendi Guidance re RICO and Section 1959 (Dec. 28, 2000), http://10.173.2.12/usao/eousa/ole/usebook/narc/apprendi/1228memo.htm [hereinafter "Apprendi RICO Memo"].

That Apprendi RICO Memo makes explicitly clear that prosecutions under 18 U.S.C. Section 1962(c) involve potential Apprendi issues, raising certain issues of pleading and proof. Where the Government seeks to obtain a sentence of more than the twenty year statutory maximum, Apprendi does apply. The Government's policy is as follows:

> (1) the count charges against the defendant a racketeering act for which the penalty includes life imprisonment; (2) the racketeering act charges the necessary facts to trigger the life imprisonment penalty, tracking that portion of the statute that sets forth the factors supporting a penalty of life imprisonment; and (3) the racketeering act cites the appropriate statute or statutes the racketeering act violates.

Criminal RICO: 18 U.S.C. Sections 1961-1968; A Manual for Federal Prosecutors (6th rev. ed.) (Organized Crime and Gang Section/U.S. Department of Justice), May 2016, at 190.

This policy is binding in all federal prosecutions. It would be a miscarriage of justice for the government to urge the Court to deny Miller relief under Section 404 of the FIRST STEP Act, due to his RICO Act 10 conviction under Count One for aiding and abetting Criminal Facilitation in the Second Degree. Human error on multiple levels, the overwhelming sentencing disparity, and the absence of any other avenue for relief, constitutes a totality of the circumstances and compelling reasons for the Court's exercise of discretion.

-------------------------------------------------------------------------------------------------------

Racketeering Acts 1, 5, 6, 7 and 8, does not include life imprisonment under 18 U.S.C. Section 1963(a). Neither does Miller's RICO Act 10 conviction. With the passage of Section 404(b) of the FIRST STEP Act, the Court now has authority to impose a reduced sentence of 20 years imprisonment on Count One "to remove the unfair and unjust life sentence that was required to be imposed." Powell, 360 F. Supp. 3d at 138.

Notwithstanding that above, in fiscal year ("FY") 2020, the national average length of a federal sentence for murder was approximately 21 years, and the median sentence was approximately 19 years. U.S. Sentencing Commission, Preliminary Fy20 4th Quarterly Sentencing Update 9 (Jan. 4, 2021). The numbers are not significantly different for FY 2019. In that year, sentences for murder averaged just over 21 years nationally, and the median was 20 years. U.S. Sentencing Commission, 2019 Federal Sentencing Statistics 11 (2020). The average murder sentence in the Second Circuit was roughly 17 years in FY19. Id. In FY 1996, a year after Miller was sentenced, the national average length of a sentence for murder was approximately 24.5 years, and the median sentence was approximately 22 years. U.S. Sentencing Commission, 1996 Federal Sentencing Statistics 10 (1997).

In view of federal sentencing practices, the Court should conclude that reducing Miller's life sentence under Count One, of which he has already served nearly 34 years, would not create an unwarranted disparity between him and similar offenders. Gerald Miller's sentence was the product of the then-mandatory Sentencing Guidelines, and under today's sentencing scheme he would not have been given such a long and harsh sentence. See Booker, 543 U.S. 220 (2005).

-------------------------------------------------------------------------------------------------

## CONCLUSION

Life without parole signifies that a defendant is entirely beyond rehabilitation, can contribute nothing to society, and is worthy of only warehousing. That does not appear to be the case for Gerald Miller. Mr. Miller demonstrates that he possesses that requisite level of maturity, rehabilitation, and readiness to reenter society necessary to merit immediate release under Section 404 of the Formerly Incarcerated Reenter Society Transformed Safely Transitioning Every Person Act of 2018. This is Gerald Miller's first substantive opportunity for relief from his crack-quantity-based concurrent life sentences - sentences that, for over two decades, have been on the wrong side of significant changes in federal sentencing law. The Court should impose a reduced sentence under Counts One, Three, Seven, Eight, Nine and Ten, consistent with the purposes of Section 404 of the FIRST STEP Act and Congress's intent to remedy the disproportionate impact of the statutory penalties applied to crack cocaine offenses prior to August 3, 2010; and to eliminate the disparity between the Defendant and those sentenced thereafter.

FOR THE FOREGOING REASONS, this Honorable Court should issue an order:

(1) Declaring Gerald Miller eligible for relief under Section 404(a) of the FIRST STEP Act of 2018;

(2) granting a hearing pursuant to Rule 47(c) of the Federal Rules of Criminal Procedure;

(3) imposing a reduced sentence of 20 years to run concurrent on Counts One, Seven, Eight, Nine and Ten, and time served on Count Three pursuant to Section 404(b) of the FIRST STEP Act; or

(4) a sentence sufficient, but not greater than necessary, to achieve the purposes of sentencing as set forth in Title 18 U.S.C. Section 3553(a); and

(5) for any other relief the Court deems just and appropriate.

DATED: November 28, 2023

Respectfully submitted,

*Gerald Miller*

GERALD MILLER, pro se