UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------X

UNITED STATES OF AMERICA,

        -against-                  92-CR-91-01 (NGG)

GERALD MILLER,

        *Defendant.*
--------------------------------------------------------------X


**SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF
GERALD MILLER'S REQUEST FOR A REDUCTION IN SENTENCE
PURSUANT TO 18 U.S.C. § 3582(c)(1)(B)**

Zachary Segal
Richard Levitt
Levitt & Kaizer
40 Fulton Street, 17th Floor
New York, N.Y. 10038
(212) 480-4000
zsegal@landklaw.com
*Attorneys for Gerald Miller*

March 29, 2024

# TABLE OF CONTENTS

Introduction .................................................................................................1

I. BACKGROUND .........................................................................................4

    A. Procedural History........................................................................4

        1. New York State Case: 1990-1991..................................................4

        2. Federal Case: Indictment, Trial, Sentencing Habeas..................4

    B. Post-Conviction Rehabilitation. ........................................................11

        1. Self-Reflection ...............................................................13

        2. Understanding the Consequences of Crime .................................14

        3. Applying the Lessons from CODE Within Prison.........................17

        4. Applying the Lessons from BOP Courses to the Community ......23

II. THE COURT SHOULD REDUCE MR. MILLER'S LIFE SENTENCES
TO FORTY YEARS ...........................................................................29

    A. Mr. Miller's Convictions were for Covered Offenses...........................29

    B. The Proposed Reduction to 40 Years is Consistent with § 3553(a)....33

Conclusion.........................................................................................39

# TABLE OF AUTHORITIES

**Cases**                                                                                         **Page(s)**

*Concepcion v. United States,*
    597 U.S. 481 (2022) ............................................................................ 30, 33

*Miller v. United States,*
    99-cv-3346, Doc. 1 (E.D.N.Y. May 28, 1999) ............................................ 9

*Pepper v. United States,*
    562 U.S. 476 (2011) ................................................................................... 33

*Reynolds v. United States,*
    No. 99-CR-520 (NGG), 2022 WL 1444167 (E.D.N.Y. May 6, 2022) ............... 36, 37

*Testa v. United States,*
    971 F. Supp. 833 (S.D.N.Y. 1997) ............................................................ 37

*United States v. Boyd,*
    987 F.3d 278 (2d Cir. 2021) .................................................................... 30

*United States v. Burrell,*
    No. 97 CR 998-1 (RJD), 2020 WL 5014783 (E.D.N.Y. Aug. 25, 2020) ............ 32, 35

*United States v. Davis,*
    961 F.3d 181 (2d Cir. 2020) .................................................................... 29, 32

*United States v. Evans,*
    633 F. App'x 55 (2d Cir. 2016) ............................................................... 38

*United States v. Geraldo,*
    687 F. App'x 101 (2d Cir. 2017) ............................................................. 38

*United States v. Glynn,*
    No. 06-CR-580 (JSR), 2022 WL 562652 (S.D.N.Y. Feb. 24, 2022) .................. 36

*United States v. Hernandez,*
    604 F.3d 48 (2d Cir. 2010) ..................................................................... 33

*United States v. Jimenez,*
    No. 92-CR-550-01 (JSR), 2020 WL 2087748 (S.D.N.Y. Apr. 30, 2020) ............ 29

*United States v. Johnson,*
    No. 98-CR-860(7) (ARR), 2021 WL 5755047 (E.D.N.Y. Dec. 3, 2021) ............ 36

*United States v. Jones*,
No. 3:99-CR-264-1 (VAB), 2020 WL 2791862 (D. Conn. May 29,
2020) ........................................................................................................ 35

*United States v. King*,
No. 00-CR-1108 (RJD), 2023 WL 7386659 (E.D.N.Y. Nov. 8, 2023) ................... 36

*United States v. Lake*,
No. 98-CR-500-FB, 2022 WL 17083288 (E.D.N.Y. Nov. 18, 2022) ...................... 36

*United States v. Lugo*,
No. 01-CR-922 (NG), 2022 WL 732153 (E.D.N.Y. Mar. 11, 2022) ................ 35, 38

*United States v. Martin*,
974 F.3d 124 (2d Cir. 2020) ................................................................................ 30

*United States v. Miller*,
116 F.3d 641 (2d Cir. 1997) .................................................................................. 9

*United States v. Miller*,
92-cr-91 (EDNY) ................................................................................................... 1

*United States v. Miller*,
No. 92 CR 91 (RJD), 2010 WL 1269796 (E.D.N.Y. Mar. 30, 2010) ................ 9, 10

*United States v. Palmer*,
35 F.4th 841 (D.C. Cir. 2022) .............................................................................. 32

*United States v. Qadar*,
No. 00-CR-603 (ARR), 2021 WL 3087956 (E.D.N.Y. July 22, 2021) ................... 36

*United States v. Ramos*,
No. 03-CR-315 (ERK), 2023 WL 1766279 (E.D.N.Y. Feb. 3, 2023) ..................... 36

*United States v. Reed*,
7 F.4th 105 (2d Cir. 2021) ................................................................................ 3, 30

*United States v. Rodriguez*,
492 F. Supp. 3d 306 (S.D.N.Y. 2020) ................................................................. 35

*United States v. Roman*,
No. 3:94-CR-00112 (AWT), 2023 WL 8435990 (D. Conn. Dec. 5,
2023) ........................................................................................................ 30

*United States v. Russo*,
643 F. Supp. 3d 325 (E.D.N.Y. 2022) ............................................................ 37, 38

*United States v. Tellier*,
  No. 92 CR. 869 (LGS), 2023 WL 5498909 (S.D.N.Y. Aug. 25, 2023) .................... 35

*United States v. Underwood*,
  No. 88-CR-822 (SHS), 2021 WL 3204834 (S.D.N.Y. Jan. 15, 2021) .................... 36

**Statutes and Other Authorities**

18 U.S.C. § 1956 ........................................................................................ 5, 6, 31, 32

18 U.S.C. § 1959 .................................................................................................... 6

18 U.S.C. § 1962 ............................................................................................... 5, 31

18 U.S.C. § 1963 ................................................................................................. 32

18 U.S.C. § 3582 ................................................................................................... 1

18 U.S.C. § 3584 ................................................................................................. 31

21 U.S.C. § 841 ..................................................................... 5, 6, 29, 31, 32

21 U.S.C. § 846 ............................................................................................... 5, 31

21 U.S.C. § 848 ................................................................. 6, 29, 31, 32

Fair Sentencing Act of 2010 .................................................... 3, 29, 30, 32

First Step Act .................................................... 3, 20, 30, 33, 34

David M. Herszenhorn, *Man Is Charged in '91 Killings Once Blamed
  on Drug Dealers*, New York Times, July 18, 1997, available at
  https://www.nytimes.com/1997/07/18/nyregion/man-is-charged-in-
  91-killings-once-blamed-on-drug-dealers.html ........................................ 7

https://drive.google.com/file/d/1I4L-
  SEk83KSa7K0PMIQMLUzs3aqkSGHO/view?usp=sharing ................................ 24

Jon Levine, *Notorious Gambino mob 'Gemini Twins' hitman linked to
  11 murders, dismemberments paroled after getting life sentence*,
  New York Post, https://nypost.com/2023/12/09/news/gambino-mob-
  hitman-anthony-senter-paroled-set-for-2024-release/ .......................................... 37

*Peace Negotiator: Erica Ford*, New York City Office of Neighborhood
  Safety, available at
  https://neighborhoodsafety.cityofnewyork.us/office-to-prevent-gun-
  violence/peace-negotiator-erica-ford/ .................................................................. 26

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------X

UNITED STATES OF AMERICA,

        -against-                         92-CR-91-01 (NGG)

GERALD MILLER,

            *Defendant.*
------------------------------------------------------X

### SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF GERALD MILLER'S REQUEST FOR A REDUCTION IN SENTENCE PURSUANT TO 18 U.S.C. § 3582(c)(1)(B)

Nearly 29 years ago, a 32-year-old Gerald Miller appeared for sentencing, knowing full well he was about to be sentenced to spend the rest of his life in prison. The life sentence was pre-ordained both by the mandatory nature of the Guidelines and by Miller's CCE conviction. Mr. Miller gave a lengthy statement at his sentencing. Part of his statement included recounting the trajectory that resulted in his facing a life sentence, as well as expressions of remorse for the harm his crimes caused to his family and to society at large. Mr. Miller also lamented his fear that a life sentence would disable him from "the chance to correct the errors of my past ways." Judge Dearie, although believing the concurrent six life sentences he ultimately imposed was a just sentence, nonetheless acknowledged that Mr. Miller's "obvious intelligence" could be used to "discourage others who would likely admire you if they saw you on the street from following in your footsteps." *See* Doc. 862, Sent. Trans., at 56.[1]

---

[1]     Unless otherwise noted, references to "Doc." are to the instant case, *United States v. Miller*, 92-cr-91 (EDNY).

1

In the 29 years since Mr. Miller was sentenced, Judge Dearie's words – which echoed those of Father Jerry Connolly's beseeching his childhood friend William "Rocky" Sullivan as Sullivan approached the electric chair in Michael Curtiz's 1938 crime drama *Angels With Dirty Faces*[2] – could be read as prophetic. Dating back to 2001, the Court will see from Mr. Miller's BOP records that Mr. Miller employed his intelligence and leadership skills to deter younger inmates from following in his footsteps, a skill he learned through participation in various BOP programs, including the CODE Program (now known as the Challenge Program), which teaches inmates empathy. Letters from correctional officers and inmates alike attest not only to the continuity of Mr. Miller's personal transformation, but also to his successful efforts to positively influence the younger generation. Mr. Miller's success was not confined to the walls of the penitentiary, however, as letters from community activists, former inmates, and even a once-troubled teenager who visited him in prison reveal the positive impact he has had on the community.

Thirty-four years have elapsed since Gerald Miller was last on the streets — he was arrested March 21, 1990. With no prospect of ever returning to freedom, Mr. Miller nonetheless endeavored to make the streets a better place than the state he left them in. Whether it was organizing basketball tournaments, promoting peace in the very projects his drugs were sold, or things he said to inmates that have helped them live law-abiding lives and remain free, Mr. Miller's impact has been real, positive, and tangible.

---

[2]    Father Connolly begged Rocky to die like a coward to discourage his young gang proteges from following him into a life of crime.

True, this change in Mr. Miller did not occur overnight. As he candidly explains to the Court, "I caught 8 disciplinary infractions in less than three years between 1997-to-2000. … But faced with the reality of dying in prison, I had to think about the kind of person I wanted to be." Exhibit A, Miller Ltr to Court, at 1. The person he wanted to be was the person Judge Dearie believed Mr. Miller could be, and Judge Dearie's words helped him become that person, inasmuch as they encouraged Mr. Miller to help others to reach their potential. *Id*. at 6 ("They've lingered in my mind for decades and kept me firmly grounded on my path to drive as many children, teenagers, and young adults as possible away from crime, violence, and narcotics.")

As discussed below, Mr. Miller's convictions are "covered offenses" under the Fair Sentencing Act. Congress gave retroactive effect to these amendments through Section 404 of the First Step Act, believing that district courts should have an opportunity "to retroactively reduce sentences associated with offenses involving crack cocaine that may have been unfairly impacted by [the 100:1] historical disparity." *United States v. Reed*, 7 F.4th 105, 116 (2d Cir. 2021). This Court has a unique opportunity to additionally determine whether Mr. Miller lived what can only be described as a second lifetime, in such a positive way, that he is deserving of living a third as a free man, in the community he dedicated his second life to improving, and among the family and friends who have supported him throughout.

For the reasons that follow, this Court should grant the instant motion and re-sentence Mr. Miller on his six concurrent life sentences to concurrent terms of 40 years.

# I.     BACKGROUND

## A. Procedural History

### 1.  New York State Case: 1990-1991

On March 21, 1990, Mr. Miller, then 27 years old, was arrested by New York State authorities on an indictment from Queens County charging, *inter alia*, a controlled substance conspiracy (PSR ¶ 128). A few months later, in July 1990, Mr. Miller was arrested, again by NYS authorities, on another Queens County indictment charging him and four others for their alleged involvement in the murder of four Colombians (PSR ¶ 129); Mr. Miller was incarcerated when these murders occurred. The evidence on the drug case consisted of wiretaps and cooperator testimony whereas the murder had no wiretaps. Mr. Miller proceeded to trial on the murder charges and was acquitted on May 7, 1991 (PSR ¶ 129). Mr. Miller remained in state custody on the drug charges until the wiretaps were suppressed in a related case, at which point the federal Government arrested him at Rikers, and the state case was dismissed.

### 2.  Federal Case: Indictment, Trial, Sentencing, Habeas

On January 24, 1992, Mr. Miller and his nine co-defendants were named in a multi-count indictment charging them with a variety of crimes related to their involvement in the "Supreme Team" enterprise, which sold crack predominantly in the Baisley Park Housing Projects in South Jamaica, Queens. *See* Doc. 1. After pre-trial motions were filed, seeking suppression of the wiretaps suppressed in the state, Mr. Miller and his co-defendants were named in a twelve-count superseding

indictment on July 8, 1992 (Doc. 142). Count One, charging a substantive RICO violation (18 U.S.C. § 1962(c)), listed 20 racketeering acts ("RA"). *Id.* at 6-10.

On August 31, 1992, just shy of two months after the superseding indictment was filed, the Government presented Mr. Miller and his co-defendants with a global plea offer. *See* Exhibit B, Plea Offer, at 1. Relevant here, the plea required Mr. Miller to "allocute to all homicide predicates with which he is charged." *Id.* In exchange, the Government agreed "to a sentencing cap of 40 years' imprisonment." *Id.* The plea was rejected, and the defendants went to trial. The charges against Mr. Miller, and dispositions, are reflected in the chart below:

| | Brief description | Co-defendants charged | Outcome |
|---|---|---|---|
| Count 1, RA 1: Narcotics conspiracy (21 U.S.C. § 846) | Distribution of crack from Aug. 1986-March 1990 | all | Convicted (PSR ¶ 1) |
| Count 1, RA2: Narcotics trafficking (21 U.S.C. § 841) | Distribution of cocaine in July 1989 | Arroyo, Hale, Jimenez, Hunt, Arciniegas, Tucker | Acquitted (*id.*) |
| Count 1, RA 5: Narcotics trafficking (21 U.S.C. § 841) | Distribution of crack in December 1989 | Arroyo, Hale, Coleman, Tucker, Brown | Convicted (*id.*) |
| Count 1, RA 6: Narcotics trafficking (21 U.S.C. § 841) | Distribution of crack in January 1990 | All except Hunt | Convicted (*id.*) |
| Count 1, RA7: Narcotics trafficking (21 U.S.C. § 841) | Distribution of crack in February 1990 | *Id.* | Convicted (*id.*) |
| Count 1, RA8: Narcotics trafficking (21 U.S.C. § 841) | Distribution of crack in March 1990 | *Id.* | Convicted (*id.*) |
| Count 1, RA 10: criminal facilitation in the second degree (N.Y.P.L. §§ 115.05, 20.00) | Providing information to facilitate a murder in the summer of 1987 | None | Convicted (*id.*) |
| Count 1, RA 11: murder (N.Y.P.L. §§ 125.25, 20) | Murder of John Doe 1 (acquitted in Queens) | Arroyo, Hale, Jimenez, Hunt | Acquitted (*id.*) |
| Count 1, RA 12: murder (N.Y.P.L. §§ 125.25, 20) | Murder of John Doe 2 (*id.*) | *Id.* | Acquitted (*id.*) |
| Count 1, RA 13: murder (N.Y.P.L. §§ 125.25, 20) | Murder of John Doe 3 (*id.*) | *Id.* | Acquitted (*id.*) |
| Count 1, RA 14: murder (N.Y.P.L. §§ 125.25, 20) | Murder of John Doe 4 (*id.*) | *Id.* | Acquitted (*id.*) |
| Count 1, RA 19: money laundering (18 U.S.C. § 1956) | Money laundering | None | Convicted (*id.*) |
| Count 1, RA 20: money laundering (18 U.S.C. § 1956) | Money laundering | None. | Convicted (*id.*) |

| Count 2: narcotics trafficking (21 U.S.C. §§ 846, 841) | Distribution of crack from Aug. 1986-March 1990 | All | Convicted, but dismissed on appeal. |
|---|---|---|---|
| Count 3: CCE (21 U.S.C. § 848(b)) | Running a continuing criminal enterprise | None. | Convicted (*id.*) |
| Count 4: Narcotics trafficking (21 U.S.C. § 841) | Distribution of cocaine in July 1989 | Arroyo, Hale, Jimenez, Hunt, Arciniegas, Tucker | Acquitted (*id.*) |
| Count 7: Narcotics trafficking (21 U.S.C. § 841) | Distribution of crack in December 1989 | Arroyo, Hale, Coleman, Tucker, Brown | Convicted (*id.*) |
| Count 8: Narcotics trafficking (21 U.S.C. § 841) | Distribution of crack in January 1990 | All except Hunt | Convicted (*id.*) |
| Count 9: Narcotics trafficking (21 U.S.C. § 841) | Distribution of crack in February 1990 | *Id.* | Convicted (*id.*) |
| Count 10: Narcotics trafficking (21 U.S.C. § 841) | Distribution of crack in March 1990 | *Id.* | Convicted (*id.*) |
| Count 11: threatening violence in aid of racketeering (18 U.S.C. § 1959; N.Y.P.L. §§ 215.15, 20.00) | Calling and threatening the brother of a witness who testified against Mr. Miller in his Queens case. | None. | Acquitted (*id.*) |
| Count 12: money laundering (18 U.S.C. § 1956(a)(1)(b)) | Buying a BMW to conceal proceeds of drug activity in April-May 1989 | None | Convicted (*id.*) |

The trial started in April 1993 and after ten-weeks Mr. Miller was convicted of the offenses listed above. Notably, the only count involving violence of which Mr. Miller was convicted was RA 10 — providing information that was used to facilitate a murder committed by another. He was, again, acquitted of ordering the murder of the four Colombians. Although his co-defendants were also acquitted of the same, the jury found Arroyo and Hale guilty of one attempted murder and three completed murders, charged in RAs 15-18.[3]

---

[3] At co-defendant Waverly Coleman's sentencing, the Government noted that Mr. Miller was not involved in the Gus Rivera murder (RAs 15, 18). *See* Doc. 754 at 19 ("I also note … the Gus Rivera incident, is important because Gerald Miller had no role in that. He was in jail. That was Wilfredo Arroyo's plan at the time he was running the organization[.]"); *see also* Gov. App. Br., 1996 WL 33661144, at *29 ("Hence, in August 1989, in a plan arranged by Arroyo, Rivera was shot in the head by Hunt[.]")

Mr. Miller was sentenced on May 12, 1995. *See* Doc. 862, Sent. Trans., at 1. Defense counsel, Joyce London, requested an adjournment until November 1995 because the Second Circuit was considering whether the 100:1 crack disparity violated equal protection and the Sentencing Commission recommended lowering the disparity to 1:1, which, if approved, would have taken effect in November 1995. *Id*. at 10-11. Arguing that Mr. Miller's CCE conviction "under 848(b)" carried a mandatory life sentence irrespective of the guidelines or changes thereto, the Government opposed adjournment. *Id*. at 11. Although expressing discomfort with the 100:1 disparity, saying "maybe we'd be all be better off if [defense counsel's] position [regarding the fairness of the 100:1 disparity] prevailed", Judge Dearie went forward with sentencing because of Mr. Miller's CCE conviction and the uncertainty as to whether any change would be retroactive. *Id*. at 12-14. Defense counsel's remarks thereafter were limited because the then-mandatory guidelines mandated imposition of a life sentence. *Id*. at 35 ("Obviously, he has one life to give and I can't ask for the lower end of that range."). The Government's remarks were equally limited but focused on the violence charged in the indictment, concluding that Mr. Miller "earned the right to spend every minute of the rest of his life in prison[.]" *Id*. at 35-36. [4] Mr. Miller, by contrast, gave a lengthy statement, notwithstanding the inevitability of a life sentence.

---

[4]     Allegations that Mr. Miller tried to influence one of the cooperator's testimony during his 1991 trial (*see* Doc. 862, Sent. Trans., at 35) were dispelled in 1997 by the NYPD when they arrested the culprit, who's motive was to rob the victims. *See* David M. Herszenhorn, *Man Is Charged in '91 Killings Once Blamed on Drug Dealers*, New York Times, published July 18, 1997, available at https://www.nytimes.com/1997/07/18/nyregion/man-is-charged-in-91-killings-once-blamed-on-drug-dealers.html

Mr. Miller's statement was a combination of remorse and disappointment. He was critical of the 100:1 crack-cocaine disparity, disappointed that his sentencing was not being adjourned pending further legislative consideration of that disparity and upset that the federal government was permitted to use the same wiretaps suppressed in his state case against him in his federal case. *Id*. at 47-52. But most of his disappointment was directed at himself. He traced his upbringing, recounting how he was raised well, but explaining that he got caught up in the streets because he wanted the nice cars, jewelry, and overall lifestyle only the drug dealers had. *Id*. at 52-53. He acknowledged his "present nightmare [w]as a result of my personal decisions as a youth and because I didn't have the courage or intelligence to try and do something more positive or productive when I became a parent and an adult," but also laid blame on the "gross hypocrisy of the court system." *Id*. at 53. He addressed the "hardships" that befell his family, including his daughter, during the five years he had been remanded, noting how much harder it was knowing he could never physically be there for them. *Id*. at 53-54. Mr. Miller concluded, saying,

> That's main -- what I have to say. I had more but I'm -- right now, I'm not in the mood to keep going on talking because it doesn't help much anyway. But I just want to add that I apologize for any problems that you say may have occurred during this trial. And I say that not because I'm expecting anything because I know I'm getting a life sentence, but I say that because, as a person, I believe you – you're a good person, I think. And I make that apology to you or the marshals and Ms. Caldwell and everybody else. That's all I have to say.

*Id*. at 55. Judge Dearie took note of Mr. Miller's "insights into how it is that you found your way into this level of activity[.]" Doc. 862, Sent. Trans., at 55-56. He then told Mr. Miller that his intelligence could be used as a force for good, "to discourage others

who would likely admire you if they saw you on the street from following in your footsteps." *Id*. at 56. What Judge Dearie said he did not hear was "regret", even though he also said "I think I – it's not to say I don't think you're regretful on a number of levels, my sense of you is that you are." *Id*. Judge Dearie then went on to impose the six life sentences, which he believed was a "just and appropriate sentence." *Id*. at 56. The proceedings concluded with Judge Dearie wishing Mr. Miller "luck in the Court of Appeals." *Id*. at 57.

On appeal, Mr. Miller's convictions and sentences were affirmed, except for Count Two, charging a narcotics conspiracy, because the punishment was duplicative of the CCE conviction in violation of double jeopardy. *See United States v. Miller*, 116 F.3d 641, 678 (2d Cir. 1997). In 1999, Mr. Miller filed his habeas corpus petition. *See Miller v. United States*, 99-cv-3346, Doc. 1 (E.D.N.Y. May 28, 1999). After filing his reply on September 7, 1999, *id*. at Doc. 8, Mr. Miller moved to amend his petition in 2001 to include other ineffectiveness arguments (*id*. at Docs 11, 17, 21), and then in 2006 arguing the Supreme Court's decision in *Booker* should be given retroactive effect (*id*. at Doc. 29). In 2009, he sought retroactive application of Guideline Amendment 706. *See* Doc. 801. On March 30, 2010, Judge Dearie denied both Mr. Miller's sentence reduction motion and habeas petition. *See United States v. Miller*, No. 92 CR 91 (RJD), 2010 WL 1269796, at *1 (E.D.N.Y. Mar. 30, 2010). Judge Dearie explained that Mr. Miller was ineligible for relief under Amendment 706 and that *Booker* was not given retroactive effect. *Id*. at *12. On the ineffective arguments, Judge Dearie denied relief, explaining, "Not only do his claims lack any recognizable

merit, Miller should not even be heard to complain of alleged 'errors' that it was his trial strategy to bring about." *Id.* at *1.

***

The next section of this memorandum documents Mr. Miller's rehabilitative journey. This journey began between in or about 2001, around the time Mr. Miller filed the last habeas petition alleging ineffective assistance of counsel. In the 11 years between the 1999 filing of Mr. Miller's original habeas petition and its 2010 denial, Mr. Miller used the intelligence Judge Dearie recognized to evolve into the role model His Honor believed he could be. Mr. Miller's progress continued largely unabated. Although he had a disciplinary infraction in 2016 for a fight "no contact",[5] a correctional officer, writing in 2022, who had overseen Mr. Miller for 15-years, explains how Mr. Miller's ability to influence others to avoid conflict combined with his "polite and honest" character enabled the correctional officer to believe that a person can be reformed:

> I am writing to you on behalf of Mr. Gerald Miller. I have worked with inmate Miller for the past 15 years. In that time I have seen Mr. Miller do many good things within his community at the prison. When I worked as a temporary recreation officer, I witnessed Mr. Miller stop heated arguments over workout equipment and calm the atmosphere of the individuals involved. As my orderly I have never had to call the housing units looking for Mr. Miller as he was always there on time.

---

[5] A "no contact" fight is one where no contact is made. Mr. Miller explained to the undersigned this incident arose on the basketball court when the other inmate, who was much younger, started antagonizing Mr. Miller to earn respect. When Mr. Miller's attempts to use words failed, he took care to ensure the punch he threw did not land as a means of showing the younger inmate Mr. Miller was capable of hurting him but not desiring to do so. After the incident, Mr. Miller explains he resolved the dispute with the younger inmate and they shook hands. When they were both taken to SHU, Mr. Miller recounts that he told the CO to only give him an infraction because he was older and should've known better. Mr. Miller was thereafter returned to the general population, and the younger inmate remained in his unit. His only other infraction since 2000 was a 2009 citation for phone abuse. *See* Exhibit D, BOP Transcripts, at 1.

When I worked in Mr. Miller's Unit he has always been polite and honest with me. If I had a problem with any of the inmates within my unit I would ask Mr. Miller to talk with them as to avoid any further incidents. Mr. Miller would take that inmate aside, talk with him, and the inmate would return to me with an apology. I have witnessed Mr. Miller stop fights on the yard before they escalated into a larger disruption. As a Corrections Officer I have seen many types of individuals come and go at this Prison, but Inmate Gerald Miller has shown me that even in a grim and place of low self-value a man can overcome the evils of his past and surroundings.

Mr. Miller has taken a negative in his life, forged through and grown to become a leader in his community. **I honestly believe in reform of offenders because of Mr. Miller and the years I have watched, worked with, and been around him.** If you find it well enough to give Mr. Miller a second chance to return to the outside world, I personally believe he would make the best of it. I believe that Mr. Miller would become a leader and asset in his community.

Exhibit C, BOP Letters of Support, at 10 (CO J. Gosciminski) (emphasis added).

## B. Post-Conviction Rehabilitation

Between 1993 and 2000, Mr. Miller accumulated fourteen disciplinary infractions, eight of which occurred after his May 1995 sentencing. *See* Exhibit D, BOP Transcripts, at 1-6. He was fighting, possessing dangerous weapons, and disobeying orders. *Id*. Although initially designated to USP Allenwood, a facility fairly close to New York City,[6] Mr. Miller was, by the end of 1997, shipped far away to USP Lompoc in California, and then to USP Beaumont in Texas — it was at these facilities where seven of the eight post-sentencing infractions occurred. By the end of

---

[6] Even during these tumultuous years, according to Bill Underwood, Mr. Miller spent time studying the law and trying to improve himself. *See* Exhibit C, BOP Letters of Support, at 29. When Underwood met Mr. Miller, he had already been serving a life sentence for CCE and murder, but was undergoing the very transformative process Mr. Miller would pursue in the coming years. Mr. Miller, in his letter to the Court, remarks how Underwood's transformation not only inspired his own, but compelled him to use the influence he had in the criminal underworld to deter youth in the same Underwood used his influence to eventually deter Mr. Miller. *See* Exhibit A, Miller's Ltr, at 3.

2000, Mr. Miller's habeas had not been ruled on, and he began to face the reality of his circumstances: that he was going to die in prison.

Faced with this reality, Mr. Miller relates in his letter that Judge Dearie's words at sentencing "made me realize that my life is still meaningful." Exhibit A, Miller's Ltr, at 6. To become a better person, Mr. Miller first sought to understand the roots of his criminality, followed by understanding the consequences of his crimes by taking programs (*e.g.*, CODE) that teach inmates self-reflection and empathy. *Id.* at 2 ("I felt if I did not begin the process of rehabilitation with a repentant heart for the crimes I committed by understanding why I committed them, then there could be no real transformation.") After graduating from CODE in 2007, Mr. Miller enrolled in educational and vocational programs, wherein he got stellar grades and applied the lessons he learned in CODE to assist other inmates both academically and with their personal growth. *See* Exhibit E, BOP Records, 1-3; *see also* Exhibit C, BOP Letters of Support, at 28 (CO Toomey: "An example of his character was when another inmate in the program that wanted to quit, but Inmate Miller encouraged him to stay and helped that inmate finish the program, this is something that is rare in a prison setting.") The latter feat was accomplished through the creation of a program Mr. Miller designed called PATIENCE (discussed *post*). *See* Exhibit C, BOP Letters of Support, at 3-8. Armed with the capacity to help those in prison, Mr. Miller then directed his efforts to the community, resulting in tangible benefits. As one youth he assisted relates, "I was able to graduate from the middle school and now attending high school with the support and inspiration of Mr. Miller." *See* Exhibit F, Letters from Family & Friends, at 42 (N███████ W████).

Mr. Miller's blueprint for success is nothing short of extraordinary. Indeed, his efforts helped many of his fellow lifers obtain their own release, something Mr. Miller relishes as evidence that change is possible, even though he admits that "I can't stop myself from thinking that I may likely die in prison." What keeps him going is the "the inner peace and joy of having changed my life around. … If I can prevent just one child, teenager, or young adult from making a bad choice now that can destroy their life in the future, then I'm accomplishing my goals. It gives me some solace and hope." *See* Exhibit A, Miller's Letter, at 5.

### 1. Self-Reflection

The first part of Mr. Miller's transformative journey was to understand what drove him to crime. This question plagued Mr. Miller because he and his siblings were raised by the same parents, yet he was the only one who got involved in the streets. *See* Exhibit A, Miller's Letter, at 1 ("For those reasons I needed to identify the source of criminality that gradually crept into my life, which caused me to engage in criminal behavior"); *see also* Exhibit F, Letters from Family & Friends, at 23 (Parents: "Our other three children have grown up to be family oriented responsible law-abiding adults. Our son Gerald has been taught right and have the basic [sic] for the same beliefs. However somewhere along the line back in the 1980s he was seduced by the streets of South Jamaica.") Mr. Miller identified one source of criminality, the trauma he endured at 10-years old when another 10-year-old, Clifford Glover, was killed by a police officer and the ensuing "political and social upheaval of the times." *Id*. at 1-2. Another source was the desire to drive the fancy cars and live the extravagant lifestyle admired and emulated by certain of the youth in his community, drug

dealers. *Id.* at 3. Identifying the source of criminality, however, does not excuse Mr. Miller's conduct, as he well understands:

> Yet that trauma provides no excuse for my later criminality, neither does poverty. My decision to begin selling drugs at 21 years old in July 1984, was a bad choice to engage in criminal activity, which turned to guns and violence, contributing to the degradation of my community. Instead of finding solutions to change life in the ghetto for myself and others, I added to the problems. I cannot express to this Court in mere words the enormous feelings of regret and remorse I have for the crimes I committed nearly 34 years ago. My lack of maturity and underdeveloped sense of responsibility resulted in my impetuous and ill-considered actions and decisions as a youth and young adult.

Exhibit A, Miller's Letter, at 1. This realization by Mr. Miller was made possible by participation in CODE, which as Mr. Miller explains "was instrumental in guiding me though the process of understanding and sharing the feelings of others" because "As criminals we often feel like what we did only affected ourselves. We usually never stop to think about the damage we caused to the people directly impacted by our criminal behaviors." *Id.* at 4.

### 2. Understanding the Consequences of Crime

Mr. Miller's first step in understanding the consequences of criminality was his participation in the Victims Impact program at USP Beaumont. *See* Exhibit E, BOP Records, at 6. This and other programs he took to heart helped Mr. Miller earn the opportunity to return to USP Allenwood. *Id.* at 7-12. Almost immediately upon his return to USP Allenwood, in or about September 2005, Mr. Miller was accepted into CODE, a residential therapy program that "encompasses the belief that living in an environment which expects and encouraged positive coping behaviors and is directed toward specific goals can help facilitate change." *Id.* at 13. CODE is a

demanding four phase program, requiring the inmate to live in a designated unit, over the course of fifteen months. *Id*. Each phase includes group meetings as well as individual counselling. Upon completion of the orientation phase in December 2005, CODE treatment specialist, Suzanne Mitchell, observed that Mr. Miller was sincere in expressing a desire to change, and willing to engage CODE's change methodically, which first required him to understand the effects of crime:

> Mr. Miller identified three areas to address while in CODE to include: criminal thinking, communication skills and victim impact. He took the initiative to submit copouts for two groups listed in his treatment plan which are Victim Impact and Breaking Barriers. Mr. Miller is one of the elder individuals in group who has already served many years in prison as well as is facing a Life sentence. His younger peers often seek his guidance and direction regarding his past and current ways of thinking. Mr. Miller provides them with meaningful feedback in order to demonstrate that they have a choice in how to live their lives.

> Overall, Mr. Miller remains an above average group participant. He always attends group in a timely manner, completes assigned tasks and interacts on a mature level both in group and on the unit.

*Id*. at 17. During the second phase, per Ms. Mitchell's April 2006 report, Mr. Miller continued to be an "above average group participant." *Id*. at 22. Inasmuch as he continued participating in group discussions "without hesitation", Mr. Miller, instead of merely responding to younger inmates, became proactive in trying to help them by offering insight gleaned from the 15 years he had already served of his life sentence:

> He also provides the group with personal experiences on what it is like to have a Life sentence. Mr. Miller tries to encourage group members, especially the younger members, to work hard at looking at their poor choices and make pro-social choices for their future. He continues to explore important topics for discussions as well as provides the group with a mature outlook. … He took an active role in the Victim Empathy portion of the CODE Program and received a certificate of completion. … Overall, Mr. Miller remains an above average group participant. His

> mature demeanor provides an important balance needed in group
> settings.

*Id*. at 22. Although Mr. Miller graduated CODE in August 2006, *id*. at 26, he re-enrolled shortly thereafter "in order to maintain positive focus throughout his incarceration, as well as continue working on his treatment goals." *Id*. at 29. Ms. Mitchell's April 2007 review from the second orientation phase underscored Mr. Miller's desire "to work on the same treatment goals which include: criminal thinking, effective communication and victim empathy." *Id*. Whereas before Mr. Miller tried diverting younger inmates by discussing the hardships of his life sentence, by April 2007, he began freely discussing his own criminal ways as a means of deterrence:

> He completed his criminal history worksheet which was an oral
> presentation during group. He freely discusses his past ways of thinking
> and how it has negatively impacted his life. Mr. Miller remains open
> minded to different points of views, as well as, offers valuable feedback
> to the group members. Overall, Mr. Miller is an above average group
> participant.

Exhibit E, BOP Records, at 29. By August 2007, according to Ms. Mitchell, Mr. Miller's respect of others "both in and outside of group sessions" and "present[ation] in a mature manner" resulted in "group members often look[ing] to him for guidance and direction." *Id*. at 33. Mr. Miller graduated CODE again in October 2007. *Id*. at 38. In February 2008, Mr. Miller enrolled in the LIFE program, a 21-week "cognitive behavioral program" geared towards "identifying beliefs, improving problem solving skills, setting goals and emotion management." *Id*. at 40. Upon completing LIFE in July 2008, the post-completion review, authored by Richard Divers, noted Mr. Miller's success in both becoming a problem solver and identifying the causes of his incarceration:

During his treatment planning interview Miller expressed a desire to work on the following: addressing his use of criminal thinking. Over the course of the LIFE skills program Miller learned to be a more effective problem solver. He was also able to identify how he set himself up to make poor decisions by not considering his options and rushing through the decision making process. During group sessions he was also able to share personal information as it related to course material. Overall Miller did a good job in the LIFE skills program. He should continue to identify ways to challenge himself and develop his underdeveloped potential.

*Id.* at 43. Taking Mr. Divers' advice, Mr. Miller looked to his next challenge. He found it in the vocational and educational programs offered by the BOP. There, Mr. Miller was able to work with inmates that had not been enrolled in CODE and show them they had a capacity for change. His dedication to the well-being of those around him earned him the respect of fellow inmates and the correctional officers supervising him.

### 3. Applying the Lessons from CODE Within Prison

Between 2008 and the present, Mr. Miller completed thousands of hours of programming. *See* Exhibit E, BOP Records, at 1-3. In just 2008 alone, Mr. Miller obtained his commercial driver's license and completed a paralegal course, graduating the latter with a 98.38% average. *Id.* at 48-52. He also obtained vocational certifications for food handling and personal trainer. *Id.* at 71-75, 81; *see also* Exhibit C, BOP Letters of Support, at 28 (CO Toomey, "Inmate Miller was consistently at the top of the class for exam scores."). More recently, Mr. Miller earned the "highest score of all students" in a sociology course in 2023, *id.* at 84, and in January 2024 graduated from BOP's re-entry GROW program, in which he also served as a mentor. *Id.* at 90-105; *see also* Exhibit A, Miller's Letter, at 4-5.

From 2015 until 2022, Mr. Miller's "work detail" was assigned to Ryan Shuck, the Recreation Specialist at USP Allenwood, and Shuck describes Mr. Miller's work ethic towards both his jobs and rehabilitation:

> What I can tell you is that Mr. Miller has been and is one of the best workers and best men that have been employed by our department. No matter what job we ask him to perform he always manages to exceed our expectations. He is one of, if not the most, consistent and trustworthy people that have worked for the recreation department. … He is constantly trying to better himself and spends the majority of his free time participating in educational courses offered by departments throughout the institution. His education transcript is proof of the effort he has put in to complete numerous recreation, education, and vocational trainings.

Exhibit C, BOP Letters of Support, at 24 (Schuck).

Mr. Miller put this same work ethic into helping his fellow inmates. The respect staff and older inmates had for him made it possible to reach his target audience, younger inmates. One way Mr. Miller used his influence was motivating the younger inmates to get their GEDs. *See* Exhibit C, BOP Letters of Support, at 1 (Reavon Brown: "I have received my GED … with the help of Mr. Miller. He was the one who encouraged to take my GED and helped me understand the work needed to pass."); *id.* at 4 (Mouhahmet Cherry: "Never did I think the day would come when I would receive my GED. Needless to say, with Mr. Miller's sincere guidance and assistance, I was finally able to get my GED (and I'm smiling again because I'm proud that I did!)").

Capitalizing on his ability to gain younger inmates' attention, Mr. Miller then used his intellect to develop a program called PATIENCE, which Mouhahmet Cherry

explains, was designed to keep him on the straight and narrow following release. *Id.*
at 7. As Mr. Cherry explains, PATIENCE is an acronym:

> P – Prepare for your release no later than your first day of incarceration;

> A – Always look to build on the knowledge and skills you'll need to hold onto a job once released;

> T – Take time out for yourself to observe and think without distractions;

> I – Initiating your mind to think positive at all times will lead to greater insight;

> E – Evaluate what people ask you to do for them in terms of what is legally and morally right or wrong for you, your family, your community, and society;

> N – Never fail to plan and articulate what you want out of life;

> C – Channel your energies on the positive construction of self regardless of what others may think;

> E – Experience you gain during your work assignments now will improve your chances in achieving your prospective employments goals once released.

*Id.* at 6-7. Using this rubric, Cherry explains that he is "able to rationalize my thoughts in order to make better decisions for my future." Cherry was released on September 7, 2022. Richard Kelly, another younger inmate, explains that when he first Mr. Miller at USP Allenwood in 2013, he "honestly thought I could sound cool and speak of all my exploits in life to appear cool to him." *Id.* at 20. But, Kelly continues, "To my surprise he looked at me and said 'young brother if you want something you never had, you have to do something you never did'[.]" Unable to understand how Mr. Miller's words applied to him, Kelly returned to Mr. Miller, and after many walks on the yard, understood that "I never valued myself enough to view

for myself. He seen that I was well-witted but arrogant; he seen that I was driven but no map." *Id*. Kelly was released in 2016, and, believing he was smarter, was ready to revert his prior ways, but an opportunity arose to become a pet groomer, at which point Kelly realized this was an opportunity to change, and so he contacted Mr. Miller:

> Through my conversations with Mr. Miller I was challenged with various perspectives and was at a crossroads. I discovered the possibility of caring for something more than I cared for myself! I couldn't figure out how to ingest this mindset on no level. I impatiently awaited the opportunity to speak to Mr. Miller to share with him my thoughts. I prayed that he gave me a perspective that will help me see the rights that outweighed my wrong... "I said Gerald" I have an opportunity to groom dogs and cats but I have no knowledge of it. I feel "less-than..". He told me something that change my outlook on life in that moment. He said lil brother ; "you've been grooming dogs all your life" all you have to do is equate that to your modern day reality.

> Your Honor, I needed to hear exactly that in that moment! I need a reason to be great! This man gave me that reason with minimum effort.

> Today I'm the proud owner with my wife of FLOSSY PET PAWLOR LLC. We have over 1500 customers in 2 years and 5 star reviews! I'm blessed, Your Honor.

*Id*. at 20-21.

Luke Jones, a federal prisoner whose life sentences were recently reduced pursuant Section 404, explains why Mr. Miller is so dedicated to helping younger inmates like Cherry and Kelly:

> Prince, also empathized with people-mainly youth and young men-who were becoming criminals and losing their freedom and their lives because they lacked the knowledge, discipline, skills and tools needed to live productive lives. Prince once told me that just as people like he and I had looked up to, followed and were influenced by older drug dealers in our communities, others have done the same with respect to us.

> Prince expressed disgust at the thought someone else's life may have been ruined, emulating his. Prince said that such a thought was a punishment in itself that would remain with him for all of his days, or at least until he could outweigh his bad with good.

Exhibit C, BOP Letters, at 14-15. Observing the talks Mr. Miller had with younger inmates, Luke Jones notes that Mr. Miller "condemned his past lifestyle, us[ing] it and his current circumstances to symbolize himself as a failure and a 'statue of a fool,' of whom they should 'never let [themselves] become.'" *Id*. at 15-16 (alterations in original); *see also id*. at 27 (Rene Tellier: "The younger prisoners respected him immensely because of his criminal background and how he emerged to transform his character into a positive role model. … I heard him many times remorsefully mention his hatred for his criminal behavior.")

Luke Jones continued explaining that one of the ways Mr. Miller sought to outweigh "his bad with good" was enlisting the help of other inmates serving life sentences to join him in deterring the youth coming through USP Allenwood by dropping a jewel, meaning sharing their experiences. *Id*. at 16; *see also id*. at 22 (Richard Lugo: "Together we motivated younger prisoners to purposely take programs to better themselves so they would not return[.]") Not all the lifers, however, were amenable to dropping jewels, but on even them, Mr. Miller had an impact by preventing violence by methodically segregating the adversaries, learning the source of the conflict, and bringing them together to talk things out to prevent bloodshed. *Id*. at 17 (Luke Jones); *see also* Exhibit F, Letters from Family & Friends, at 28 (Veronica Miller: "Gerald has been helping the other inmates approach their problems with mathematical style reasoning: every problem has a solution, you just

have to find the right formula to apply to the problem.") But, when Mr. Miller's words didn't work, Mr. Miller would go as far as reaching into his own pocket to resolve disputes, just to prevent violence:

> I have watched Gerald Miller literally pay other prisoners' debts to end arguments and or violence which is very prevalent in prison. There are more fights and stabbings and assaults in prison over debts than any other reason. So for miller to step up and pay off outstanding debts is a very rare occurrence. To me these selfless acts speak volumes about the genuineness of Miller's radically transformed character.

*Id.* at 26 (Rene Tellier). Mr. Miller, however, did not only reach into his pocket to prevent violence: he also did "when it came to feeding hungry inmates who were destitute of funds. He gave them food from his own commissary purchases and made sure they had personal hygiene items which many of them lacked." *Id.* at 22 (Richard Lugo). The small acts that Mr. Miller performed earned him notoriety among staff as well, such as Recreation Specialist Ryan Schuck, who wrote,

> What sticks out most to me about Mr. Miller is his high character and a great attitude. He is always respectful and polite. He is also extremely unselfish and willing to help others. Countless times I have witnessed him giving food, clothing, hygiene products, and other personal possessions to those around him who don't have as much. Almost every time he has received a bonus (in the form of candy/Gatorade/water bottle) as compensation for his superior work performance he has given it away to someone who needs it more. His model behavior has always been in compliance with our rules, regulations, and policies. These qualities have earned him the utmost respect from both staff and fellow inmates and speak volumes to how he has successfully rehabilitated himself.

Exhibit C, BOP Letters of Support, at 24-25. Mr. Schuck concluded his letter by recommending that the Court "consider" giving Mr. Miller a second chance:

> It is with my highest recommendation that you would consider giving this man a second chance. He has been a model inmate and has proven that he has fully rehabilitated himself. His strong work ethic and

commitment to improving himself gives me great confidence that if given the opportunity he would make the most of his freedom and become a positive contributor to society. His strong family ties and good support system give him a solid foundation to be successful.

*Id.* at 25. From within the prison walls, Mr. Miller has already been a "positive contributor to society." And he has done so by using the skills he learned in prison, which is a great source of pride to his family members, as they too have always believed in his potential. *See* Exhibit F, Letters from Family & Friends, at 25 (Fertice Miller III (Mr. Miller's youngest brother), explaining Mr. Miller's transformation "represents so much to me, my family, and more importantly to Gerald himself[.]")

### 4. Applying the Lessons from BOP Courses to the Community

Although Mr. Miller deserves to take satisfaction in becoming a source for positive change in prison, he nonetheless laments "there is not a day that goes by when I do not express some form of regret over the egregious, unlawful, shameful, and embarrassing behavior that hurt my community and family." Exhibit A, Miller's Letter, at 2. "On the other side of that", Mr. Miller continues, "I have grown to respect the law wholeheartedly. I've developed the integrity to do what is morally and legally right even when other people are not watching. … Now, my mission in life is to prevent others from ending up in prison just like I did." *Id.*; *see also* Exhibit F, Letters from Family & Friends, at 10 (Breon Hopkins: "When asked about his dedication [to giving back], Gerald simply stated, 'When I realized the magnitude of what I had done, I understood how much of myself I needed to give back.'")

Harold "Pete" Johnson grew up with Mr. Miller in Jamaica, Queens. *See* Exhibit F, Letters from Family & Friends, at 11. Although Pete moved to North

Carolina, where he became a scout for the Five Star Basketball Camp, he decided to write Mr. Miller after a trip to New York, and the response he received prompted Pete to visit him. Mr. Miller's response expressed concern for the "gun violence that was high in Jamaica Queens" and he proposed solutions to fix it. Pete writes that "Mr. Miller gave me a blueprint" for a program Pete would start called Both Sides of the Game, which, in addition to providing tutoring and food to the youth in Jamaica, also hosted, together with Life Camp Inc., the "Game of Peace to Fight Gun Violence where we brought together two housing projects – The Baisley Housing Projects and The 40 Housing Projects, with the hopes to promote peace." Below are photos from the tournament:[7]

 

---

[7]     Here is a link to a video showing Pete speaking at the tournament: https://drive.google.com/file/d/1I4L-SEk83KSa7K0PMIQMLUzs3aqkSGHO/view?usp=sharing.  Other photos from this and other events, can be found at Exhibit G.

After the game, Mr. Miller spoke to the young players by phone. One of them was Jaytuan McMillan, then a 15-year-old living in the Bailey Housing Projects who "was deeply entrenched in a life of crime and violence." Exhibit F, Letters from Family & Friends, at 21. "However," Jaytaun writes, "everything changed when I heard Gerald speak about his journey that led him to prison. Despite the hardships he faced, Gerald expressed profound regret for the choices that landed him behind bars." *Id*. Jaytaun continues,

> He spoke directly to me, urging me to break free from the cycle of violence and pursue a better path. His words resonated deeply within me, igniting a fire of motivation to leave the gang, prioritize education, and become a positive role model for my community. Gerald's warning about the consequences of remaining in the streets struck a chord with me, compelling me to make a life-changing decision then and there.

> Today, I stand before you as a testament to Gerald's impact. Thanks to his guidance, I have graduated from high school, established my own business, and actively contribute to my community through various initiatives, including organizing events and teaching yoga as a means of promoting peace and resilience. As a young leader in my community, I recognize the importance of having strong mentors like Gerald to guide us in rebuilding and revitalizing our neighborhoods.

> Gerald Miller possesses the wisdom, compassion, and determination needed to effect positive change, not only in the lives of individuals like myself but also in our broader community.

*Id*. at 21; *see also id*. at 38-39 (detailing Mr. Miller's volunteering with It Takes a Village and impact he has by speaking with other youths by phone).

Given the success of the tournament, Pete believed the youth could benefit even more from Mr. Miller by meeting him in person, so he brought kids to visit. *Id*. at 11; *see also* Exhibit G, Misc. Photos, at 11. One of the young men Pete brought to visit was N███ W███, a middle school student who was referred to Toni Ebron

(the school's Family Engagement Coordinator and childhood friend of Mr. Miller) as part of a "mediation intervention" to decide whether to send W███ to an alternative school because "N████ W███ was one of those students on that ledge, lost and very much heading in the wrong direction." *Id.* at 5 (Toni Ebron). Having successfully included Mr. Miller in other community projects, Toni suggested N█████ visit him because he "has helped our youth to stay in school and off the streets because the streets have nothing to offer and only two place[s] one could end up [was] in jail or killed." *Id.* at 42. (N█████ W███). The visit was a success, as N█████ "was able to graduate from the middle school and now attending high school with the support and inspiration of Mr. Miller." *Id.*; *see also* Exhibit G, Misc. Photos, at 12 (photo Pete and W███ outside Allenwood USP). Indeed, Toni relates that N████'s "mom continues to thank me for … introducing her son to Mr. Gerald Miller." *Id.* at 5 (Toni Ebron); *see also id.* at 7 (Erica Ford, Life Camp Inc. CEO: "He has mentored a number of at-risk youth in our target area, guiding them away from gangs and a life of crime towards a more positive and productive path.")[8]

Mr. Miller's rehabilitation is a source of pride for his friends and family because they knew he had it in him all along. His parents, now in their 80's, explain "we would not write to you on his behalf if we did not believe the sincere belief that our son Gerald has learned some hard lessons from his mistakes and incarceration

---

[8]  According to the New York City Office of Neighborhood Safety, "Erica's long tenure in the community as an advocate for peace and reconciliation has made her a trusted, respected ambassador for the Cure Violence model, and for the work of the Crisis Management Network." *See Peace Negotiator: Erica Ford*, New York City Office of Neighborhood Safety, available at https://neighborhoodsafety.cityofnewyork.us/office-to-prevent-gun-violence/peace-negotiator-erica-ford/

and that he now seems to be more like the son that we knew he had inside himself." Exhibit F, Letters from Family & Friends, at 23. In addition to seeing Mr. Miller grow, his parents also dote on their granddaughter, Monique. *Id.*

In his letter to the Court, Mr. Miller details the pain he experiences in not being physically present in his daughter's life. But, as Monique explains, his absence was only physical because "he's been able to encourage me in other ways." *Id.* at 16. For example, "he always encouraged me to strive for excellence, and I did. I graduated in the top 10% of my high school class with honors, obtained three college degrees with honors, and I currently practice as a board-certified perioperative registered nurse." *Id.* Although initially "my dad would go months at a time without calling me" because, "he later admitted the pain of hearing my voice mature from his 'little girl' to a young lady was too much for him to face[,]" that has since changed and she often visits and speaks to him by phone. *Id.* at 16-17. A frequent topic of conversation is Monique's children, in particular her 2-year-old daughter, whose birthday is "just 2 weeks after my father's." *Id.* at 17. As Monique explains, Mr. Miller views his granddaughter "as his second chance to be a father to his 'little girl.'" *Id.*

In 2009, Monique wrote Judge Dearie in connection with one of Mr. Miller's post-conviction motions. She remarked how she spent many years "angry at my father, you, and the system I felt took him away from me." *See* Exhibit A, Miller's Letter, at 52 (Ltr Exhibit F).[9] She would complain to her father "all the time, that if he used his intelligence for other things than what he did, he would be someone

---

[9]     Mr. Miller included exhibits to his letter. These exhibits follow Mr. Miller's letter (Exhibit A at 1-7) and are labeled and accessible in the "bookmark" section of the PDF.

great." Responding to her anger, Mr. Miller shared with her that Judge Dearie said something similar to him at his sentencing:

> When he told me that I almost cried, because even at that difficult point in time you recognized how great he could be if he stayed on the right path. I was comforted to hear that someone like you could see this in my father, the same as I do.

*Id.* These same words, Mr. Miller writes, "lingered in my mind for decades and kept me firmly grounded on my path to drive as many children, teenagers, and young adults as possible away from crime, violence, and narcotics. I use those words as a personal reference point and I've expressed them with many others over the course of my imprisonment, including with members of society and with my daughter." *See* Exhibit A, Miller's Letter, at 6. These same words inspired him to participate in a documentary that he hoped "would discourage others from following in my footsteps."

Nasir Jones, a world-renowned rapper, with seventeen studio albums since 1994, ten of which are certified gold, platinum or multi-platinum, produced the documentary, "Supreme Team." Nas grew up in Queens and, having "had a front row seat to all that transpired in the crack era '80s and beyond", wanted to "explore more formally" the complexity of that era. *See* Exhibit F, Letters from Family & Friends, at 15. Like most people who grew up in that era, Nas was familiar with Mr. Miller's story "that had only previously been filled in with myth, legend, and lore." *Id.* With the producer and director, Nas spent five years interviewing countless people in Mr. Miller's orbit, including Pete, Toni, Monique, and Mr. Miller's parents to get a sense of his character. "But more than any of that, I got to know the man myself, through

direct phone calls with him." Nas shares with the Court his observations of Mr. Miller:

> Gerald displayed great wisdom, embodied true kindness and the choices of his youth are undoubtedly long behind the 60+ year old grandfather that I've come to know.
>
> In my 50 years on this planet, I've been around people from all walks of life, street hustlers to Wall Street billionaires, and one thing has become clear- with time, true character becomes undeniable. It is clear to me that Gerald is someone who is kind, honest, and ready to re-enter society as a true upstander after serving his 30 plus year prison sentence. He is ready to explore life as a father and grandfather and I standby that he is a man of honor- I look forward to meeting him face to face and shaking his hand.

*Id.*; *see also id.* at 32-35 (letters from director Peter Scalettar and producer Don Sikorski). Sikorski expressed the same sentiments as Nas, and is offering to employ Mr. Miller at his production studio, Flow State Films, if released. *Id.* at 35.

## II. THE COURT SHOULD REDUCE MR. MILLER'S LIFE SENTENCES TO FORTY YEARS

### A. Mr. Miller's Convictions were for Covered Offenses

Congress passed the Fair Sentencing Act of 2010 to correct the 100:1 disparity between crack and powder cocaine. As relevant here, Section 2 of the Fair Sentencing Act increased from 50 grams to 280 grams the amount of crack required to trigger the minimum (10 years) and maximum (life) sentences imposed by 21 U.S.C. § 841(b)(1)(A)(iii). *See United States v. Davis*, 961 F.3d 181, 185 (2d Cir. 2020). Section 2 also "effectively increased from 1.5 kilograms to 8.4 kilograms the amount of crack required to trigger the mandatory life sentence imposed by [21 U.S.C.] § 848(b)." *United States v. Jimenez*, No. 92-CR-550-01 (JSR), 2020 WL 2087748, at *2 (S.D.N.Y. Apr. 30, 2020). Although the Fair Sentencing Act did not apply retroactively, in 2018,

Congress enacted the First Step Act, authorizing district courts to "impose a reduced sentence" on defendants serving sentences for certain crack-cocaine offenses "as if sections 2 and 3 of the Fair Sentencing Act ... were in effect at the time the covered offense was committed." *Concepcion v. United States*, 597 U.S. 481, 488 (2022) citing Pub. L. 115–391, § 404(b), 132 Stat. 5222.

The Second Circuit has said: "Section 404 of the First Step Act limits eligibility for a sentence reduction to a 'covered offense' and defines that term as 'a violation of a Federal criminal statute, the statutory penalties for which were modified by section 2 or 3 of the Fair Sentencing Act.'" *United States v. Reed*, 7 F.4th 105, 111 (2d Cir. 2021). "[I]t is the statute under which a defendant was convicted, not the defendant's actual conduct, that determines whether a defendant was sentenced for a 'covered offense' within the meaning of Section 404(a) [of the First Step Act]." *United States v. Martin*, 974 F.3d 124, 134 (2d Cir. 2020). When a single offense, such as a multi-object conspiracy, encompasses multiple charges, the inclusion of one charge that was modified by the Fair Sentencing Act renders the offense covered, even if other charges were not so modified. *See Reed*, 7 F.4th at *Id*. at 113; *see also United States v. Roman*, No. 3:94-CR-00112 (AWT), 2023 WL 8435990, at *5 (D. Conn. Dec. 5, 2023) (defendant convicted of racketeering eligible even though one RA was covered but the other three, for murder, were not). A defendant is only eligible for a sentence reduction if he has not previously received a sentence or a reduction in accordance with sections 2 and 3 of the Fair Sentencing Act. *See United States v. Boyd*, 987 F.3d 278, 283-84 (2d Cir. 2021).

Here, Mr. Miller is serving six concurrent life sentences plus a 20-year term to be served concurrently to his life sentences. Relevant here are the six life sentences,[10] which were imposed for the following convictions:

- **Count One:** Conducting the affairs of an enterprise through a pattern of racketeering activity, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c)
  - RA 1: Narcotics conspiracy in violation 21 U.S.C. § 846
  - RA 5: Narcotics trafficking in violation of 21 U.S.C. § 841(a)(1)
  - RA 6: Narcotics trafficking in violation of 21 U.S.C. § 841(a)(1)
  - RA 7: Narcotics trafficking in violation of 21 U.S.C. § 841(a)(1)
  - RA 8: Narcotics trafficking in violation of 21 U.S.C. § 841(a)(1)
  - RA 10: Criminal facilitation in violation N.Y.P.L. §§ 115.05, 20.00
  - RA 19: Money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i)
  - RA 20: Money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i)
- **Count Three:** Engaging in a continuing criminal enterprise, in violation of 21 U.S.C. § 848(b)
- **Count Seven:** Distributing cocaine base, in violation of 21 U.S.C. §§ 841(a) and 841(b)(1)(A)(iii)
- **Count Eight:** Distributing cocaine base, in violation of 21 U.S.C. §§ 841(a) and 841(b)(1)(A)(iii)
- **Count Nine:** Distributing cocaine base, in violation of 21 U.S.C. §§ 841(a) and 841(b)(1)(A)(iii)
- **Count Ten:** Distributing cocaine base, in violation of 21 U.S.C. §§ 841(a) and 841(b)(1)(A)(iii)

*See* PSR ¶¶ 1-18; Doc. 193, S-2; Doc. 749, Amended J&C.

Nine of the thirteen substantive offenses and RAs that Mr. Miller was convicted of were pursuant to 21 U.S.C. §§ 841(a) and 841(b)(1)(A)(iii) — Count One's RAs 1, 5, 6, 7, 8, Count Seven, Count Eight, Count Nine, and Count Ten. According to the PSR, RAs 5, 6, 7, and 8 of Count One "relate[] to the same conduct that constitutes Counts 7, 8, 9 and 10" (PSR ¶ 77), meaning these RAs were for violations

---

[10] Miller's seventh substantive conviction was for money laundering, in violation of 18 U.S.C. § 1956. Because the 20-year sentence (the statutory maximum) on this conviction runs concurrently with his six life sentences, Mr. Miller, having been incarcerated well over 20 years, is no longer serving this offense. *See* 18 U.S.C. § 3584(c).

of § 841(b)(1)(A)(iii), a covered offense because Section 2 of the Fair Sentencing Act increased the aforesaid statute's threshold to trigger the 10-life penalty from 50 grams to 280 grams. *See United States v. Davis*, 961 F.3d 181, 186 (2d Cir. 2020). These same RAs moreover, were the only ones which were pursuant to a statute that authorized a life sentence, and so their inclusion increased the otherwise statutory maximum on Count One from 20 years to life. *See* 18 U.S.C. § 1963(a).[11] Mr. Miller's convictions on Counts One, Seven, Eight, Nine, and Ten, therefore are covered offenses. The only remaining conviction for which a life sentence was imposed is Count Three, a Continuing Criminal Enterprise ("CCE") pursuant to 21 U.S.C. § 848(b), and that too is a covered offense — as even the Government previously conceded to the D.C. Circuit — because the drug quantity required to trigger the "Super CCE Offense" must be "at least 300 times the quantity of a substance described in subsection 841(b)(1)(B)", meaning the previous 1,500 gram triggering quantity was increased to 8,400 grams. *See United States v. Palmer*, 35 F.4th 841, 850 (D.C. Cir. 2022) ("Accordingly, as the government agrees, Palmer's Super CCE offense [848(b)] is a 'covered offense'"); *see also United States v. Burrell*, No. 97 CR 998-1 (RJD), 2020 WL 5014783, at *6 (E.D.N.Y. Aug. 25, 2020) (noting Government's concession in another case that §848(b) is a covered offense, and also finding §§848(a),(c) were covered offenses).

Having been convicted and sentenced before the Fair Sentencing Act was passed, and never having received a reduction, this Court should find Mr. Miller

---

[11] The statutory maximum for RA 10, criminal facilitation in violation N.Y.P.L. §§ 115.05, 20.00, is 15 years. *See* NYPL § 70.00(2)(c). And the statutory maximum for RAs 19 and 20, money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i), is 20 years. *See* 18 U.S.C. § 1956(a).

eligible for a reduction in sentence because all six of his life sentences were imposed on covered offenses.

## B. The Proposed Reduction to 40 Years is Consistent with §3553(a)

In *Concepcion v. United States*, 597 U.S. 481 (2022), the Supreme Court addressed what a district court may consider in evaluating the § 3553(a) factors at a re-sentencing under Section 404 of the First Step Act: "The discretion federal judges hold at initial sentencings also characterizes sentencing modification hearings." *Id.* at 2399. Particularly relevant here, the Supreme Court also said,

> When a defendant appears for sentencing, the sentencing court considers the defendant on that day, not on the date of his offense or the date of his conviction. *Pepper v. United States*, 562 U.S. 476, 492 (2011).

*Id.* at 2396.

Today, Mr. Miller is not the same person he was when he was initially arrested in 1990 or at his 1995 sentencing. The transformation he has undergone over the past 34 years should be a model for what a person can accomplish, even under the most difficult, and seemingly hopeless of circumstances. *See Pepper*, 562 U.S. at 491 ("evidence of postsentencing rehabilitation may be highly relevant to several of the § 3553(a) factors that Congress has expressly instructed district courts to consider at sentencing."); *see also United States v. Hernandez*, 604 F.3d 48, 54 (2d Cir. 2010) (evidence of post-conviction rehabilitation relevant at re-sentencing as counterbalance to heinous nature of crime committed). At no point did Mr. Miller let his past crimes, or current circumstances (including being a 62-year-old staring down six life sentences), define the person he would become. Instead, Mr. Miller dug deep into his soul, taking to heart the words uttered by Judge Dearie at his sentencing,

and committing himself to ensuring his legacy would be a positive one. He, in the words of his parents, "has learned some hard lessons from his mistakes and incarceration and … he now seems to us more like the son that we knew he had inside himself." *See* Exhibit F, Letters from Family & Friends, at 22; *see also id.* at 24 (Veronica Miller, sister: "There has been a remarkable change in Gerald that is noticeable to everyone that has known him over these 30 years of incarceration.")

This person inside had the tenacity to help others realize their potential, many of whom have written to the Court, including Luke Jones, Richard Lugo, and Rene Tellier. *See also* Exhibit C, BOP Letters of Support, at 9 (Larry Dusenbery, another lifer, writes: "If it was not for Mr. Miller's encouragement and support[,] I may have committed suicide.") These individuals, like Mr. Miller, had been condemned to spend the rest of their lives in prison. Indeed, Luke Jones notes that at his sentencing, the judge told him he "'was incorrigible,' and undeserving to live among 'civilized people,' and 'should be locked away ... for the rest of [my] life, never to breathe free air again.'" *Id.* at 18 (quoting his sentencing). But, unlike Mr. Miller thus far, these men have since had their life sentences reduced, and their crimes were no less serious than Mr. Miller's:

- Luke Jones was the leader of "a violent drug trafficking enterprise in Bridgeport, Connecticut, in the late 1990's." He was charged and convicted of various crimes, including racketeering, crack distribution, three murder conspiracies, and a substantive murder, the latter of which was dismissed before sentencing even though the judge said he had "no doubt that Jones intentionally killed Lawrence on the night of November 27, 1998[.]" In 2004, Jones was sentenced to four concurrent life sentences, and the sentencing judge did not mince words in detailing the harm Jones' drug dealing had on the community and the callous nature of the murder. Jones, eligible for Section 404 relief, had his life sentences reduced to concurrent terms of 450 months

because of his post-conviction rehabilitation. *See United States v. Jones*, No. 3:99-CR-264-1 (VAB), 2020 WL 2791862, at *12 (D. Conn. May 29, 2020).

- Richard Lugo was a hitman for the "D-Nice Enterprise … which distributed large quantities of powder and crack cocaine in New York City, and later, Baltimore. … The D-Nice Enterprise hired Richard Lugo and his brother … to seek and kill members of the rival drug operation. … In the early morning hours of December 27, 1998, Dillard was shot and killed as he left the party with his wife and family." After rejecting a plea to 10-years, Lugo was convicted at trial and, in 2005, was sentenced to life imprisonment. In 2022, Judge Gershon reduced his sentence to 25-years, in part due to his rehabilitation, citing letters of support from inmates, correctional staff, and family. *See United States v. Lugo*, No. 01-CR-922 (NG), 2022 WL 732153, at *8 (E.D.N.Y. Mar. 11, 2022).

- Rene Tellier helped "lead a criminal organization known as the 'Tellier Organization' that operated in the tri-state area at least through the late 1970s through the early 1990s. Defendant committed four murders and one attempted murder in connection with his role in the Tellier Organization." In 1994, Tellier was convicted at trial and sentenced to two concurrent life sentences, "a sixty-year concurrent sentence for the robbery conspiracy and murder-for-hire counts, and five- and twenty-year consecutive sentences on the § 924(c) counts." In 2023, Judge Schofield granted Tellier compassionate release due to his rehabilitation, also citing letters from correctional staff, inmates, and family. *See United States v. Tellier*, No. 92 CR. 869 (LGS), 2023 WL 5498909, at *3 (S.D.N.Y. Aug. 25, 2023).

Three district court judges found that, under § 3553(a), the rehabilitation demonstrated by these men warranted reductions of their life sentences; and each one has acknowledged Mr. Miller's positive influence on them in discussing their rehabilitative journeys. *See* Exhibit C, BOP Letters of Support, at 13 (Jones), 22 (Lugo), 27 (Tellier). Findings by judges in our circuit that post-conviction rehabilitation can militate in favor of relief for incarcerated persons convicted of even the most serious of offenses is not anomalous;[12] indeed, this Court so found in

---

[12] *See e.g.*, *United States v. Burrell*, No. 97 CR 998-1 (RJD), 2020 WL 5014783, at *9 (E.D.N.Y. Aug. 25, 2020) (reducing two life sentences to 30 years for defendant convicted of CCE); *United States v. Rodriguez*, 492 F. Supp. 3d 306, 316 (S.D.N.Y. 2020) (defendant's life sentence, imposed instead of death for CCE/leadership of cocaine and heroin enterprise that carried out murders, reduced to 30-

reducing Thomas Reynolds' 42-year sentence to 36-years, and he plead guilty to personally committing two murders, among other conduct. *See Reynolds v. United States,* No. 99-CR-520 (NGG), 2022 WL 1444167, at *7 (E.D.N.Y. May 6, 2022); *see also United States v. King*, No. 00-CR-1108 (RJD), 2023 WL 7386659, at *5 (E.D.N.Y. Nov. 8, 2023) ("I am of the view that if rehabilitation is to be a true goal of our criminal justice system, then clear evidence of rehabilitation such as that presented by King must be recognized to ensure the integrity of that system.")

What distinguishes Mr. Miller from this lot is that, in addition to playing a role in their rehabilitation, Mr. Miller's reach extended beyond the prison walls, to repairing the community his crimes harmed. *See* Exhibit F, Letters from Family & Friends, at 8 (AU Hogan: "I'm the Chief of Streets at LIFE Camp, Inc … the largest anti-violence organization in Queens. … There were only a few that volunteered their time to the The Baisley Park Community, and Gerald was one of them.")[13] He uses himself as the "statue of a fool" to ensure that his status as a role model reflects the good he does, and not the bad he did. Jaytaun McMillan and N██████ W████, two

---

years); *United States v. Underwood*, No. 88-CR-822 (SHS), 2021 WL 3204834, at *6 (S.D.N.Y. Jan. 15, 2021) (CCE life sentence reduced to 33 years for leader of city-wide heroin distribution network that was responsible for at least five murders); *United States v. Qadar*, No. 00-CR-603 (ARR), 2021 WL 3087956, at *11 (E.D.N.Y. July 22, 2021) (life sentence reduced to 20 years for defendant convicted of ordering murder); *United States v. Johnson*, No. 98-CR-860(7) (ARR), 2021 WL 5755047, at *5 (E.D.N.Y. Dec. 3, 2021) (reducing 25-year sentence to 20 years for defendant convicted of murder); *United States v. Glynn*, No. 06-CR-580 (JSR), 2022 WL 562652, at *7 (S.D.N.Y. Feb. 24, 2022) (life sentence reduced to 420 months for defendant convicted of leading, for seven years, gang that sold crack and ordered two murders); *United States v. Lake*, No. 98-CR-500-FB, 2022 WL 17083288, at *1 (E.D.N.Y. Nov. 18, 2022) (reduction from 540 to 468 months for defendant convicted of Hobbs Act robbery and implicated in four murders); *United States v. Ramos*, No. 03-CR-315 (ERK), 2023 WL 1766279, at *3 (E.D.N.Y. Feb. 3, 2023) (reduction from life to 35 years was "consistent with other sentences within this Circuit for comparable defendants, *i.e.,* members of drug and/or racketeering crews involved in brutal acts of violence"); *United States v. King*, No. 00-CR-1108 (RJD), 2023 WL 7386659, at *5 (E.D.N.Y. Nov. 8, 2023) (two life sentences reduced to 30 years for defendant convicted of involvement with a "violent gang that sold crack").

[13]     The opinions granting Tellier, Lugo, and Jones relief do not mention community outreach.

kids who abandoned street life after being mentored by Mr. Miller, are living proof that Mr. Miller's approach to deterring youth still in the community works. Mouhahmet Cherry, Reavon Brown and Richard Kelly, younger inmates that discovered their self-worth and obtained their GEDs through Mr. Miller's mentorship, are proof that his approach applies to those who made the mistakes McMillan and W███ might have made if they didn't have the benefit of being mentored by Mr. Miller.

The accolades from correctional officers, including a recommendation from CO J. Gosciminski that Mr. Miller be given a "second chance," supports the conclusion that Mr. Miller would not pose a danger to the community, *see e.g., United States v. Russo*, 643 F. Supp. 3d 325, 338 (E.D.N.Y. 2022), no less so than BOP's determination that Mr. Miller is at a low risk level in terms of both recidivism and violence. *See* Exhibit D, BOP Transcripts, at 12; *see also Reynolds*, 2022 WL 1444167, at *6 (E.D.N.Y. May 6, 2022) ("today, the BOP estimates that Reynolds's risk of recidivism is low"). Indeed, good institutional conduct is so highly regarded that, just recently, the United States Parole Commission granted Anthony Senter parole 35 years into his life sentence, finding "he had substantially observed the rules of the institution and that his release in June 2024 would not jeopardize the public welfare."[14] Senter, a hitman for the DeMeo crew, was involved "in at least seven murders." *See Testa v. United States*, 971 F. Supp. 833, 834 (S.D.N.Y. 1997).

---

[14] *See* Jon Levine, *Notorious Gambino mob 'Gemini Twins' hitman linked to 11 murders, dismemberments paroled after getting life sentence*, New York Post, published Dec. 9, 2023, available at, https://nypost.com/2023/12/09/news/gambino-mob-hitman-anthony-senter-paroled-set-for-2024-release/

As Mr. Miller notes in his letter, like him, the legal landscape has changed. Among other changes, the national average sentence for murder is 240-months. *See Russo*, 643 F. Supp. 3d at 335 (E.D.N.Y. 2022). The thirty-four years Mr. Miller has served, when considering good time, is double that national average, and he was twice acquitted of murder. *Compare United States v. Geraldo*, 687 F. App'x 101, 106-07 (2d Cir. 2017) (affirming 420-month sentence as reasonable for violent gang defendant involved in multiple murders); *United States v. Evans*, 633 F. App'x 55, 57 (2d Cir. 2016) (affirming 420-month sentence as reasonable for crack cocaine racketeer responsible for a murder and shootings).

The thirty-four years Mr. Miller has been imprisoned is also commensurate with the 40-year plea the Government offered him before trial if he allocuted to the charged murders. *See Russo*, 643 F. Supp. 3d at 335 ("If the Government in offering its plea deals did not believe that all those indicted on murder charges should be sentenced to life, why should the court?"); *see also Lugo*, 2022 WL 732153, at *9 (same). Indeed, if he accepted that deal, Mr. Miller would be preparing for his release today, and would have the tools at his disposal to make that release successful.

Mr. Miller has an employment offer from Don Sikorski to work at Flow State Films, where he will be working on documentaries and podcasts focused on mass incarceration, policing, and criminal justice stories. *See* Exhibit F, Letters from Family & Friends, at 34. This position will not require Mr. Miller to be in the office, making him available to assist his aging parents. Having been gone for 34-years, Mr. Miller's plan is to move in with his parents, who currently reside in Georgia, near his sister (a high school social worker). In their 80s, Mr. Miller's parents are anxious to

feel the warmth of their son's physical presence for the remaining years of their life. Mr. Miller has earned the opportunity to be physically present there for them, just as he is, in the words of his daughter Monique, deserving of a "second chance to be a father to his 'little girl.'"[15]

**Conclusion**

For all these reasons, we respectfully ask the Court to reduce Mr. Miller's six life sentences to concurrent 40-year terms.

Dated:   March 29, 2024

Respectfully submitted,

*Z. Segal*

_____

Zachary Segal
Richard Levitt
LEVITT & KAIZER
40 Fulton Street, 17th Floor
New York, New York 10038
(212) 480-4000
zsegal@landklaw.com
*Attorneys for Gerald Miller*

---

[15]     Older pictures of Mr. Miller and his family can be found at Exhibit G, Misc. Photos, at 18-19. These photos are from a magazine circulated by 2d Chance 4 Real, an organization Mr. Miller volunteers with by speaking with youth. *See* Exhibit F, Letters from Family & Friends, at 38-41.