UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-against-

GERALD MILLER,

Defendant.

MEMORANDUM & ORDER

92-CR-91 (NGG)

NICHOLAS G. GARAUFIS, United States District Judge.

Defendant Gerald Miller brings this motion pursuant to 18 U.S.C. § 3582(c)(1)(B) for resentencing under the First Step Act. In his letter to this court, Mr. Miller writes, "I once read that 'wisdom too often never comes, and one ought not reject it merely because it comes too late.'"[1] (Gerald Miller Letter ("Miller Ltr.") (Dkt. 918-1) at 7.) Today, this court is faced with wisdom that came too late for Mr. Miller's first sentencing: wisdom that neither Mr. Miller, nor the sentencing court had at the time that court handed down six life sentences for Mr. Miller's conduct during the 1980s and 1990s.

Much has changed since Mr. Miller's sentencing 30 years ago. Mr. Miller has fully rehabilitated himself into a non-violent, law-abiding citizen. As Mr. Miller wrote:

> I can honestly say that I've learned a lot and I've turned my life around. It has been a complete metamorphosis, like a caterpillar turning into a butterfly and I'm proud of the change! . . . I have grown to respect the law wholeheartedly. I've developed the integrity to do what is morally and legally right even when other people are not

---

[1] Mr. Miller is referencing a quote from the late Supreme Court Justice Felix Frankfurter. In dissent, Justice Frankfurter wrote a similar sentiment, stating, "Wisdom too often never comes, and so one ought not to reject it merely because it comes late." *Henslee v. Union Planters Nat'l Bank & Tr. Co.*, 335 U.S. 595, 600 (1949) (Frankfurter, J., dissenting).

> watching. It has taken decades in prison for me to accomplish this. I was able to identify and rid myself of the criminal thinking patterns that led to my incarceration. Now, my mission in life is to prevent others from ending up in prison just like I did.

(*Id.* at 2.)

The law has also changed. Congress and the courts have recognized the unfair disparity that existed in crack cocaine sentencing and rejected as unconstitutional non-jury findings that trigger mandatory minimum sentences.

The court now considers whether these changes, in Mr. Miller and in the law, warrant a reduction in the sentence imposed on Mr. Miller 30 years ago.

For the reasons set forth below, the court finds that Mr. Miller is both eligible and deserving of resentencing on each of the six life sentences imposed for his role as a leader in a crack cocaine distribution enterprise. In consulting the relevant policy rationales and sentencing factors, the court finds that the 34 years Mr. Miller has already served in prison is an appropriate sentence.[2] Mr. Miller's motion is therefore GRANTED in full.

## I.   BACKGROUND

In 1992, Mr. Miller and nine co-defendants were charged with a variety of crimes related to their roles in the Queens-based "Supreme Team" enterprise, a violent crack cocaine distribution organization that operated in the 1980s and 1990s. (Def. Supp.

---

[2] The court notes that the 34 years Mr. Miller has served includes time spent in state custody given his initial arrest by state authorities in March 1990 that subsequently led to the federal Indictment and conviction here. (*See* Def. Supp. Motion for Reduction ("Def. Supp. Mot.") (Dkt. 918) at 4.) *See also United States v. Miller*, 116 F.3d 641, 654-55 (2d Cir. 1997) (describing the posture that led to the instant prosecution).

Motion for Reduction ("Def. Supp. Mot.") (Dkt. 918) at 4; Pre-Sentence Investigation Report ("PSR") (Dkt. 853) ¶ 19.) Initially created and formed by Mr. Miller's uncle, Kenneth "Supreme" McGriff, the Supreme Team was a notorious street gang that operated out of the Baisley Park Houses in Jamaica, Queens. (PSR ¶ 20.) McGriff was arrested and jailed on state narcotics charges in 1985, allowing Mr. Miller to assume the role as leader of the Supreme Team. (*See id.* ¶¶ 22, 61.) In this role, he oversaw the operations of the enterprise, which were extensive and complex, including "kilogram quantities" of crack cocaine that the team "produced and subsequently distributed." (*Id.* ¶ 61.)

Under Mr. Miller's leadership, the enterprise's "drug territory" expanded significantly, with Mr. Miller commanding others to take new "turf" through violent force. (*Id.* ¶ 32.) Intimidation was a key tactic employed by Mr. Miller and his team, particularly against other individuals involved in drug operations. (*See id.* ¶ 41.)[3] And although Mr. Miller was not convicted of violent crimes, the PSR outlines multiple murders and acts of intimidation that happened under Mr. Miller's command and expansion efforts. (*Id.* ¶¶ 33-38, 61.)

At trial, a jury convicted Mr. Miller of eight separate counts, including, racketeering, in violation of 18 U.S.C. § 1962(c) (Count One); conspiracy to distribute cocaine base, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A) (Count Two); continuing a criminal enterprise ("CCE") offense, in violation of 21 U.S.C. §§ 848(a) and 848(b)(1) (Count Three); four counts of distributing cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A) (Counts Seven-Ten); and money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B) (Count Twelve). (*Id.* ¶¶ 1-

---

[3] The Government reports that "[m]any of the defendant's victims were rival drug dealers." (Gov. Opp. (Dkt. 920) at 7.)

18.)[4] For his racketeering count, Mr. Miller was found guilty of eight predicate racketeering acts ("RAs"), which included: conspiracy to distribute cocaine base; four RAs of distribution of cocaine base; criminal facilitation; and two RAs of money laundering. (*Id.* ¶¶ 4-11.) For his CCE offense, he was found at sentencing to have engaged in a series of violations involving more than 1.5 kg of cocaine base, in violation of 21 U.S.C. §§ 848(a) and 848(b)(1). (Sentencing Transcript ("Sent'g Tr.") (Dkt. 862) at 33:14-21.)

Judge Raymond J. Dearie sentenced Mr. Miller to six life sentences for his convictions under Counts One, Two, Three, Seven, Eight, Nine, and Ten. (*Id.* at 57:1-4.) He imposed an additional 20-year sentence for Mr. Miller's conviction on Count Twelve. (*Id.* at 56:25-57:1.) All sentences were to run concurrently. (*See* Am. Judgment (Dkt. 674) at 3.)

On appeal, the Second Circuit upheld all convictions except Count Two (conspiracy to distribute cocaine base), which was dismissed as duplicative of Count Three (CCE) in 1997. *See Miller*, 116 F.3d at 678. Following this appeal, Mr. Miller brought several post-conviction motions between 1999 and 2010, seeking to vacate or reduce his sentence as it related to the crack cocaine offenses. *See Miller v. United States*, 99-CV-3346 (habeas civil docket), Docket Nos. 1, 11, 17, 20, 21, 29 (E.D.N.Y. May 28, 1999). (*See also* January 8, 2009 Motion to Reduce Sentence (Dkt. 799); January 8, 2009 Motion to Vacate (Dkt. 801).) Judge Dearie denied all motions in a single order issued on March 30, 2010. (*See* March 30, 2010 Memorandum & Order ("2010 M&O") (Dkt. 827) at 47.)

---

[4] The money laundering conviction (Count Twelve) carried a 20-year sentence. (Sentencing Transcript ("Sent'g Tr.") (Dkt. 862) at 56:25-57:1.) As this sentence ran concurrently with his other sentences, (Am. Judgment (Dkt. 674) at 3), Mr. Miller has completed this sentence, and it is therefore not a part of the motion before this court.

At Mr. Miller's sentencing, Judge Dearie expressed that the sentence he imposed, while harsh, was a just one given the severity of Mr. Miller's crimes. In imposing the sentence, Judge Dearie stated as follows:

> [T]aking into account what's been done, the people whose lives have been ruined, the people whose lives have been lost, you know, and perhaps even more meaningfully, the people who have to live a kind of death every day as a result of the activity that you engineered . . . this is a just and appropriate sentence.

(Sent'g Tr. at 56:16-25.)

Notwithstanding, Judge Dearie also expressed some hope that Mr. Miller may move past his prior criminal conduct, explaining to Mr. Miller that "with the intelligence that you have, you could find some way, some way to discourage others who would likely admire you if they saw you on the street from following in your footsteps." (*Id.* at 56:6-9.)

It would appear that Mr. Miller has never forgotten these statements made by Judge Dearie at sentencing many years ago, writing that "the Honorable Judge Raymond J. Dearie's words of wisdom at [his] sentencing" are what inspired his substantial growth during the subsequent 30 years he served in federal custody, and further wishing he could tell Judge Dearie: "Thank you your Honor for sentencing me in a way that helped me find meaning and purpose in my life." (Miller Ltr. at 7.)

With this newfound purpose, Mr. Miller now comes before this court seeking a reduction in his sentence under 18 U.S.C. § 3582(c)(1)(B) and the First Step Act. (*See* Def. *Pro Se* Motion for Reduction ("Def. *Pro Se* Mot.") (Dkt. 913) at 1; Def. Supp. Mot. at 1; Def. Reply (Dkt. 921) at 1.)

5

## II. LEGAL STANDARD

Under 18 U.S.C. § 3582(c)(1)(B), the court may "modify an imposed term of imprisonment to the extent . . . expressly permitted by statute."

As relevant here, under Section 404 of the 2018 First Step Act, courts may retroactively apply the Fair Sentencing Act of 2010, which increased the quantity thresholds of crack cocaine needed to trigger certain penalties, to offenses committed before August 3, 2010. *See* First Step Act, Pub. L. No 115-391, § 404, 132 Stat. 5194, 5222 (2018); Fair Sentencing Act of 2010, Pub. L. No. 111-220, § 2(a), 124 Stat. 2372, 2372 (2010).[5] Courts can now re-sentence individuals using the new, higher crack cocaine quantity thresholds if those individuals are currently serving sentences determined by the previous, lower quantity thresholds. *Concepcion v. United States*, 597 U.S. 481, 488 (2022) (noting that the First Step Act "authorized district courts to 'impose a reduced sentence' for qualifying movants 'as if sections 2 and 3 of the Fair Sentencing Act . . . were in effect at the time the covered offense was committed'") (quoting First Step Act, Pub. L. No 115-391, § 404(b), 132 Stat. 5222)).[6]

Once finding that a defendant is eligible for resentencing under Section 404 of the First Step Act, courts can not only resentence individuals as if the higher quantity thresholds were in place at the time of the individual's original sentencing, but they can also consider "intervening changes of law or fact" in consultation with

---

[5] Congress's goal in passing the First Step Act was "to improve unduly harsh federal drug sentencing policies and reduce recidivism." George L. Blum, Annotation, *Reduction of Sentence Under First Step Act, 18 U.S.C.A. §§ 3631 et seq.—Federal Appellate Cases*, 54 A.L.R. Fed. 3d Art. 2, § 2 (2020).

[6] When quoting cases, unless otherwise noted, all citations and internal quotation marks are omitted, and all alterations are adopted.

the sentencing factors set forth in 18 U.S.C. § 3553(a). *Concepcion*, 597 U.S. at 500. This includes consideration of a defendant's post-sentencing rehabilitation as well as amendments (even nonretroactive) to the United States Sentencing Guidelines (the "Guidelines"). *Id.* at 498-500. Essentially, if a defendant is eligible for resentencing, the court looks at the individual and the law as they exist today, not as they existed at the time the defendant was originally sentenced. *See id.* at 492-93, 500. The resentencing court has "broad discretion" in these decisions. *Id.* at 501. The court must consider the parties' arguments, but it is ultimately the court's own "professional judgment" to determine which arguments, including policy arguments, it finds compelling. *Id.*

There are only two limitations placed on the court in considering a motion brought under Section 404 to give retroactive effect to the Fair Sentencing Act: the court "may not consider a First Step Act motion if the movant's sentence was already reduced under the Fair Sentencing Act or if the court considered and rejected a motion under the First Step Act." *Id.* at 496.[7]

## III. DISCUSSION

This court finds that Mr. Miller is eligible for resentencing under 18 U.S.C. § 3582(c)(1)(B) and the First Step Act. After considering the sentencing factors under 18 U.S.C. § 3553(a), the court further finds that the 34 years Mr. Miller has already served is an appropriate sentence, taking into account the severity of his crimes and the law as it stands today.

### A.   Eligibility for Resentencing under the First Step Act

"The First Step Act permits a reduction only for a sentence imposed for a 'covered offense,' and defines the term 'covered offense' to encompass 'a violation of a Federal criminal statute,

---

[7] Neither of these limitations apply in this case.

the statutory penalties for which were modified by section 2 or 3 of the Fair Sentencing Act.'" *United States v. Moore*, 975 F.3d 84, 89 (2d Cir. 2020) (quoting *United States v. Davis*, 961 F.3d 181, 185 (2d Cir. 2020)[8]); *see also* First Step Act § 404(a), 132 Stat. 5222. As relevant here, a "covered offense" is an offense—committed before August 3, 2010—that relied on prior drug quantity thresholds that the Fair Sentencing Act subsequently changed. *Moore*, 975 F.3d at 91; *see also* Fair Sentencing Act of 2010 § 2.

Indeed, before the Fair Sentencing Act, an offense charged as involving 5 grams or more of crack cocaine carried a minimum of 5 years and a maximum of 40 years in prison under 21 U.S.C. § 841(b)(1)(B)(iii). Section 2 of the Fair Sentencing Act raised the threshold quantity for that penalty range to 28 grams. Section 2 also raised the threshold quantity of crack cocaine from 50 grams to 280 grams for a prison range of 10 years to life for offenses charged under 21 U.S.C. § 841(b)(1)(A)(iii). Section 3 eliminated the 5-year mandatory minimum sentence for simple possession of crack cocaine under 21 U.S.C. § 844(a). *See generally* Fair Sentencing Act of 2010; *see also Moore*, 975 F.3d at 87.

If a single offense, such as a multi-object offense, encompasses multiple charges, only one of those charges needs to have been affected by the Fair Sentencing Act for the entire offense to be considered a "covered offense" within the meaning of Section 404(a) of the First Step Act. *United States v. Reed*, 7 F.4th 105, 110 (2d Cir. 2021). This is true "even though [the multi-object offense] contains a separate object . . . whose statutory penalties were not so modified." *Id.* at 117-18. Additionally, separate statutes that cross-reference to, and therefore rely on, the quantities in the altered statutes are also covered offenses. *See, e.g., United*

---

[8] Caselaw commonly cites this case as *United States v. Johnson*, 961 F.3d 181, 185 (2d Cir. 2020). Because the decision refers to Defendant Davis's motion, this court, in accordance with the Westlaw citation, cites the caption as *United States v. Davis*.

*States v. Palmer*, 35 F.4th 841, 850 (D.C. Cir. 2022) (finding that 21 U.S.C. § 848(b)(1)(B) is a covered offense because it requires the involvement of "at least 300 times the quantity of a substance described in subsection 841(b)(1)(B)"); *United States v. Jimenez*, No. 92-CR-550-01 (JSR), 2020 WL 2087748, at *2 n.1 (S.D.N.Y. Apr. 30, 2020) (same).

All of the convictions for which Mr. Miller received life sentences are covered offenses. Counts Seven, Eight, Nine, and Ten are clearly covered offenses as all four are convictions directly under 21 U.S.C. §§ 841(a) and 841(b)(1)(A)(iii). (*See* PSR ¶¶ 14-17.) *See also* Fair Sentencing Act of 2010 § 2(a).

Count One is covered as it is a "multi-object" offense that is "based in part upon a crack cocaine object whose statutory penalties were modified by the Fair Sentencing Act." *Reed*, 7 F.4th at 117-18. While *Reed* focused on "multi-object *conspiracies*" rather than racketeering charges, *id.* at 116 (emphasis added), the Circuit's reasoning applies equally to racketeering charges. As the Second Circuit noted:

> Congress clearly intended to provide an opportunity for a sentence reduction in any case involving crack cocaine offenses triggering the penalty provisions in 21 U.S.C. § 841(b)(1)(A)(iii) or § 841(b)(1)(B)(iii) because of the possibility that the district court's pre-Fair Sentencing Act view of crack cocaine may have unfairly impacted its sentences on those offenses.

*Id.* at 116-17.

In such cases, "Congress undoubtedly wanted to allow the district court in its discretion to re-examine the sentence . . . to determine whether it was impacted by the pre-Fair Sentencing Act view of the gravity of crack cocaine crimes in a manner that caused the overall sentence on that multi-object count to be excessively high." *Id.* at 117.

For Mr. Miller's racketeering charge, the "narcotics activity" drove the overall sentence, as they were grouped together to determine Mr. Miller's offense level. (PSR ¶¶ 105-07.)[9] As the PSR states, "RICO Acts 1, 5, 6, 7, 8 and Counts 1, 2, 3, 7, 8, and 9[10] involve[] narcotics activity and the offense level is determined on the basis of the quantity of narcotics involved. Therefore, these acts are grouped together per Guideline 3D1.2(d)." (*Id.* ¶ 105; *see also id.* ¶ 76 (explaining that the Guidelines direct courts to determine the RICO offense level by looking at "the offense level applicable to the underlying racketeering activity")).) The court went on to adopt the offense level determined by this grouping. (Sent'g Tr. at 20:7-12; Amendments to PSR[11] (Dkt. 853) at ECF

---

[9] Four of the racketeering predicate acts under Count One (RAs Five, Six, Seven, and Eight) are crack cocaine-related objects invoking 21 U.S.C. §§ 841(a) and 841(b)(1)(A)(iii), once again, the very statutory provisions altered by the Fair Sentencing Act. (*See* Def. Supp. Mot. at 31; *see also* PSR ¶¶ 5-8, 77.) RA One is the conspiracy conviction related to the crack cocaine offenses, (Def. Supp. Mot. at 31; PSR ¶ 105), which *Reed* makes clear is also a covered offense. *Reed*, 7 F.4th at 117-18 (holding that a 21 U.S.C. § 846 conspiracy conviction based on a 21 U.S.C. § 841 object is a covered offense). The remaining RAs—RAs Ten, Nineteen, and Twenty—involve criminal facilitation and money laundering, which are connected to the distribution enterprise but are not directly implicated in the Fair Sentencing Act. (*See* Def. Supp. Mot. at 31.)

[10] Count Ten, which charges distribution of cocaine base, is the same charge as Counts Seven, Eight, and Nine and should thus be included in this list for grouping purposes. It would appear Count Ten was inadvertently omitted. (*See e.g.,* PSR ¶ 106.)

[11] At sentencing, Judge Dearie accepted some objections made by the Defense resulting in a revised offense level. (*See* Sent'g Tr. at 19:6-20:12.) As such, Probation submitted "Amendments to Guideline Presentence Report" ("Amendments to PSR") as well as an Addendum, which were appended to the original PSR. (*See* Dkts. 853, 853-2, 853-3.) The court notes that the Amendments, the original PSR, the Addendum, and Defense's Objections appear to be one consolidated file. When docketed, the consolidated file was then split into 20-page "Parts." (*See generally* Dkt. 853.) For sake of clarity, where the specific document has its own pagination, the court will

2.)[12] Therefore, it is apparent that the crack cocaine acts and quantities affected sentencing for the RICO conviction, which suffices to re-examine the sentence under *Reed*'s analysis of the First Step Act.[13] Here, there is clear evidence that "the offense level [was] determined on the basis of the quantity of narcotics involved." (PSR ¶ 105.)

Other district courts, both inside and outside of this Circuit, have confirmed the same, finding that RICO convictions are covered offenses if they include predicate acts that were altered by the Fair Sentencing Act. *See e.g.*, *United States v. Jones*, No. 99-CR-264-6 (VAB), 2019 WL 4933578, at *14 (D. Conn. Oct. 7, 2019)

---

refer to that document's page numbers. For documents without their own pagination, namely the Amendments to PSR, the court will refer to the ECF page numbers.

[12] RA Ten for Count One charges Criminal Facilitation in the Second Degree, in violation of N.Y.P.L. §§ 115.05, 20.00; this RA could not be grouped with the others as the conduct did not relate to crack cocaine offenses. (PSR ¶¶ 9, 85-86.) Accordingly, this resulted in an offense level lower than that for the grouped narcotics acts. (*Id.* ¶ 108.) The sentencing court, therefore, did not base its sentence on this offense level as it was practice to merely adopt the "Greater of the Adjusted Offense Levels." (*Id.* ¶ 110.) The sentencing court followed this practice, basing its sentence for the RICO charge on the offense level calculation from the grouped narcotics charges. (*Id.* ¶¶ 110-13; *see also* Sent'g Tr. at 20:7-12, 55:18-21.)

[13] At sentencing, Judge Dearie stated, "Mr. Miller[] is sentenced at a combined, adjusted offense level of 48." (Sent'g Tr. at 55:18-19.) By cross-referencing this comment with the PSR (and its amendments), it is clear that the offense level was determined by incorporating the offense level from the grouped crack cocaine offenses, not the criminal facilitation count. (*See* PSR ¶¶ 105-13; Amendments to PSR at ECF 1-2.) The only logical way to arrive at level 48 is by combining the amended offense level for the grouped crack cocaine acts (46) and the upward adjustment for obstruction of justice (2). (*See* Amendments to PSR at ECF 1; PSR ¶¶ 105-13.) If instead it was the criminal facilitation count driving the offense level for sentencing, the offense level would be two points lower, at level 46 (level 44 for criminal facilitation, plus 2 level upward adjustment for obstruction of justice). (*See id.*) The sentencing, therefore, was based on the crack cocaine acts.

("The RICO, RICO Conspiracy, and heroin violations thus were addressed together, with the crack cocaine violation, as part of a single sentencing package, and these offenses thus are inextricably related. The Court therefore has the authority to reduce Mr. Jones's entire sentence under the First Step Act."); *United States v. Robinson*, 05-CR-322-009 (NAM) (Dkt. 1293), at 15 (N.D.N.Y. October 15, 2020) (finding the defendant eligible for relief whose RICO "conviction was premised, at least in part, on a violation of 21 U.S.C. § 841(b)(1)(A)"); *United States v. White*, No. 93-CR-97 (BAH), 2022 WL 3646614, at *11, 25 (D.D.C. Aug. 24, 2022) (granting relief to two defendants who received life sentences under RICO convictions); *United States v. Mothersill*, 421 F. Supp. 3d 1313, 1319-20 (N.D. Fla. 2019) (concluding the defendant's crack cocaine offenses clearly affected sentences on RICO and felony murder counts, warranting reduction on all counts).

Therefore, Mr. Miller's RICO conviction (Count One), which was based in part on objects that are covered offenses, is also a covered offense within the meaning of Section 404(a) of the First Step Act.

Count Three, which charges Mr. Miller with engaging in a CCE in violation of 21 U.S.C. §§ 848(a) and 848(b)(1), is also a covered offense. At the time of Mr. Miller's sentencing, 21 U.S.C. § 848(b) mandated a life sentence for anyone deemed a "leader of the enterprise" and engaged in a continuing criminal enterprise involving "at least 300 times the quantity of a substance described in [21 U.S.C. §] 841(b)(1)(B)." 21 U.S.C. § 848(b) (1995). Because § 848(b) cross-references the quantities in 21 U.S.C. § 841(b)—the quantities that the Fair Sentencing Act changed—this is a covered offense.[14] *See, e.g.*, *Palmer*, 35 F.4th

---

[14] The subsections under 21 U.S.C. § 848 provide different sentences depending on various triggering factors. Mr. Miller met these triggering

at 850 (holding that a CCE conviction under 21 U.S.C. § 848(b) is a covered offense because it incorporates threshold quantities from 21 U.S.C. § 841(b)); *Jimenez*, 2020 WL 2087748, at *2 (same).

Lastly, Mr. Miller committed all of his offenses before August 3, 2010. (*See* Am. Judgment at 1.) This court therefore finds that each of Mr. Miller's six charges for which he was sentenced to life are covered offenses.[15]

The Government does not dispute that Mr. Miller's convictions are covered offenses, instead stating without elaboration that

---

factors as his violation involved more than 1.5 kilograms of crack cocaine, and he was thus sentenced under 21 U.S.C. § 848(b), rather than the standard 21 U.S.C. § 848(a), which does not directly rely on any specific quantity of a narcotic substance. (*See* Sent'g Tr. at 28:12-33:21.) At least one Circuit court has held that a defendant sentenced under 21 U.S.C. § 848(a) would be ineligible for relief because there is not a direct cross-reference to the amended quantities. *See United States v. Thomas*, 32 F.4th 420, 429 (4th Cir. 2022). Under the logic of *Reed*, however, this is less clear. Because the continuing criminal enterprise involved in a § 848 violation could be one involving crack cocaine, and therefore a sentencing court may have been using a pre-Fair Sentencing Act view of crack cocaine to determine a sentence, a sentence under 21 U.S.C. § 848(a) may also have been affected had the changes been in place at the time of sentencing, despite § 848(a) not explicitly listing threshold quantities of crack cocaine. Here, however, the court need not address whether the First Step Act may apply to 21 U.S.C. § 848(a). Judge Dearie made clear that it was the threshold of drugs—the 1.5 kilograms—that mandated life imprisonment. (*See* Sent'g Tr. at 33:20-21.) Because Mr. Miller's sentence was based on § 848(b), a statute that cross-references the drug quantities in § 841, it falls under Section 404 as a covered offense. Moreover, the Government appears to concede the same logic, citing to § 841(b) when reviewing the purported cocaine base findings that led to a life sentence under the statute. (*See* Gov. Opp. at 6.)

[15] As noted, the court does not consider the remaining money laundering charge (Count Twelve), for which Mr. Miller was sentenced to 20 years because he has already served this sentence and thus it is not at issue here. *See supra* note 4.

"many of Miller's convictions are 'covered offenses.'" (Gov. Opp. at 6.) The Government does, however, object to the conclusion that Mr. Miller is eligible for resentencing on other legal grounds, namely that he has not "fully exhausted all administrative rights." (*Id.* at 5.) To support this claim, the Government cites to 18 U.S.C. § 3582(c)(1)(A), which requires exhaustion of administrative remedies. (*Id.* at 4-5.) As the Defense reiterates in its reply, however, Mr. Miller "does not seek compassionate release under § 3582(c)(1)(A), but rather [he] invoke[s] 18 U.S.C. § 3582(c)(1)(B) in seeking retroactive relief of the Fair Sentencing Act." (Def. Reply at 1; *see also* Def. Supp. Mot. at 1.) No exhaustion requirement exists under 18 U.S.C. § 3582(c)(1)(B), which authorizes modification of a term of imprisonment to the extent "expressly permitted by statute," and which the Second Circuit has confirmed is the proper avenue for First Step Act motions. *See United States v. Martin*, 974 F.3d 124, 137 (2d Cir. 2020). The court thus finds the Government's exhaustion argument to have no bearing on Mr. Miller's eligibility for resentencing. Mr. Miller is therefore eligible for relief under 18 U.S.C. § 3582(c)(1)(B) and the First Step Act.

### B.   Whether Resentencing is Warranted

Because Mr. Miller is eligible for relief, this court now considers whether, and to what extent, a reduction of his sentence is proper. *See Concepcion*, 597 U.S. at 495. The court first outlines its authority to resentence Mr. Miller below a previously mandated life sentence, before considering the relevant sentencing factors pursuant to 18 U.S.C. § 3553(a).

#### 1.   Minimum Sentences

Mr. Miller was sentenced to six life sentences, one for each of the relevant six counts. Five of these life sentences were imposed under statutes without statutorily mandated life sentences. Life sentences were mandated, however, under the Sentencing Guidelines that existed at the time. (*See* PSR ¶ 143.) *See also*

U.S.S.G. § 5A (Sentencing Table) (1992). Such Guidelines are no longer mandatory. *See United States v. Booker*, 543 U.S. 220, 245-46 (2005); *see also United States v. Ruggiano*, No. 05-CR-425, 2014 WL 6694799, at *1 (E.D.N.Y. Nov. 25, 2014) (explaining that while the "mandatory nature of the Guidelines has been excised," the Sentencing Commission's recommendations are now "advisory").

Mr. Miller's distribution of cocaine base charges (Counts Seven, Eight, Nine, and Ten) have statutory minimums of 10 years and statutory maximums of life under 21 U.S.C. § 841(b)(1)(A). (PSR ¶ 142.)[16]

Mr. Miller's racketeering charge (Count One) has a statutory maximum of life. (*Id.*) This is due to the underlying RAs in the charge. Pursuant to 18 U.S.C § 1963(a), any defendant convicted under § 1962 shall be "imprisoned not more than 20 years (or for life if the violation is based on a racketeering activity for which the maximum penalty includes life imprisonment)." 18 U.S.C § 1963(a). RAs One,[17] Five, Six, Seven, and Eight are violations of 21 U.S.C. § 841(a), (PSR ¶¶ 4-8), and therefore, just like Counts Seven, Eight, Nine, and Ten above, all have statutory minimums of ten years and statutory maximums of life. *See* 21 U.S.C. § 841(b)(1)(A). As all of these RAs have maximum penalties of life imprisonment, the statutory maximum for Count One is also life, rather than twenty years, with no mandatory minimum sentence under 18 U.S.C § 1963. (PSR ¶ 142.) The underlying RAs for crack cocaine distribution, however, have mandatory minimums of ten years. *See* 21 U.S.C. § 841(b)(1)(A).

---

[16] This statutory minimum is assuming the highest quantity of drugs possible, triggering the most severe punishment (absent death or bodily harm) under 21 U.S.C. § 841. These minimums could be even lower if there was a lower drug quantity.

[17] RA One is the conspiracy charge (21 U.S.C. § 846) related to the distribution under § 841(a). (PSR ¶ 4.)

Regardless, this court faces no statutory bar on a sentence lower than life.[18]

For Counts One, Seven, Eight, Nine, and Ten, Mr. Miller is therefore eligible for sentence reductions, if warranted, ranging anywhere from ten years to life imprisonment.[19]

Mr. Miller's remaining life sentence, relating to his CCE conviction under 21 U.S.C. § 848 (Count Three), is more complicated. (*See* Def. *Pro Se* Mot. at 7-8.) At the time of his sentencing, a basic conviction under 21 U.S.C. § 848 held a statutory minimum of 20 years. *See generally* 21 U.S.C. § 848(a) (1995). But if an individual was a principal administrator, organizer, or leader of a CCE and the enterprise involved more than 1.5 kilograms of crack cocaine, the individual was subject to a mandatory life sentence. *See* 21 U.S.C. § 848(b) (1995).[20] The sentencing court found Mr. Miller's violation to involve more than 1.5 kilograms

---

[18] Indeed, absent the crack cocaine distribution RAs, Mr. Miller would face a statutory *maximum* of 20 years. RA Ten is a violation of N.Y.P.L. §§ 115.05 and 20.00. (PSR ¶ 9.) As this act is a Class C Felony in New York State, *see* N.Y. Penal Law § 115.05, it has a statutory maximum of 15 years. *See* N.Y. Penal Law § 70.00. RAs Nineteen and Twenty are violations of 18 U.S.C. § 1956(a)(1)(B)(i). (*See* PSR ¶¶ 10-11.) Such violations hold statutory maximum sentences of 20 years. 18 U.S.C. § 1956(a). Therefore, it is only the crack cocaine distribution RAs that permit a sentence under Count One to be over 20 years. This analysis reinforces the court's conclusion, discussed *supra*, that it was the crack cocaine charges driving the sentence calculated and imposed under Count One. The crack cocaine distribution RAs drove sentencing under the Guidelines, and notably, had the highest statutory mandates.

[19] These were the same statutory ranges available at Mr. Miller's first sentencing on these counts. (PSR ¶ 142.)

[20] This provision, mandating a life sentence for a "leader" of an enterprise and the underlying felony involving more than 1.5 kilograms of crack cocaine, is often referred to as the "Super CCE" provision. *See Palmer*, 35 F.4th at 845.

of crack cocaine and sentenced him to the mandatory life sentence under 21 U.S.C. § 848(b).[21] (Sent'g Tr. at 33; Def. *Pro Se* Mot. at 7.)

But a jury did not make this drug quantity finding. (Sent'g Tr. at 28-33.) In Mr. Miller's case, the jury was never instructed on, and never found, the threshold drug quantity that triggered the mandatory life sentence. (*Id.* at 32.) Rather, the sentencing judge made the finding of 1.5 kilograms. (*Id.* at 33.) That finding led to a mandatory term of life imprisonment under 21 U.S.C. § 848(b). (*Id.* at 11:13-20 (the Government noting that Mr. Miller is subject to a mandatory life sentence under § 848(b) and the court agreeing); *id.* at 32:1-4 (the court expressing that "if the Second Circuit says the elements of 848(b) are issues of fact for the jury, then obviously the mandatory life provision doesn't apply because the jury wasn't instructed on those elements").)

While this judge-made finding by the sentencing judge rather than the jury may have been proper at Mr. Miller's original sentencing, it is improper today. In 2013, the Supreme Court held that "[f]acts that increase the mandatory minimum sentence are [] elements and must be submitted to the jury and found beyond a reasonable doubt." *Alleyne v. United States,* 570 U.S. 99, 108 (2013). Thus, a factual determination that increases the statutory mandatory minimum must now be found by a jury, not a sentencing judge. *Id.* at 108, 117.[22]

---

[21] It is because Mr. Miller met this triggering factor under 21 U.S.C. § 848(b) that he is clearly eligible for resentencing. *See supra* note 14. Had he been sentenced under 21 U.S.C. § 848(a), it is less clear if he would be eligible. (*Id.*)

[22] There was Second Circuit precedent at the time indicating that this finding needed to be made by the jury rather than the sentencing court. *See United States v. Torres,* 901 F.2d 205, 229 (2d Cir. 1990) (recognizing "it was the government's burden to prove all the elements of section 848(b) beyond a reasonable doubt"), *abrogated on other grounds by United States*

*Alleyne* does not have retroactive effect, *see United States v. Redd*, 735 F.3d 88, 92 (2d Cir. 2013), but it does inform the process by which this court goes about resentencing Mr. Miller. *See Concepcion*, 597 U.S. at 497-98 (emphasizing that "the language Congress enacted in the First Step Act" requires district courts to apply the Fair Sentencing Act "as if it applied at the time of the commission of the offense" when calculating the Guidelines "if they chose to modify a sentence"). In particular, the court today will not make a judge-made finding of drug quantity to invoke a mandatory minimum sentence under 21 U.S.C. § 848(b)(2); instead, this court will follow *Alleyne* and rely solely on the jury findings. 570 U.S. at 117-18. Absent such a new drug quantity finding by this court, Mr. Miller does not face a mandatory life sentence for his 21 U.S.C. § 848 conviction. The statutory sentencing range for the 21 U.S.C. § 848 conviction is 20 years to life imprisonment. *See generally* 21 U.S.C. § 848(a).

Even if this court adopted the sentencing court's prior judge-made findings, this would not be enough to invoke a mandatory life sentence under the statute today. Given the changes in threshold quantities over the years, the mandatory life sentence under 21 U.S.C. § 848(b) is only triggered today if there is a finding of over 8.4 kilograms of crack cocaine. *Jimenez*, 2020 WL 2087748, at *2. While the PSR indicated that the offense involved over 15 kilograms of crack cocaine, (PSR ¶ 99), Judge Dearie only explicitly found 1.5 kilograms of crack cocaine at Mr. Miller's original sentencing. (Sent'g Tr. at 33:20-21 ("THE

---

*v. Marcus*, 628 F.3d 36, 41 (2d Cir. 2010). Indeed, Defense counsel raised this point at sentencing, citing to *Torres*, and arguing a judge-made decision was improper. (Sent'g Tr. at 30:19-31:8.) As it was not material at that time, given Mr. Miller's multiple life sentences under the Guidelines, however, the court "reserve[d] [the issue] for another day." (*Id.* at 32:24.) To be clear, this court does not question Mr. Miller's original sentence. Whether or not a judge-made finding was proper then, it is improper now.

COURT: All I have to do is find 1.5 [kilograms], but in this instance I find 1.5. I could find 15.").) In 2010, Judge Dearie revisited the quantity of crack cocaine involved and stated Mr. Miller was "accountable for well in excess of 4.5 kilograms." (2010 M&O at 45.) Neither of these two findings meets the 8.4-kilogram threshold required today to trigger a mandatory life sentence.

The Government instead relies on Judge Dearie's comment at Mr. Miller's original sentencing that he "can find fifteen"[23] kilograms and also claims "the trial evidence established that Miller was responsible for at least 15 kilograms." (Gov. Opp. at 6.) While Judge Dearie's comment implies there may have been fifteen kilograms of crack cocaine involved, still missing from the Government's argument is any official finding—by either a judge or a jury—that Mr. Miller's violation included more than 8.4 kilograms of crack cocaine, which is the amount required to trigger a mandatory life sentence today. The Government is asking this court to make a new factual finding today that Mr. Miller's violation included more than 8.4 kilograms of crack cocaine to continue to trigger a mandatory minimum sentence. (*See id.*) This is exactly what *Alleyne* prohibits, and consequently, this court will not entertain such an inquiry.

Other courts have refused to allow judge-made factual findings to trigger mandatory minimums in similar situations for § 848 convictions. In *United States v. Palmer*, for instance, under the First Step Act, Judge Lamberth reduced the sentence of an individual previously facing a mandatory life sentence under 21 U.S.C. § 848(b), despite making a factual finding that the quantity of drugs involved was "at least 150 kilograms of crack cocaine." No. 89-CR-36 (RCL), 2023 WL 2265255, at *7-8, 14 (D.D.C. Feb. 28, 2023). Notwithstanding such a finding, Judge

---

[23] The court notes that this quote from the Government's opposition is not a direct quote from the sentencing transcript. (*Cf.* Sent'g Tr. at 33:20-21.)

Lamberth determined that 34 years, rather than life, was the appropriate sentence in large part due to the defendant's "remarkable" post-sentencing conduct. *Id.* at *7-8, 13.[24]

Similarly, in *United States v. Thomas*, the Fourth Circuit confirmed that "the district court found the facts necessary to impose a mandatory life sentence under § 848(b)" and that "today, and after the [Fair Sentencing] Act, the Government would have to prove beyond a reasonable doubt before a jury that [the defendant] possessed 8.4 kilograms of cocaine to receive the mandatory life sentence enhancement" under 21 U.S.C. § 848(b). 32 F.4th 420, 428-29 (4th Cir. 2022).[25]

Here, Count Three charged Mr. Miller with knowingly and intentionally engaging in a CCE involving in excess of 1,500 grams of cocaine base and being a "principal administrator, organizer and leader of the enterprise" in violation of 21 U.S.C. § 841(a)(1), § 846, §§ 848(a), (b)(1), and § 860. (*See* PSR ¶ 13.) Probation then confirmed, when calculating Mr. Miller's offense level, that his instant offense involved more than 15 kilograms of cocaine base

---

[24] Judge Lamberth made, and used, the drug quantity finding not to invoke a mandatory minimum but to calculate the defendant's current Guidelines range, which stood at 360 months to life. *Id.* at *8. Despite a life sentence still being permissible, Judge Lamberth found a reduction to be proper, resentencing the defendant to 34 years. *Id.* at *14.

[25] Not all courts follow this approach, however. The Eleventh Circuit, for instance, requires district courts considering First Step Act motions to adopt the factual findings of the prior sentencing judge. *United States v. Jackson*, 58 F.4th 1331, 1336 (11th Cir. 2023). As described *supra*, however, doing so in this case is unclear, as the prior sentencing court noted different drug quantity findings at different times, neither of which is over the 8.4-kilogram threshold of today's requirement. Nevertheless, mandating such an adoption seems to be an outlier approach across the country, especially in light of the broad discretion *Concepcion* gives to district courts considering First Step Act motions. *See generally Concepcion*, 597 U.S. 481.

to find a base offense level of 42. (*Id.* ¶ 79.)[26] In concluding that the Supreme Team was involved in distributing over 1,500 grams or 1.5 kilograms of cocaine base, the Probation Department relied on the Government's representations, explaining that the Government "could not provide the exact amount of crack" that the Supreme Team distributed throughout the years, but that the Government "maintains that the 'Supreme Team' was involved in distributing far in excess of 15 kilograms of crack." (*Id.* ¶ 63.)

At the time the report was made, Mr. Miller objected to this finding, noting that the Probation Department came to this conclusion "without indicating the specific bases for its conclusion." (*See* Def. PSR Objections (Dkt. 853-3) at 8.) In response, the Probation Department submitted an addendum to the PSR. (*See generally* Addendum to PSR (Dkts. 853-2, 853-3).) In the addendum, the Probation Department further explains that based on the information the Government provided, and "[s]ince the offense involved the period of several years, it appeared obvious that the drug operations in which the defendant was a participant produced, at the very least, several hundred kilograms of cocaine base over the duration of the instant offense." (*Id.* at 3.) Thus, as Probation writes, "although the Government did concede that it could not provide an exact amount . . . the Government did indicate that it could prove by a preponderance of evidence a cocaine base amount far in excess of 15 kilograms." (*Id.*)[27]

---

[26] To be sure, the base offense level was subsequently amended to a level of 38 per the amendment to U.S.S.G. § 2D1.1 that was made effective November 1, 1994. (*See* Amendments to PSR at ECF 1-2.)

[27] Notably, Mr. Miller also raised this issue, among others, on appeal, but the Second Circuit summarily dismissed his arguments, finding that they "present no arguably meritorious issue for [the Court's] consideration." *United States v. Miller*, No. 10-1432-CR, 2011 WL 13491992, at *1 (2d Cir. Dec. 30, 2011).

As noted above, this ad hoc process would not be proper under today's caselaw and guidance. Rather, based on the jury's factual findings, Mr. Miller's mandatory minimum sentence for his 21 U.S.C. § 848 conviction is 20 years, not life imprisonment. This is so because the jury only considered 21 U.S.C. § 848(a) for Count Three. *See* 21 U.S.C. § 848(a) (noting the statutory minimum is 20 years). (*See also* Am. Judgment at 1.)[28] Mr. Miller has already served 34 years. This court, therefore, faces no statutory requirement to impose an additional period of incarceration for any of Mr. Miller's convictions on resentencing.

## 2.   Rehabilitation and Section 3553(a) Factors

This court has wide discretion to determine Mr. Miller's new sentence, which includes a consideration of the changes in law and Mr. Miller's considerable rehabilitation over the past 34 years. *See Moore*, 975 F.3d at 92 n.36. Indeed, "[t]he First Step Act prescribes no procedure for assessing whether to exercise discretion in reducing an eligible defendant's sentence, but a district court's inquiry must be guided by sound legal principles." *United States v. King*, No. 00-CR-1108, 2023 WL 7386659, at *2 (E.D.N.Y. Nov. 8, 2023).

Looking at the totality of circumstances present in Mr. Miller's case, the court concludes that Mr. Miller is deserving of a lower sentence. The court will discuss Mr. Miller's rehabilitation over

---

[28] Per the Judgment entered in this case, the jury also considered 21 U.S.C. § 848(b)(1), which mandates life imprisonment for a leader who engages in CCE, but explicitly did not consider 21 U.S.C. § 848(b)(2). (Am. Judgment at 1.) Notably, § 848(b) is a conjunctive provision, requiring both clauses to be met in order to impose a life sentence. *See* 21 U.S.C. § 848(b) (mandating life for any person who is (1) a "principal administrator, organizer, or leader of the enterprise" AND either (2)(A) "the violation . . . involved at least 300 times the quantity of a substance described in [§ 841(b)(1)(B)]" OR (2)(B) the enterprise received "$10 million dollars in gross receipts" for the manufacture, importation, or distribution of a substance during any 12-month period).

the past 34 years, the Government's arguments against release, and then an appropriate sentence in accord with the sentencing factors set forth in 18 U.S.C. § 3553(a).

### a. Rehabilitation

While Mr. Miller himself admits that "[i]t has been a long process on the road to rehabilitation," (Miller Ltr. at 2), he stands before this court a different man than he was at sentencing: rehabilitated, remorseful, non-violent, and dedicated to helping others "free [themselves] from a criminal mindset and its addictive behaviors." (*Id.* at 4.)

Mr. Miller began his process of rehabilitation through internal reflection. As he writes, "I needed to identify the source of criminality that gradually crept into my life, which caused me to engage in criminal behavior." (*Id.* at 1-2.) As part of that reflection, Mr. Miller has participated in numerous educational and therapeutic courses in prison, resulting in over 1,500 hours of programming. (BOP Records (Dkt. 918-5) at 1-3.) This includes courses on topics such as healing, victim empathy, problem solving, drug abuse, diversity, and life after prison. (*Id.* at 1-5.) Mr. Miller has received a remarkable number of certificates due to his completion of these programs, including a certificate of successful completion of "Positive Psychology," (*id.* at 78); two certificates for completion of "OVC Victim Impact: Listen & Learn," (*id.* at 59, 62); two certificates for completion of "Victim Empathy Group," (*id.* at 21, 34); a certificate of appreciation for recognition as a positive parent or mentor, (*id.* at 56); and two certificates for completion of the "Inside Out Dad" program, for fathers who are incarcerated. (*Id.* at 58, 63.) Mr. Miller was also chosen to be a speaker at the graduation ceremony for Getting Ready for the Outside World ("GROW"), a program whose slogan is "Rethink, Rebuild, Refocus... ReEntry." (*Id.* at 101-104.) As Ryan Schuck, a Federal Bureau of Prisons ("BOP") Recreation Specialist at USP Allenwood, writes, "[Mr. Miller] is constantly

trying to better himself and spends the majority of his free time participating in educational courses offered by departments throughout the institution." (BOP Letters of Support ("BOP Letters") (Dkt. 918-3) at 24.)

His instructors note that he often served as a mentor to younger inmates in classes. A letter from CODE Treatment Specialist Suzanne Mitchell notes that Mr. Miller is one of the elder individuals in the group and his younger peers "often seek his guidance and direction regarding his past and current ways of thinking. Mr. Miller provides them with meaningful feedback in order to demonstrate that they have a choice in how to live their lives." (BOP Records at 17.) Assistant Food Service Administrator at USP Allenwood, B. Toomey, echoes this: "[W]hen another inmate in the program [] wanted to quit, [] Inmate Miller encouraged him to stay and helped that inmate finish the program, this is something that is rare in a prison setting." (BOP Letters at 28.)

These classes helped Mr. Miller appreciate and take responsibility for his past actions. Multiple fellow inmates, prison staff, and family write to this court about Mr. Miller's clear remorse for his past criminal activities. For instance, Luke Jones, an individual who served time with Mr. Miller and recently obtained relief under the First Step Act, writes, "I was [] able to recognize that [Mr. Miller's] process of reparations for his past criminal activity had already begun. I deduced this from talks we had in which [Mr. Miller] would show contrition for his past criminal conduct and empathy for those impacted by it." (*Id.* at 14.) J. Gosciminski, a BOP Senior Officer Specialist who has worked with Mr. Miller for over 15 years, writes, "I honestly believe in reform of offenders because of Mr. Miller and the years I have watched, worked with, and been around him." (*Id.* at 10.) And Mr. Miller's daughter further explains that "my father has expressed sincere remorse for his actions and has taken full responsibility for the consequences

of his mistakes. He understands the gravity of his past actions and is committed to making amends by leading a law-abiding life." (Family and Friends Letters of Support ("Family Letters") (Dkt. 918-6) at 16.)

Mr. Miller directly expresses sincere remorse to this court himself, noting it was important to his overall journey toward rehabilitation. As he explained in his letter, "I felt if I did not begin the process of rehabilitation with a repentant heart for the crimes I committed by understanding why I committed them, then there could be no real transformation." (Miller Ltr. at 2.) He explains that "[i]nstead of finding solutions to change life in the ghetto for myself and others, I added to the problems. I cannot express to this Court in mere words the enormous feelings of regret and remorse I have for the crimes I committed over 34 years ago." (*Id.* at 1.) He describes his past actions as "egregious, unlawful, shameful, and embarrassing" and "apologize[s] to the people of Queens County, and specifically the community of South Jamaica." (*Id.* at 2, 7.)

Mr. Miller's rehabilitation journey did not stop at repentance. Letters from others indicate Mr. Miller's interest in using his prior experiences to help others who may be facing situations similar to his own. Breon Hopkins, who previously served time in federal prison, writes on this point, stating, "[w]hen [I] asked about [Mr. Miller's] dedication [to giving back to others], [Mr. Miller] simply stated, 'When I realized the magnitude of what I had done, I understood how much of myself I needed to give back.'" (Family Letters at 10.)

Mr. Miller has dedicated his time in prison to helping individuals recently released or soon-to-be released from federal custody to live positive, law-abiding lives on the outside. In 2013, for example, then-36-year-old Richard Kelley was incarcerated with Mr. Miller at USP Allenwood. (BOP Letters at 20.) When Mr. Kelley was released from prison, he almost found himself once again

involved in a life of crime. (*Id.*) Mr. Kelley contends that it was Mr. Miller who played an essential role in helping him avoid re-cidivating: "Through my conversations with Mr. Miller I was challenged with various perspectives and was at a crossroads. I discovered the possibility of caring for something more than I cared for myself!" (*Id.* at 20-21.) Mr. Kelley goes on to express that

> [Mr. Miller] helped guide and give me a sense of com-fortability to be great in my 'NEW' [non-criminal] way! If he can help shape my mentality, he can help shape a lot of gentleman [sic] who faced what I faced! I'm grateful and hopeful that Your Honor grant this man the oppor-tunity to change the minds of Men and Women that think it's cool to do wrong. The goal today is to 'show' these youth that it's cool to do right.

(*Id.* at 21.)

Mouhahmet Cherry, another individual who was incarcerated with Mr. Miller, writes, "[Mr. Miller] has shown us that it's really not hard for inmates to change our lives around, or to be the best that we can become in life in a society based on law and order. . . . He doesn't want to see many of us make the same bad choices." (*Id.* at 5-7.) As Luke Jones recalls, Mr. Miller would have "heart-felt talks" with "the youth/young men who would be returning home to their loved ones . . . [and] urge those who were return-ing to society to treasure such an opportunity and to go live productive lives and make positive contributions to their loved ones and communities." (*Id.* at 16.)

The court takes particular interest in how Mr. Miller has grappled with the impact of seeing his peers be released from prison, often for similar crimes, with or without the aid of Mr. Miller. Mr. Mil-ler expresses:

26

> [S]eeing individuals return home to their families has
> been a challenging road to travel while serving a life sen-
> tence. I can't stop myself from thinking that I may likely
> die in prison. This weighs heavily on me when I think
> about my parents, daughter, and grandchildren. None-
> theless, the inner peace and joy of having changed my
> life around is rewarding. In addition, to share my change
> and feelings of redemption with the outside community,
> specifically with the younger generation, has been a great
> relief. I'm preventing others from engaging in a life of
> crime, violence, and incarceration.

(Miller Ltr. at 4-5.)

Such a positive, yet humble revelation is commendable. Mr. Mil-
ler has fueled his desire to return home by pouring his knowledge
and experience into others through advocacy and mentorship.
This advocacy has also included youth outreach, working with
organizers to help young boys struggling to stay out of crime.
One highschooler was introduced to Mr. Miller after undergoing
mediation at his school. He recalls how others spoke of Mr. Mil-
ler, noting that he has "helped our youth to stay in school and off
the streets," and explaining that Mr. Miller's support inspired him
to graduate middle school and attend high school. (Family Let-
ters at 42.)

Mr. Miller also works to improve the lives of prisoners, assisting
in the prevention of crime and violence, including by assisting
prison staff in maintaining peace and order. As Senior Officer
Specialist J. Gosciminski writes,

> If I had a problem with any of the inmates within my unit
> I would ask Mr. Miller to talk with them as to avoid any
> further incidents. Mr. Miller would take that inmate
> aside, talk with him, and the inmate would return to me
> with an apology. I have witnessed Mr. Miller stop fights
> on the yard before they escalated into a larger disruption.

(BOP Letters at 10.)

Rene Tellier, who served time with Mr. Miller and has since received compassionate release, also notes Mr. Miller's peacemaking ability: "I have seen Gerald Miller be a peacemaker between inmates and groups of inmates who were literally involved in heated arguments that could have led to extreme violence had he not stepped in as an arbitrator between the parties." (*Id.* at 26.) Indeed, Mr. Miller "takes great pride in being part of all of these groups that promote solidarity between the inmates to reduce the acts of violence within the prison." (Family Letters at 28.)

Mr. Miller's exemplary behavior in prison goes beyond preventing further crime and violence. He productively interacts with prison staff and takes pride in his work. Indeed, Mr. Miller insists it was his interactions with BOP staff that enhanced his rehabilitative efforts. (Miller Ltr. at 5 (noting that BOP staff's "purpose was to slow me down and make me pay attention to my actions. Studying their humanity toward one another enforced in me that there are rules to the road of living [and that] my life and others' lives are valuable").)

As Recreation Specialist Ryan Schuck explains, "Mr. Miller has been and is one of the best workers and best men that have been employed by our department. No matter what job we ask him to perform he always manages to exceed our expectations. He is one of, if not the most, consistent and trustworthy people that have worked for the recreation department." (BOP Letters at 24.) Another BOP Recreation Specialist at USP Allenwood, Rodolfo Hernandez, concurs, noting that "Mr. Miller conducted himself in an exemplary manner. He showed up to any and all briefings and classes on time and was always respectful towards all staff and inmates. Mr. Miller showed an eagerness to learn and was always accepting, and appreciative, of any feedback given to him." (*Id.* at 11.)

28

There are many examples of Mr. Miller helping fellow inmates in other ways. For example, he would share funds and items with other inmates who had less. (*See, e.g.*, *id.* at 22 ("Mr. Miller had a large heart when it came to feeding hungry inmates who were destitute of funds. He gave them food from his own commissary purchases and made sure they had personal hygiene items which many of them lacked."); *id.* at 24 ("Countless times I have witnessed him giving food, clothing, hygiene products, and other personal possessions to those around him who don't have as much. Almost every time he has received a bonus (in the form of candy/Gatorade/water bottle) as compensation for his superior work performance he has given it away to someone who needs it more.").) He also assisted other inmates with their legal cases. (*Id.* at 27 ("[Mr.] Miller helped an endless number of fellow inmates to file motions and appellate briefs. Amazingly he did these time-consuming projects without charging the recipients a service charge. I have even seen him go into his own pocket to pay for the typing and copying and mailing of prisoners' legal paperwork."). He even provided emotional support and advice for those struggling with mental health and the harsh realities of being confined in federal prison. (BOP Letters at 9 ("If it was not for Mr. Miller's encouragement and support I may have committed suicide. He helped me every day to keep going and was always there for me.").)

In addition to completing his GED while incarcerated, Mr. Miller also notes that he is 15 credits shy of obtaining an associate degree. (Miller Ltr. at 4.) And should Mr. Miller be released from prison, he intends to enroll in online courses to ensure he receives his degree. (*Id.*) Moreover, if Mr. Miller is released, it appears to the court that he already has the support system in place to continue bettering himself and helping younger individuals and his community at large.

Mr. Miller has received multiple job offers to work for social justice causes. Journalist and Film Producer Don Sikorski writes: "[I]f [Mr. Miller] is released from prison, he will have employment with my television production company, and we have plans for the future to tell more important and historical stories that focus on social justice, criminal justice, and mass incarceration." (Family Letters at 35.)

Tommy Walker, the CEO of 2nd Chance 4 R.E.A.L, also writes: "If granted a reduction in sentence, Mr. Miller would be a valuable asset to my organization and others, allowing him to continue his meaningful work in the field of law." (*Id.* at 41.) Mr. Miller also has the support and love of his family. (*See, e.g., id.* at 26 ("With us, as his immediate family, his daughter, his grandchildren, and related family support structures, he will achieve his vision with a measure consistency [sic] unlike anything he's ever done."); *id.* at 17 ("I would like to highlight that my father has a concrete plan for his post-release life. He has established a network of supportive individuals who can guide him in his journey toward successful reintegration.").)

Taken together, it is abundantly clear to the court that Mr. Miller has spent the last 34 years in federal custody transforming himself and taking what he has learned to make his community a safer and more peaceful place. Mr. Miller is surely a different person than the man who led a violent drug enterprise almost 40 years ago.

        *b.   The Government's Arguments Against Release*

The Government raises two principal arguments in opposing Mr. Miller's motion.

First, the Government argues Mr. Miller is not fully rehabilitated and "still fails to come to grips with the full damage he has caused his victims." (Gov. Opp. at 8.) This argument is unavailing as Mr. Miller himself expresses remorse consistently in his own writings.

(*See, e.g.*, Miller Ltr. at 1 ("I cannot express to this Court in mere words the enormous feelings of regret and remorse I have for the crimes I committed over 34 years ago."); *id.* at 2 ("[T]here is not a day that goes by when I do not express some form of regret over the egregious, unlawful, shameful, and embarrassing behavior that hurt my community and family."); *id.* at 7 ("I regret the choice I made to become a criminal."); *id.* ("I want to apologize to the people of Queens County, and specifically the community of South Jamaica.").) And multiple peers and prison staff echo Mr. Miller's contrition for his past actions and how he has sought to rehabilitate himself to move past who he was in his younger years. (*See, e.g.*, BOP Letters at 14 ("[Mr. Miller] would show contrition for his past criminal conduct and empathy for those impacted by it."); *id.* at 25 ("[Mr. Miller] has been a model inmate and has proven that he has fully rehabilitated himself."); *id.* at 28 ("I feel that if [Mr. Miller] were to re-enter society he would be a success story for the First Step Act and how programming can help reduce recidivism.").) Thus, contrary to the Government's arguments, Mr. Miller has demonstrated contrition for his prior conduct and overwhelmingly demonstrates full rehabilitation.[29]

---

[29] The Government also argues rehabilitation alone is not sufficient to provide an "extraordinary and compelling reason" for release. (Gov. Opp. at 6 (citing *United States v. Brooker*, 976 F.3d 228, 237 (2d Cir. 2020)).) This argument fails in two ways. First, the Defense is not arguing his rehabilitation alone warrants release. The primary argument—and indeed the only reason this court is looking to resentence Mr. Miller—is due to explicit changes in law. Mr. Miller's rehabilitation merely complements such changes. Under the First Step Act, looking to both changes in law and rehabilitation is the proper course. *See Concepcion*, 597 U.S. at 498 (holding consideration of post-conviction rehabilitation is "[c]onsistent with th[e] text and structure" of the First Step Act). Second, and more fundamentally, the Government miscites the provision under which Defense makes this motion. The "extraordinary and compelling" language that the Government references is the requirement under 18 U.S.C. § 3582(c)(1)(A), but

Second, the Government argues that "[e]ven if Miller were fully rehabilitated, resentencing still would not be merited." (Gov. Opp. at 8.) Here, the Government focuses on deterrence and the severity of Mr. Miller's conduct. (*Id.*) The Government is correct that Mr. Miller's crimes were serious. As described earlier when detailing the background of this case, Mr. Miller led a violent criminal organization that produced and distributed significant amounts of crack cocaine for years. Moreover, he maintained and expanded the organization's position through extreme violence and intimidation. As part of his reign, the court does not take lightly the fact that murders occurred and that Mr. Miller either oversaw or ordered them as "leader" of the Supreme Team. (*See, e.g.*, PSR ¶¶ 33-60.) The Government nevertheless argues that he has "refused to accept responsibility" for his role in the murders of "more than a dozen people." (Gov. Opp. at 7 ("Nowhere does he apologize to or even mention the families of [individuals]— all of whom Miller personally ordered to be executed.").) However, the court agrees that "such specific remorse is not required" and finds that "Defendant's remorse is sufficiently established in the record." *United States v. Tellier*, No. 92-CR-869 (LGS), 2022 WL 1468381, at *4 (S.D.N.Y. May 10, 2022).[30]

---

Mr. Miller brings his motion under 18 U.S.C. § 3582(c)(1)(B). *See United States v. Harris*, No. 04-CR-203 (ARR), 2022 WL 2315702, at *2 (E.D.N.Y. June 28, 2022) (explaining the different standards for motions brought under § 3582(c), which does not include a requirement for 18 U.S.C. § 3582(c)(1)(B) motions that the defendant show extraordinary and compelling reasons warranting a reduction), *reconsideration denied*, No. 04-CR-203 (ARR), 2022 WL 3053710 (E.D.N.Y. Aug. 3, 2022).

[30] The court notes the parties' arguments regarding uncharged murders, including murders for which Mr. Miller was expressly acquitted of, in part because he was incarcerated at the time of said murders. (*See* Gov. Opp. at 7; Def. Reply at 6-7.) The court does not consider the acquitted murders, particularly in light of anticipated 2024 Amendments to § 1B1.3 expressly excluding acquitted conduct from the scope of relevant conduct to consider when calculating one's Guidelines range. *See* U.S.S.G. Amend. (Nov. 1,

Contrary to the Government's arguments, invocations of general deterrence do not mandate a life sentence or prohibit the court from resentencing an individual to a sentence less than life when it has the authority to do so. This is especially the case when the Defendant has already served over 30 years and displayed significant—extraordinary in Mr. Miller's case—rehabilitation.

Thus, the court considers the severity of the crime when resentencing Mr. Miller. But it does so in light of the other factors that the court must consider.

In looking to deterrence of crime as a sentencing goal, the court acknowledges the need for a severe sentence for the offense conduct charged, which weighs against a reduction in sentence. Indeed, Mr. Miller led an extensive drug operation and used force and intimidation to do so. However, it would also seem that 34 years in prison is a lengthy sentence that would suffice for purposes of general deterrence. *See United States v. Bowman*, No. 92-CR-392 (LAP), 2020 WL 470284, at *2 (S.D.N.Y. Jan. 29, 2020) ("[O]ne would think that the 26 years of incarceration that [defendant] has served is sufficient to constitute general deterrence.").

It is also notable that Mr. Miller has shown a remarkable ability to intervene and prevent violence during his time in prison. (*See, e.g.*, BOP Letters at 10, 26.) Indeed, former inmate Luke Jones recalls "two occasions in which [he] was present when [Mr. Miller] intervened and resolved potentially deadly conflicts." (*Id.* at 17.) Mr. Miller has also encouraged younger individuals to turn away from crime and live productive lives. Reavon Brown, who served time in USP Allenwood with Mr. Miller, recalls, "[w]hen I

---

2024) at 1-4. Even including the remaining charged and uncharged conduct, however, the court reaches the same conclusion: Mr. Miller's evolution over the years is enough to overcome the severity of the "egregious, unlawful, shameful, and embarrassing behavior that hurt [his] community and family." (Miller Ltr. at 2.)

first met Mr. Miller I was a young misguided individual, but it was the work of Mr. Miller that helped me realize that my incarceration is suppose[d] to help me become a better person." (*Id.* at 1.) Mouhahmet Cherry adds, "[Mr. Miller] [l]ooks out for most the younger inmates . . . in the hopes that they will turn their lives around for the better once they regain their freedom." (*Id.* at 3.) Mr. Miller has even mentored young men outside of prison, discouraging them from turning to crime. Erica Ford, the CEO of LIFE Camp Inc., an anti-gun violence organization, writes: "[Mr.] Miller has made a significant impact on the community even while incarcerated. He has mentored a number of at-risk youth in our target area, guiding them away from gangs and a life of crime towards a more positive and productive path." (Family Letters at 7.)

If Mr. Miller has been able to have such a positive impact while in prison, one can only imagine the impact he could have if released. Indeed, many have imagined just that: "I am sure that if [Mr. Miller] can defuse potentially deadly conflicts in a prison setting . . . he can reach young gun-toting, drug-dealers and gang-bangers in society," (BOP Letters at 19); "I know in my heart that [Mr. Miller] could also renter [sic] society and positively affect youth who have turned to the streets and the gang culture, and be a force for change to help them turn their lives around," (*id.* at 30); "[Mr. Miller's] unique insights and experiences position him as an invaluable resource for combating the rise of violence and helping young people change their trajectory away from the pain, disease of violence, and generational trauma." (Family Letters at 7.)

Bill Underwood, who served time with Mr. Miller and has since received compassionate release, speaks to the unique privilege and responsibility Mr. Miller may have as a formerly incarcerated gang leader: "I know firsthand the cache we carry amongst the youth as former gang leaders. They hang onto our every word,

looking for positive reinforcement to justify going right instead of left. We can make a difference in our community, I see it every day as I speak to young men who have reentered society as positive members and are making a difference." (BOP Letters at 30.) Even Judge Dearie, over thirty years ago, saw Mr. Miller's potential to make a difference, observing that with his intelligence, he "could find some way, some way to discourage others who would likely admire you if they saw you on the street from following in your footsteps." (Sent'g Tr. at 56:6-9.) The numerous letters of support, certifications, and Mr. Miller's own words demonstrate that Mr. Miller has found that way.

The Government ignores this evidence and instead makes a vague allusion to general deterrence. (Gov. Opp. at 8 (emphasizing "the need to deter others from committing similar crimes").) The Government fails to explain how general deterrence outweighs the factors supporting release. How does continued imprisonment of a man who has served a lengthy term for leadership in a gang that ceased to exist decades ago, who has demonstrated contrition for his crimes, who has demonstrated an extraordinary record of rehabilitation, and who has spent his time incarcerated encouraging younger individuals to live law-abiding lives, deter crime today? The Government does not provide an explanation. *See United States v. Walker*, 252 F. Supp. 3d 1269, 1297 (D. Utah 2017), *aff'd*, 918 F.3d 1134 (10th Cir. 2019) (reviewing studies on deterrence and acknowledging that there is "at least some delusion in the concept that severe punishment effects general deterrence. The court does not doubt that incarceration has some general deterrent effect; however, this effect does not work on the level of precision that a sentencing court must in crafting sentences that truly effectuate sentencing purposes").

Therefore, neither of the Government's arguments—lack of rehabilitation or general deterrence—provides justification for

continued imprisonment of Mr. Miller. To the contrary, both arguments point to release. Mr. Miller is rehabilitated and positioned to use his experience and intelligence to discourage future crime and violence. In the words of Mr. Richard Kelley, who spent time in prison with Mr. Miller and currently runs a small business here in Brooklyn: "That man's voice and influence can continue to change lives Your Honor." (BOP Letters at 21.) This court looks forward to seeing Mr. Miller continue to change lives outside the confines of federal prison.[31]

### c.   Section 3553(a) Factors

Finally, a review of the § 3553(a) factors support a reduced sentence. *See King*, 2023 WL 7386659, at *2 (stating that "the factors found in 18 U.S.C. § 3553(a)" can guide "a district court's inquiry" under the First Step Act).[32]

In the present case, several § 3553(a) factors are particularly relevant here given the parties' emphasis on these factors in their briefs: the "nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," *id.* § 3553(a)(2)(A); to afford adequate deterrence to criminal conduct, *id.* § 3553(a)(2)(B); the need to provide "correctional treatment," *id.* § 3553(a)(2)(D); and the need to avoid "unwarranted sentence disparities among

---

[31] The court thanks every individual who submitted statements about Mr. Miller's character, behavior, and journey. While not every letter or anecdote could appear in this Opinion, the court reviewed the entire record extensively in making this decision and found all 36 letters very useful in determining who Mr. Miller is today and what a proper sentence would be.

[32] *But see Harris*, 2022 WL 2315702, at *2 (noting that in making a determination whether to reduce a defendant's sentence under the First Step Act, the court "may consider the sentencing factors articulated in 18 U.S.C. § 3553(a) but [is] not required to apply them").

defendants with similar records who have been found guilty of similar conduct." *Id.* § 3553(a)(6). The overarching goal of the 18 U.S.C. § 3553(a) factors, as set out in the first sentence of the statute, is for the court to "impose a sentence sufficient, but not greater than necessary."

As discussed *supra,* Mr. Miller is fully rehabilitated. Rehabilitation plays an important role when examining the § 3553(a) factors in resentencing a defendant that brought a motion under the First Step Act. In *Pepper v. United States,* the Supreme Court stated that "evidence of post-sentencing rehabilitation may be highly relevant to several of the § 3553(a) factors." 562 U.S. 476, 491 (2011). The Court went on to state that prohibiting lower courts from looking at such evidence at resentencing "conflicts with longstanding principles of federal sentencing law and contravenes Congress' directives in §§ 3661[33] and 3553(a)." *Id.* at 493. Indeed, in *United States v. Hernandez,* the Second Circuit vacated the judgment of a district court judge who failed to consider rehabilitation at resentencing. 604 F.3d 48, 55 (2d Cir. 2010). The court stated that a failure to consider rehabilitation and mitigating evidence was essentially a "fail[ure] to consider the Section 3553(a) factors." *See id.* The § 3553(a) factors, therefore, not only allow a court to look to rehabilitation but essentially mandate it as a guiding principle throughout the analysis. Mr. Miller's rehabilitation, therefore, underpins this court's entire § 3553(a) analysis, pushing it towards reduction.

Mr. Miller has taken full advantage of the therapeutic and educational offerings available in prison to understand the negative impact of his past actions and change his mindset and behavior going forward. (*See* Def. Supp. Mot. at 14-23.)

---

[33] 18 U.S.C. § 3661 reads: "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

Mr. Miller's own words best reflect the work he has done in support of this conclusion:

> It has taken quite a long time for me to realize I suffered significant trauma after the killing of 10-year old Clifford Glover on April 28, 1973. . . . Yet that trauma provides no excuse for my later criminality, neither does poverty. My decision to begin selling drugs at 21 years old in July 1984, was a bad choice to engage in criminal activity, which turned to guns and violence, contributing to the degradation of my community. . . . But faced with the reality of dying in prison, I had to think about the kind of person I wanted to be. I wasn't born with a criminal minded acquired character. My parents never raised any of their children to become criminals. We were raised by our parents to place our faith in GOD, to make something positive out of our lives, to help people, and to respect the law. . . . I did an honest self-evaluation about my past life. I pinpointed my problems and set out upon a real, constructive path to overcome the internal and external realities that caused me to engage in criminal behavior. To grow, I had to use empathy as a tool in my tool belt to help me be a better decision-maker. Now, I'm teaching other inmates this process . . . [and if] I can prevent just one child, teenager, or young adult from making a bad choice now that can destroy their life in the future, then I'm accomplishing my goals. It gives me some solace and hope.

(Miller Ltr. at 1, 4-5.)

In considering the "nature and circumstances of the offense and the history and characteristics of the defendant" and the seriousness of the offense, 18 U.S.C. § 3553(a)(1)-(2)(A), there is no question that Mr. Miller's conduct was egregious. As he himself describes, he participated in a "violent cocaine base trafficking

organization" that used "guns and violence" to "contribut[e] to the degradation of [his] community." (*See* Def. *Pro Se* Mot. at 1; Miller Ltr. at 1.) In 2010, Judge Dearie described the gang, in which Mr. Miller served as a leader, as having a "disturbing record of violence and gruesome killings." (2010 M&O at 1-2.) After being charged, Mr. Miller went on to threaten "acts of violence against his attorney, who of course feared for her life" and engaged in "ploys and misconduct" to prevent conviction. (*Id.* at 2-3.) This resulted in an upward adjustment for obstruction of justice. (PSR ¶ 74.) His first years in prison were then riddled with unruly behavior as he "accumulated fourteen disciplinary infractions" between 1993 and 2000. (Def. Supp. Mot. at 11.) Clearly, the "nature and circumstances of the offense" and the crime's seriousness point to the need for a lengthy sentence.

This, however, is not where the factors end; indeed, it is not even where the first factor ends, which goes on to prompt courts to examine "the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). Such an examination paints a different picture. As described *supra*, Mr. Miller is a completely different man than he was over 30 years ago. He is now 62 years old—an age where the rate of recidivism is greatly reduced. *See* U.S. Sentencing Commission, Recidivism of Federal Offenders Released in 2010, 24 (Sept. 2021), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210930_Recidivism.pdf (noting that recidivism rates steadily decline with increasing age and finding that the lowest rearrest rates were for offenders age 60 and older); *United States v. Piggott*, No. 94-CR-417, 2022 WL 118632 (SHS), at *3 (S.D.N.Y. Jan. 12, 2020) (noting advanced age as a relevant factor for predicting recidivism). While in prison, Mr. Miller actively prevents violence amongst others; he encourages others to live law-abiding lives; and, contrary to the Government's assertion, he is sincerely remorseful. Moreover, Mr. Miller has not had a single infraction in eight years, and no major infraction in over

20 years. (Def. Supp. Mot. at 10 & n.5.) In the words of Senior Officer Specialist J. Gosciminski, "Mr. Miller has taken a negative in his life, forged through and grown to become a leader in his community." (BOP Letters at 10.) Therefore, this first factor considers his offenses and the nature of his crime, but it also considers Mr. Miller's efforts over the past 30 years.

As discussed *supra*, the time Mr. Miller has already served is significant and does promote both general and specific deterrence. Moreover, when released, Mr. Miller is subject to five years of supervised release with conditions that prohibit Mr. Miller from frequenting any place where controlled substances are illegally sold, used, distributed, or administered, and from associating with any person engaged in criminal activity. (*See* Am. Judgment at 4.) This additional level of supervision ensures that Mr. Miller will not reenter society and immediately commit more crimes, and the court finds that his release would not put the public at undue risk. Indeed, Mr. Miller has participated in numerous programs, obtained his GED, and is a few credits away from obtaining his associate degree. Mr. Miller's exemplary record show that he is properly incentivized and capable of living a law-abiding life.

The sixth factor examines "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). As the Defense lays out, multiple individuals with criminal records very similar to Mr. Miller—individuals with convictions for gang-related violence and drug distribution—have had their sentences reduced in recent years and have successfully rejoined society. (Def. Supp. Mot. at 34-35.) Additionally, over 30 years ago—at a time when the law was undoubtedly harsher on sentencing individuals, particularly those of color, involved in crack cocaine enterprises, other defendants received sentences that weigh in favor of Mr. Miller's release. *See United States v.*

*Burrell*, No. 97-CR-998-1 (RJD), 2020 WL 5014783, at *3 (E.D.N.Y. Aug. 25, 2020) (explaining that Section 404 of the First Step Act was enacted "in response to a broad consensus that penalties for crimes involving crack cocaine were excessively harsh" and "disproportionately affected Black defendants").[34] Indeed, Lorenzo Nichols, who pleaded guilty to ordering multiple gang-related murders in Queens around the time of Mr. Miller's conviction,[35] received 40 years for his crimes and has since been released. *United States v. Nichols*, No. 88-CR-496 (ERK), 2023 WL 2071296, at *1-2 (E.D.N.Y. Feb. 17, 2023). Because multiple individuals with convictions[36] similar to Mr. Miller's have recently been released from prison, keeping Mr. Miller in prison would create an "unwarranted sentence disparit[y]" between him and those "with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

---

[34] The Government offered Mr. Miller a plea deal for 40 years for his crimes. (Def. Supp. Mot. at 38; Gov. Opp. at 8.) While Mr. Miller did not take this plea, and therefore does not receive the benefits it may have brought, it is also indicative of plea offers for similar crimes, which one can only assume others throughout the years have taken.

[35] Of note, Mr. Nichols was charged and sentenced for ordering the murder of Isaac Bolden, the same murder for which Mr. Miller was convicted of facilitating. As the Defense notes, however, the difference between Mr. Miller and Mr. Nichols is that Mr. Nichols took the Government's plea offer of 40 years—the same offer Mr. Miller received but rejected. (*See* Def. Reply at 8.) While in the context of comparing sentences between co-defendants, courts have reduced sentences in part due to the gross disparities between those who chose to exercise their constitutional right to a trial as opposed to those who chose to take plea deals. *See United States v. Russo*, 643 F. Supp. 3d 325, 334 (E.D.N.Y. 2022) (citing cases). Of course, the foresight to accept responsibility early on, obviating the need for trial, is conduct that should result in a lower sentence, but that such a scenario results in gross disparities is a factor courts consider because such disparities do "not reflect the goals of sentencing." *Id.* at 335.

[36] This refers to convictions obtained through trial or through plea offers.

It is also notable that Mr. Miller is one of two original co-defendants still serving time for his involvement in the Supreme Team organization. (December 2, 2022 Memorandum & Order Denying Wilfredo Arroyo Motion Under 18 U.S.C. § 3582(c)(1)(A) (Dkt. 912) at 2-3.) As Mr. Miller was the highest-ranking leader, (*id.* at 2), it is unsurprising that his sentence was longer than many of the other former Supreme Team members who have rejoined society. Additionally, two co-defendants, who were sentenced to life, died in prison. (*Id.* at 2 n.2.) The only other co-defendant who remains in federal custody is Wilfredo Arroyo, and Judge Dearie denied his motion for compassionate release in 2022. (*Id.* at 4.) This court recognizes that Mr. Miller's release may create a sentence disparity between him and Mr. Arroyo, who was second-in-command under Mr. Miller in the Supreme Team. (*Id.* at 1.) This court does not believe, however, that this one disparity plays a large enough role to combat evidence of many others convicted of similar crimes who have since been released, including the other Supreme Team co-defendants. Moreover, Mr. Arroyo's motion was not a First Step Act motion but instead a compassionate release motion, requiring him to meet the "extraordinary and compelling reasons" requirement. (*Id.*)[37] As he brought the motion using a different avenue, and his factual circumstances differed greatly from those of Mr. Miller, this court does not believe one man's sentence is enough to change the analysis under the sixth factor. As such, this factor points to a reduction for Mr. Miller.

As for the victims of Mr. Miller's crimes, the Government provides no evidence that such individuals seek continued punishment for

---

[37] Mr. Arroyo filed a motion for a reduced sentence pursuant to the First Step Act on August 26, 2024. (*See* Arroyo Mot. (Dkt. 922).) The undersigned is neither the presiding judge over Mr. Arroyo's motion, nor does he make any conclusions about the merits of his motion.

Mr. Miller. (*See generally* Gov. Opp.) Absent any evidence relevant to this specific case, it is difficult for this court to reach any conclusions as to whether victims would or would not support the continued incarceration of Mr. Miller at a time when he is fully rehabilitated and expresses sincere remorse for his crimes.[38]

Further, as discussed *supra*, it is this court's belief that society at large would benefit from Mr. Miller's release, rather than his continued incarceration. He has demonstrated an ability to assist his community and mentor younger individuals from engaging in a life of crime. He has multiple job offers waiting for him, related to criminal justice and anti-violence work. (*See* Family Letters at 7, 34-35.) Ultimately, he has demonstrated that he may be a productive member of society.

While in every case, the court takes a risk in releasing a defendant back out onto the streets, the record that has been presented to this court, in consideration of the sentencing factors, warrants the release of Mr. Miller.

To Mr. Miller, "being in prison gave [him] the time, strength, and commitment to focus on changing [his] life around." (Miller Ltr. at 5.) He further adds, "If the truth be told, I should be thanking

---

[38] This court acknowledges that victims are not a monolith in their beliefs about sentencing, especially in complicated situations. *See* Hugh M. Mundy, *Forgiven, Forgotten? Rethinking Victim Impact Statements for an Era of Decarceration*, 68 UCLA L. Rev. Discourse 302, 304-08 (2020) (opening with an anecdote about victims' families, some of whom sought the continuation of a life sentence while others sought immediate release, in a setting where the defendant had already served 30 years). This is further complicated by the fact that, as the Government states, "[m]any of [Mr. Miller's] victims were rival drug dealers." (Gov. Opp. at 7.) As some of these individuals may have served time themselves or been impacted by incarceration, it is difficult to know their opinions on an individual's release after 30 years in federal custody. This court, therefore, does not draw any conclusions on this issue.

the United States Attorney's office for the Eastern District of New York. I'm a better person today due to my imprisonment." (*Id.*)

This court agrees and finds that the 34 years Mr. Miller has served in prison sufficient to reflect the goals of sentencing.

## IV. CONCLUSION

Mr. Miller is eligible for resentencing under 18 U.S.C. § 3582(c)(1)(B) and the First Step Act as each of his six life sentences are covered offenses. In light of Mr. Miller's remarkable rehabilitation and demonstrated ability to be a productive member of society, both policy rationales and an analysis of the § 3553(a) factors favor reduced sentences. This court, therefore, GRANTS Mr. Miller's motion and reduces his sentence to time served with five years of supervised release to follow. Specifically, five years of supervised release on Counts One, Three, Seven, Eight, Nine, and Ten to run concurrently, and three years of supervised release on Count Twelve to run concurrently with the other counts. All other conditions of supervised release remain.

This Order is STAYED for up to 30 days for the verification of the defendant's residence, establishment of a release plan, and to make appropriate travel arrangements for his release. The court will notify Probation to help facilitate Mr. Miller's release. As soon as a residence is verified, a release plan is established, and appropriate travel arrangements are made, the Defendant shall be released. If more than 30 days are needed to make these preparations, the parties shall immediately notify the court and show cause why the stay should be extended. Should Probation or the Government wish to include any additional special conditions to Mr. Miller's order of release, they are DIRECTED to advise the court within 14 days of this Order.

SO ORDERED.

Dated:    Brooklyn, New York
          September 6, 2024

                                          /s/(NGG)

                                    NICHOLAS G. GARAUFIS
                                    United States District Judge